IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BP AMOCO CHEMICAL COMPANY, ) <br> ) <br> Plaintiff/Counter-defendant, ) <br> ) <br> vs. ) <br> ) <br> FLINT HILLS RESOURCES, LLC, ) <br> ) <br> Defendant/Counter-plaintiff, ) | Consolidated Case Nos. <br> 05 C 5661 & 05 C 6795 |
| FLINT HILLS RESOURCES, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BP CORPORATION NORTH ) <br> AMERICA INC., ) <br> ) <br> Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff/counter-defendant BP Amoco Chemical Company (BP Amoco) brought a declaratory action against defendant/counter-plaintiff Flint Hills Resources, LLC (Flint Hills), seeking a declaration that it had not breached a contract that it entered into with Flint Hills. Two months later, Flint Hills filed a two-count counterclaim, alleging breach of contract and fraud. Flint Hills also brought a separate action against the guarantor of the contract, BP Corporation North America, Inc (BP North America) (referenced together with BP Amoco as defendants), alleging fraud and two counts of breach of contract. BP Amoco has moved to dismiss and strike Flint Hills' counterclaim, and BP North America has moved to dismiss and strike Flint Hills' amended complaint. The two actions have been consolidated. For the

following reasons, defendants' motions are granted in part and denied in part.

## BACKGROUND

The brief recitation above may create an impression of an intertwined and complex procedural posture. Fortunately, the claims arise from one transaction and there is but a single, albeit extensive, contract. BP Amoco sold a chemical plant in Joliet, Illinois, and related assets, to Flint Hills, pursuant to an Asset Purchase and Sale Agreement (Sale Agreement) dated March 29, 2004. Flint Hills assumed control of the plant and its assets two months after the parties signed the Sale Agreement. The sale price was $225,000,000, including working capital of $75,000,000. As would be expected for a transaction of this magnitude between sophisticated business entities and their financial advisors, negotiations were extensive. The 131-page Sale Agreement is the product of those discussions. BP North America, BP Amoco's parent, agreed to serve as guarantor, and to that effect it entered into a Performance Guarantee (Guarantee) with Flint Hills on May 28, 2004.

Flint Hills states that after coming into possession of the plant it encountered problems that required substantial sums to redress. These issues primarily involve the plant's environmental compliance, mechanical repair, and production capacity (cc ¶5). According to Flint Hills, BP Amoco verbally represented that the plant complied with environmental laws, was mechanically and structurally sound, and was able to produce at increased production levels. Flint Hills asserts that many of these representations were embodied in the Sale Agreement (*id.* at ¶¶6, 13, 19).

On December 21, 2004, Flint Hills informed BP Amoco that the contract had been breached and set forth the damages precipitated by the breach. After discussion between the

parties, BP Amoco filed a declaratory judgment action against Flint Hills on September 30, 2005. Flint Hills responded by filing its two-count counterclaim on October 17, 2005. It then brought a separate action against BP North America on December 1, 2005, alleging breach of the Sale Agreement and fraud, in terms virtually identical to those in the counterclaim. Flint Hills also alleges that BP North America breached the Guarantee.

In moving for dismissal of both counterclaims, BP Amoco argues that the terms of the Sale Agreement bar Flint Hills' counterclaims. BP Amoco argues that the counterclaims are based on alleged verbal representations that Flint Hills cannot rely on due to the integration clause in the Sale Agreement. BP Amoco identifies two flaws with the reliance element of the Flint Hills' fraud claim. It first argues that Flint Hills cannot establish reliance as a matter of law, in light of the no-reliance clause. It also contends that reliance is not pled with the particularity required by Federal Rule of Civil Procedure 9(b). BP Amoco also emphasizes that the plant was sold "as-is" and that all liabilities were transferred to Flint Hills. The Sale Agreement also excuses BP from liability for lost profits, consequential damages and punitive damages, and therefore, BP argues, bars Flint Hills' requests for those damages. According to BP, the counterclaim is not comprised of short and plain statements but instead includes irrelevant and immaterial matter, warranting dismissal under Federal Rules 8(a)(2) and 12(f).

BP North America incorporates the above arguments made by its subsidiary, and further argues that Flint Hills only alleges breaches of representations and warranties made by BP Amoco, and that the Sale Agreement only required that it guarantee the performance of agreements, covenants and obligations. Similarly, the Guarantee only required BP North America to ensure the performance of contractual obligations, which, according to BP North

America, do not include representations and warranties. As to the fraud claim, BP North America argues that Flint Hills fails to distinguish between statements made by it and BP Amoco, and that the claim is therefore not pled with the requisite specificity.

In response to these arguments for dismissal, Flint Hills asserts that its claims are based on representations in the written agreement, and verbal representations that are embodied in the Sale Agreement. Flint Hills also argues that BP Amoco cannot preclude a fraud claim with the integration or no-reliance clause, because the claims are partly based on representations in the Sale Agreement. Flint Hills further contends that it is too early to dismiss the damages claims, which it asserts are not barred by the Sale Agreement. Lastly, Flint Hills claims that the scope and content of the counterclaim and complaint are justified by the nature of the defendants' breaches and fraud, and that allegations regarding an explosion at another plant are relevant to BP Amoco's business practices.

## DISCUSSION

Under Rule 12(b)(6), a complaint may be dismissed if it fails to state a claim upon which relief can be granted. Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 901 (7th Cir. 2004). Dismissal is proper when it appears beyond a doubt that there exist no facts to support the allegations. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The court accepts all well-pleaded allegations and draws all reasonable inferences in plaintiffs' favor. Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971, 981 (7th Cir. 2004). Since a motion to dismiss tests the sufficiency of the complaint, matters outside the complaint are generally not considered. However, documents attached to the complaint, such as the Sale Agreement and Guarantee, become part of it for all purposes (See Fed. Rule. 10(c)), and the motions need not be converted

to motions for summary judgment. Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002); Menominee Indian Tribe v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998).

As noted above, BP Amoco emphasizes that the integration and non-reliance clauses bar the breach of contract and fraud claims. The integration clause is found in section 16.7 of the Sale Agreement, and states that the agreement, together with related exhibits and schedules "constitute the entire agreement and understanding between the parties hereto pertaining to the transactions contemplated hereby and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties relating to the subject matter hereof." Section 16.7 further sets forth that no oral and written representations, warranties, promises, or inducements have been made that are not embodied in the agreement. All liability is disclaimed for any such statements made in any form, including those set forth in the documents known as the Descriptive Memorandum and Data Room, as well as in management presentations made by BP Amoco to Flint Hills.

Section 7.3, which is titled "Independent Investigation," also includes broad disclaimers of warranty and liability. It states:

> Neither seller nor any other member of the BP Group makes any representation or warranty, express or implied, at law or in equity, with respect to itself, the assets, rights or liabilities transferred or licensed pursuant to this agreement and the implementing agreements, and seller and the other members of the BP Group make no, and expressly disclaim any, implied warranties, including any warranty of merchantability, satisfactory quality or fitness for a particular purpose or for any use or purpose whatsoever, or any representation or warranty as to value.

Section 7.3 states that the assets, rights and liabilities are sold "'as is, where is', in their present condition and . . . state of repair, with all faults, limitations and defects." Section 7.3 further disclaims all warranties and representations made in regard to the present condition and

future operating or financial performance of all sold assets, to the "accuracy, reliability, materiality, completeness or otherwise of any information, documents or materials made available to [Flint Hills]," and "to any information, statement, belief, estimate, opinion, expectation, forecast, projection or assumption made or communicated (orally or in writing) to [Flint Hills]." Echoing section 16.7, liability is specifically disclaimed for all information presented in the Descriptive Memorandum, Data Room, and management presentations. Significantly, each disclaimer is prefaced with the language, "except for the express representations, warranties and indemnities contained in sections 3.1, 7.1 and 16.1 and Article 13 hereof."

According to BP Amoco, Flint Hills relies on prior oral and written representations, and by so doing essentially attempts to write the section 16.7 integration clause and the section 7.3 no-reliance provisions out of the Sale Agreement. Typically, an "integration clause prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written, that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself." Vigortone AG Products v. PM AG Products, 316 F.3d 641, 644 (7th Cir. 2002); *see also* Much v. Pac. Mut. Life Ins. Co., 266 F.3d 637, 644 (7th Cir. 2001) (*quoting* Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 706 N.E.2d 882, 885-86, 236 Ill. Dec. 8 (Ill. 1999)). It is true that Flint Hills makes reference to prior oral and written statements in the complaint, including representations made in the Descriptive Memorandum and Data Room, which cannot be relied on under section 7.3, and cannot serve as the basis for liability under section 16.7.

However, the counterclaim also makes specific reference to section 7.1 (*see* cc ¶¶ 6, 49, citing section 7.1(j)(i); ¶¶ 13, 19, 52, 53, citing section 7.1(d)(ii); ¶ 50, citing section 7.1(j)(viii)(B); ¶ 51, citing section 7.1(j)(iii); and ¶ 54, citing section 7.1(d)(v)). Section 7.1 sets forth the seller's representations and warranties. In section 7.1(j), BP Amoco represented and warranted that it was "in compliance with all Environmental Laws which require reporting deviations and/or certifications of compliance." In section 7.1(d)(ii), BP Amoco represented and warranted that "[a]ll of the Joliet Plant process units and buildings are structurally sound, and all tangible Assets have been maintained substantially in accordance with normal industry practice, are in substantially good operating condition." Section 7.1(d)(ii) further represents that the plant "is capable of making TMA, purified isophthalic acid and MAN that consistently meet [BP Amoco's] standard specifications," and details specific "annualized maximum demonstrated sustainable production" of those chemicals.[1] Flint Hills' citations to these sections supports its claim that the plant's environmental non-compliance, structural problems, and inability to meet increased production levels breached the Sale Agreement.

By basing its claim on section 7.1, Flint Hills relies on the written agreement, and complies with section 16.7's integration clause. The claims based on section 7.1 also steer clear of the no-reliance provisions, which under the terms of section 7.3 do not apply to the representations and warranties contained in section 7.1. Thus, by virtue of the complaint's specific reference to section 7.1, the breach of contract claim is not barred by either the integration clause or the no-reliance clause.

---

[1] It is difficult to tell if the production amounts set forth in section 7.1(d)(ii) relate to excess capacity. But at this stage, resolution of that issue is not necessary as all reasonable inferences are made in Flint Hills' favor.

With respect to the extra contractual representations, Flint Hills contends that they may be relied upon because they are embodied in the written agreement. If the extra contractual representations are truly embodied in the Sale Agreement, then reference to the agreement itself should suffice. This conclusion is consistent with the integration clause and section 7.3, both of which expressly preclude reliance on extra contractual material, including the Descriptive Memorandum, Data Room, and management presentations. Section 16.7 does state that no representations, warranty, promise, inducement or statement of intention has been made "which is not embodied in this Agreement." But it would be unreasonable to read this clause to permit reference to prior representations that are purportedly consistent with the written agreement. Such a reading would null the plain import of the integration clause, which emphasizes the text of the written agreement and excludes reliance on the Descriptive Memorandum and Data Room. Flint Hills agreed that it would base any claims only on the written agreement. It cannot now go beyond that agreement to establish liability.

The fraud claim also references the representations made in section 7.1 (cc ¶ 181). Flint Hills asserts that the references were "made verbally and in writing, and were embodied in the Agreement signed by Mike Wrenn on British Petroleum's behalf on March 29, 2004." *Id.* Flint Hills further alleges that BP Amoco knew the statements were false, but made them to induce the plant's purchase. An integration clause does not bar reliance on extra contractual statements that support a fraud claim. Fraud is a tort, and the integration clause functions "[b]y virtue of the parol evidence rule," which "is not a doctrine of tort law." *Vigortone*, 316 F.3d at 644. However, an express no-reliance clause does bar a fraud claim because it precludes satisfaction of the reliance element. *Id.* at 645. Here the no-reliance clauses exempt section 7.1,

and the representations embodied in that section form the basis of the fraud claim, as well as the breach of contract claim. It would thus appear that the fraud claim is outside the scope of the no-reliance clause. However, this convergence with the contract claim warrants dismissal of the fraud claim.

In CERAbio LLC v. Wright Med. Tech., 410 F.3d 981, 990 (7th Cir. 2005), the court considered an allegation of fraud that "pertain[ed] to the character and quality of the product that is the subject matter of the contract." In such a situation, "[t]ort remedies are inappropriate where commercial contracting parties could have easily protected themselves from the misrepresentation of which they now complain." The court so observed in the context of a discussion of the economic loss doctrine, which "seeks to preserve the distinction between contract and tort law and to prevent parties from eschewing agreed-upon contract remedies and seeking broader remedies under tort theory than the contract would have permitted." Id. at 987. See also Mars, Inc. v. Heritage Builders of Effingham, Inc., 327 Ill. App. 3d 346, 351, 763 N.E.2d 428, 434, 261 Ill. Dec. 458, 464 (Ill. App. 4th Dist. 2002) ("the economic-loss rule is founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover damages caused by a breach of contract."). Neither BP Amoco nor Flint Hills discuss the economic loss doctrine, yet we are mindful of its policy concerns, which include upholding reasonable commercial expectations, and respecting the deliberate allocation of economic risks in contracts. See also In re StarLink Corn Products Liability Litigation, 212 F. Supp. 2d 828, 838-39 (N.D. Ill. 2002).

Here, the bases of Flint Hills' fraud claim: environmental compliance, mechanical

soundness, and production capacity, are all addressed in the Sale Agreement. Indeed, the issues are all subjects of bargained-for warranties. Prior representations on these subjects were disclaimed and Flint Hills pledged that it would not rely on any representations or information not contained in the written agreement.

Further, the no-reliance clause prevents Flint Hills from establishing reliance. As in CERAbio, the Sale Agreement allocated the risks to Flint Hills that the information provided by BP Amoco might be incomplete or incorrect. CERAbio, 410 F.3d at 991. By accepting those risks, Flint Hills could not reasonably rely on any extra contractual representations.[2] *Id.* The no-reliance clause is "part of the negotiated bargain." CERAbio, 410 F.3d at 992 (citing Rissman v. Rissman, 213 F.3d 381, 383 (7th Cir. 2000)). Reliance is typically an issue of fact, but it can be dealt with as a matter of law when, as here, no trier of fact could find the reliance to be reasonable. Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir. 2001). BP Amoco and Flint Hills are sophisticated business entities who were represented by equally sophisticated financial advisors. The allocated risks were all bargained for, with Flint Hills agreeing to independently investigate any and all representations, the falsity of which being a known and accepted risk. Flint Hills' reliance on any extra contractual statements was unreasonable as a matter of law, and it accordingly cannot establish the reliance element of its fraud claim. *See* Tirapelli v. Advanced Equities, Inc., 351 Ill.App.3d 450, 458, 813 N.E.2d 1138, 1145-1145, 286 Ill.Dec. 445 (Ill. App. 1 Dist. 2004).

Turning to BP Amoco's remaining grounds for dismissal, it is premature to strike the

---

[2] To the extent that the analysis considers the economic loss doctrine, assuming that any exception applies, such as the intentional false representation exception (*see* Faust Printing, Inc. v. MAN Capital Corp., 2006 U.S. Dist. LEXIS 44140, *18-19, 2006 WL 1719532 (N.D. Ill. 2006)), Flint Hills could not establish the reliance element of its fraud claim.

request for compensatory damages that may or may not be barred by the exclusive remedy provisions in section 13.6. *See* Central DuPage Health v. 3M Co., 2005 U.S. Dist. LEXIS 26042, *11, 2005 WL 2848396, *4 (N.D. Ill. 2005). However, the request for punitive damages is stricken, as it relates to the fraud claim which must be dismissed.

Rule 8(a)(2) states that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The counterclaim and complaint do at times, stray into the narrative, rather than presenting a concise version of the claims and relevant background events. There is also reference to extra contractual representations that cannot ultimately be relied upon to support the breach of contract claims. Flint Hills states that the complaint's length is justified by defendants' conduct. However, neither that conduct nor the nature of Flint Hills' claims or theories of relief nullify Rule 8(a)(2). Vicom, Inc. v. Harbridge Merchant Services, 20 F.3d 771, 776 (7th Cir. 1994). The counterclaim and complaint are lengthy documents, but they still weigh in at approximately half the size of the complaints in Vicom, 20 F.3d at 775 and Hartz v. Friedman, 919 F.2d 469, 471 (7th Cir. 1990), which were ultimately considered on the merits. The complaint is neither incoherent nor unintelligible, and it is not sufficiently cumbersome or confusing to justify the drastic measure of dismissal under Rule 8.

If in the future, specific aspects of the complaint present concrete difficulties, the proper course would be targeted motions to strike under Rule 12(f). For example, BP Amoco moves to strike allegations under the heading, "The British Petroleum Standard" (CC ¶¶ 129-134). These allegations describe an explosion at "British Petroleum's Texas City Refinery on Wednesday, March 23, 2005" (*id.*, ¶ 129). BP Amoco is not being sued for non-compliance

with safety standards in different plants, or the deaths and injuries caused by any other incidents. This claim is for breach of contract and fraud. This information is thus immaterial under Rule 12(f). Reference to this explosion risks prejudicing BP Amoco and confusing the issues by drawing attention away from the terms of the Sale Agreement and the details of the transaction. Manuel v. Lucenti, 2004 U.S. Dist. LEXIS 23102, *6-7; 2004 WL 2608355 (N.D. Ill. 2004).

We now turn to Flint Hills' complaint against BP North America, and begin with Count III, which alleges fraud. This claim suffers the same fate as the fraud claim contained in the counterclaim. Flint Hills cannot meet the reliance element in light of the no-reliance clause, and any available remedies are limited to those recoverable under the warranties contained in the contract. Without the fraud claim, only the two breach of contract claims remain against BP North America. In Count I, Flint Hills claims that BP North America "materially breached section 16.17 of the Sale Agreement because BP Amoco Chemical Company did not perform all of its obligations, actions and requirements necessary to make BP Amoco Chemical Company's representations and warranties true and correct on the date on the Agreement and the date of the sale of the Plant" (cplt. ¶ 179). And in Count II, Flint Hills claims that BP North America "breached the Performance Guarantee by failing to ensure that BP Amoco Chemical Company duly performed all of its obligations under the Purchase and Sale Agreement" (id., ¶ 189).

In section 16.17 of the Sale Agreement, BP North America agreed "to take all action necessary to cause" BP Amoco "to perform all of [its] respective agreements, covenants and obligations under this Agreement and whenever this Agreement requires [BP Amoco] to take

any action, such requirement shall be deemed to include an undertaking of [BP North America] to cause [BP Amoco] to take such action." In the Guarantee, BP North America "absolutely and unconditionally guarantees the due performance by [BP Amoco] of all obligations of [BP Amoco] under the terms of the [Sale Agreement]" (Guarantee ¶ 1). BP North America argues that these provisions do not encompass Flint Hills' breach of contract claim, which is based on the section 7.1 representations and warranties made by BP Amoco, and not any agreement, covenant or obligation.

Flint Hills takes the position that BP North America becomes liable when BP Amoco committed a breach. *See* Resp. at 9 ("Both the Agreement and the Performance Guaranty clearly contemplate that if the Seller breaches, the Guarantor is liable"). Citing the closing clause of section 16.17, Flint Hills further contends that the Sale Agreement obligates BP North America to the same extent as BP Amoco. Section 16.17 and the Guarantee are broad provisions, but they are not without limits. Section 16.17 only requires BP North America to ensure that all contractual "agreements, covenants and obligations" are performed, and to see that all contractually required action occurs. Similarly, the Guarantee requires BP North America to ensure that BP Amoco's contractual obligations are performed.

Section 7.1 details BP Amoco's representations and warranties, which are statements and promises that certain past or existing facts are true. Specifically, the section 7.1 representations that are the backbone of Flint Hills' breach of contract claim all relate to past or existing conditions of the plant (*see* section 7.1(j)(i) (compliance with environmental laws); 7.1(j)(iii) (has filed notices, reports, and certificates, and that all such notices are complete); 7.1(j)(viii)(B) (environmental control equipment is operating and in compliance); 7.1(d)(ii)

(process units and buildings are structurally sound); 7.1(d)(ii) (setting forth annualized maximum demonstrated sustainable production levels)).

Perhaps recognizing that neither section 16.17 nor the Guarantee expressly covered representations and warranties, Flint Hills anchors BP North America's breach on the failure to ensure that BP Amoco performed its obligations and took the conduct necessary to make its representations and warranties true. This allegation would state a claim under the contract if the relevant provisions of section 7.1 required BP Amoco to secure any environmental permit that had not been obtained, fix any building structure that was not maintained, increase production capacity as necessary, or take any other action in order to make the representations and warranties true. But section 7.1 contains no affirmative duties; it is only a recitation of past and existing conditions.

Neither party claims that the contract language here is ambiguous, and our inquiry is therefore limited to the four corners of the Sale Agreement. Even though the terms in dispute are not defined in the Sale Agreement, they are consistently treated as different, and we must therefore assume that they are not interchangeable or synonymous. For example, section 10.1(a) of the Sale Agreement, which is in the article that details the conditions precedent to Flint Hills' obligations, states that the representations and warranties are "true and accurate at and as of the Closing Date as though such representations and warranties were made at and as of such date." But section 10.1(b) states that BP Amoco will have "performed and complied in all material respects with all of its covenants, agreements, obligations and conditions" that are contractually required on or prior to the Closing. Further, Article 13, which discuss survival, indemnification, and third party claims, states that "[c]ovenants, obligations and

agreements shall survive until fully performed." However, section 13.1(c) states that section 7.1(j) claims "shall survive until the fifth (5th) anniversary of the Closing."

Section 7.1(b) does include the term "obligation," but that brief reference does not somehow transform the subsequent representations and warranties in sections 7.1(j) and (d) into obligations for the purposes of section 16.17 and the Guarantee. In section 7.1(b) BP Amoco represented and warranted that it and BP North America had the power and authority to perform their obligations under the Sale Agreement. Like the other representations listed above, section 7.1(b) is merely a statement relating to an existing condition. In contrast, in section 13.2(a), BP Amoco agreed to indemnify Flint Hills for any breach of warranty or representation in section 7.1. Under section 16.17, and the Guarantee, it would seem that BP North America would be required to ensure that any necessary indemnification occurred. We trust that the sophisticated parties knew how to include the terms "representations and warranties" in section 16.17, and the Guarantee, and find their decision not to do so to be significant.

Thus, focusing on the language of the Sale Agreement, Flint Hills' claims that BP North America breached section 16.17 and the Guarantee, by failing to have BP Amoco perform its obligations pursuant to section 7.1, fails to state claims upon which relief can be granted. The Sale Agreement and the Guarantee only require BP North America to ensure the performance of obligations, covenants, agreements and contractually required action. By the terms of the contract, the section 7.1 representations and warranties do not fall within those categories.

## CONCLUSION

For the foregoing reasons, the motions to dismiss and strike the counterclaim against

BP Amoco and complaint against BP North America are granted in part and denied in part. Count II of the counterclaim alleging fraud is dismissed. Paragraphs relating to a refinery explosion in Texas are stricken. The motion to dismiss the breach of contract claims against BP Amoco is denied. BP North America's motion to dismiss is granted.

*JAMES B. MORAN*
Senior Judge, U. S. District Court

Aug. 25, 2006.