**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BP AMOCO CHEMICAL COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter–Defendant, | ) | |
| | ) | Consolidated Case No. 05 C 5661 |
| v. | ) | |
| | ) | |
| FLINT HILLS RESOURCES, LLC, | ) | |
| | ) | |
| Defendant/Counter–Plaintiff. | ) | |
| ———————————————— | ) | |
| | ) | |
| FLINT HILLS RESOURCES, LLC, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BP CORPORATION NORTH AMERICA INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff/Counter-Defendant BP Amoco Chemical Company ("BP Amoco") filed suit

seeking a declaration that it had not breached a contract with Defendant/Counter-Plaintiff Flint

Hills Resources, LLC ("Flint Hills"). (R. 8-1, Am. Compl.) Flint Hills filed counterclaims

against BP Amoco for fraud and breach of contract. (R. 14-3, Answer & Countercls.) Flint Hills

also filed a separate action against the guarantor of the contract, BP Corporation North America

Inc. ("BP North America"), for breach of contract and fraud. (R. 10-1, 05 C 6795, Flint Hills'

Am. Compl.) The cases were consolidated. BP Amoco and BP North America (collectively

"BP") have moved for partial summary judgment on Flint Hills' "production capacity"

counterclaims.  (R. 220-1, Mot. for Partial Summ. J.)  For the reasons discussed below, the Court

denies BP's Motion for Partial Summary Judgment.

## BACKGROUND[1]

In May 2004, BP Amoco sold a chemical plant located near Joliet, Illinois (the "Joliet

Plant") and related assets to Flint Hills, pursuant to an Asset Purchase and Sale Agreement

("PSA").  (R. 223-1, BP's Rule 56.1 Stmt. Facts ¶¶ 3, 5, 25; R. 263-1, Def.'s Rule 56.1 Stmt.

Add'l Facts ¶ 1.)  The sale price was over $300 million.  (R. 223-3, Ex. 1, App. to BP's Rule

56.1 Stmt. Facts, Purchase & Sale Agreement § 5.1, at 60.)  In recent years, the Joliet Plant has

produced three chemicals: (1) trimellitic anhydride ("TMA"); (2) purified isophthalic acid; and

(3) maleic anhydride ("MAN").  (BP's Stmt. Facts  ¶ 5.)

The parties engaged in extensive negotiations over the terms of the 131-page PSA.  (*Id.* ¶

23.)  During negotiations, Flint Hills requested that the PSA include a representation as to the

Joliet Plant's production capacity for each of the three chemicals it produces.  (*Id.*)  Flint Hills

initially asked BP to guarantee the "effective capacity" numbers included in the Confidential

Information Memorandum ("CIM") which BP distributed as a marketing document to

prospective buyers, including Flint Hills.  (*Id.* ¶¶ 13, 23.)  BP refused to do so because, among

other reasons, the Joliet Plant's effective capacity after the sale would depend on Flint Hills'

---

[1] When determining summary judgment motions, the Court derives background facts
from the parties' Local Rule 56.1 statements, which assist the Court by "organizing the evidence,
identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a
disputed fact with admissible evidence."  *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524,
527 (7th Cir. 2000).  Local Rule 56.1(b)(3)(B) requires the nonmoving party to admit or deny
every factual statement proffered by the moving party and to concisely designate any material
facts that establish a genuine dispute for trial.  *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d
940, 944 (7th Cir. 2005).

ability to operate the Joliet Plant's production units in an efficient manner similar to that of BP Amoco, which BP could not guarantee. (*Id.* ¶ 23.) Instead, the parties discussed whether BP would guarantee the "nameplate capacity" of the production units given in the CIM. (*Id.* ¶ 24.) The CIM defined "nameplate capacity" to mean "annualized maximum demonstrated sustainable production." (R. 223-5, Ex. 2, App. to BP's Stmt. Facts, Descriptive Mem. at 30.) One way nameplate capacity differs from effective capacity is that nameplate capacity does not account for planned or unplanned downtime. (BP's Stmt. Facts ¶ 24.)

The production capacity representation contained in Section 7.1(d)(ii) of the PSA states:

Seller represents and warrants to Buyer, as of the date of this Agreement, and as of the Closing, as follows:

The annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons,[2] respectively, with the product produced meeting Seller's standard specifications therefor, recognizing that such demonstrated capacity does not take into account planned or unplanned downtime.

(BP's Stmt. Facts ¶ 26.) The PSA contains no other statements regarding capacity. (*Id.*) The PSA does not define the phrase "annualized maximum demonstrated sustainable production" ("AMDSP") or any of the individual words in that phrase. (*Id.*) Similarly, the PSA does not specify how long a rate must be achieved to be deemed "demonstrated" or "sustainable." (*Id.*)

BP now seeks partial summary judgment on Flint Hills' breach of contract and fraud claims arising out of the PSA's production capacity representation. The central issue underlying

---

[2] The PSA represented rates were given in metric tons, but other documents in the record give various production capacity rates in the form of a two- or three-digit number followed by "kmt" or "kte," both of which stand for one thousand metric tons. (*See* R. 264-6, Ex. 3A, App. to Def.'s Stmt. Add'l Facts, Expert Report of Dr. Russell A. Ogle at x (sealed).) Thus, 170,000 metric tons is the same thing as 170 kmt and 170 kte.

both claims is whether BP accurately represented the production capacity rates. That determination depends, in part, on the interpretation of the capacity representation.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, ---, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed. R. Civ. P. 56(e)). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*; *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## ANALYSIS

BP seeks partial summary judgment on Flint Hills' breach of contract and fraud claims stemming from Section 7.1(d)(ii) of the PSA—the "production capacity" representation. The

Court first will address the disputed meaning of the representation. The Court will then turn to whether Flint Hills has presented sufficient evidence to create genuine issues of material fact on its breach of contract and fraud claims. Summary judgment is inappropriate if the evidence would permit a jury to find in favor of the nonmoving party. *See Springer v. Durflinger*, 518 F.3d 479, 486 (7th Cir. 2008).

## I.    Intended Meaning of the Production Capacity Representation

### A.    Contract Interpretation Law

Under Illinois law, which controls here under the PSA's choice-of-law clause (BP's Ex. 1, PSA § 16.14, at 70), the determination of whether a contract is ambiguous, as well as the construction of an unambiguous contract, are questions of law for the Court. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219, 314 Ill. Dec. 133, 140, 874 N.E.2d 43, 50 (Ill. 2007); *Cent. Ill. Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 153-54, 290 Ill. Dec. 155, 163, 821 N.E.2d 206, 214 (Ill. 2004). "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher*, 874 Ill. 2d at 232, 314 Ill. Dec. at 148, 874 N.E.2d at 58. Under Illinois law, contracts are interpreted according to the "four corners" rule: "'[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined by the language used. It is not to be changed by extrinsic evidence.'" *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992-93 (7th Cir. 2007) (quoting *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005) (citations and internal quotation marks omitted)). In applying this rule, courts first look to the language of the contract alone. *Camico*, 474 F.3d at 993 (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 236 Ill. Dec. 8, 10, 706 N.E.2d 882,

884 (Ill. 1999)); *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58 ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.").  Under Illinois law, contract terms are interpreted according to their plain meaning unless otherwise defined.  *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004).  "Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." *Id.*; *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58.  When a contract contains an integration clause, extrinsic evidence may not be used to create ambiguity in an otherwise unambiguous contract. *Air Safety*, 185 Ill. 2d at 465-66, 236 Ill. Dec. at 11-12, 706 N.E.2d at 885-86.

If the language of the contract is facially clear and unambiguous, courts interpret the contract as a matter of law without the use of extrinsic evidence.  *Camico*, 474 F.3d at 993; *Air Safety*, 185 Ill. 2d at 462, 236 Ill. Dec. at 10, 706 N.E.2d at 884.  Only if the contract language is ambiguous is extrinsic evidence admissible to aid in resolving the ambiguity and ascertaining the intent of the parties.  *Camico*, 474 F.3d at 993; *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58.  "The fact that parties disagree about the meaning of a contractual provision does not mean the contract is ambiguous." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000).  A contract provision is ambiguous only if it is susceptible to more than one reasonable interpretation.  *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 893 (7th Cir. 2004); *Interim Health*, 225 F.3d at 879; *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 166 Ill. 2d 520, 529, 211 Ill. Dec. 459, 463, 655 N.E.2d 842, 846 (Ill. 1995).  The general rule in Illinois is that when contract language is ambiguous and therefore

must be decided on the basis of extrinsic evidence, summary judgment is inappropriate. *Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005); *Loyola Acad. v. S&S Roof Maint., Inc.*, 146 Ill. 2d 263, 272, 166 Ill. Dec. 882, 886, 586 N.E.2d 1211, 1215 (Ill. 1992). An exception to this rule, however, is that when the extrinsic evidence and the inferences to be drawn from that evidence are undisputed, the interpretation of the ambiguous contract is a question of law for the court and summary judgment may be appropriate. *Cont'l Cas. Co.*, 427 F.3d at 1041; *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 341, 294 Ill. Dec. 348, 363, 830 N.E.2d 760, 775 (Ill. App. Ct. 2005).

### B.    Section 7.1(d)(ii) Is Ambiguous on Its Face

The parties dispute the meaning of several aspects of the production capacity representation. BP argues that the production capacity representation in Section 7.1(d)(ii) of the PSA is wholly unambiguous and supports its interpretation. (R. 222-1, BP's Br. in Supp. of Partial Summ. J. at 11.) Thus, BP would have the Court interpret the language without resort to extrinsic evidence. Flint Hills, however, generally contends that the provision is ambiguous and that extrinsic evidence is required to ascertain its intended meaning.[3] (R. 262-1, Def.'s Resp. Br. at 11-12, 14.) Flint Hills offers its own "reasonable" interpretation of the PSA's plain language in support of its position. (*Id.* at 12.) Because the PSA contains an integration clause (BP's Ex. 1, PSA § 16.7, at 67), the Court determines whether the production capacity representation is ambiguous from the contract itself without reference to extrinsic evidence. *Air Safety*, 185 Ill. 2d

---

[3] Flint Hills at times also argues that BP's construction of certain disputed portions of the production capacity representation is unreasonable and that the provision's plain meaning supports its interpretation (*see* R. 262-1, Def.'s Resp. Br. at 12-13), but the bulk of Flint Hills' arguments concerning contract interpretation assume it is ambiguous and focus on establishing the intended meaning by reference to extrinsic evidence.

at 465-66, 236 Ill. Dec. at 11-12, 706 N.E.2d at 885-86.

## 1.    Simultaneously Versus Individually Operating Units

Most significantly, the parties disagree as to whether the PSA's production capacity representation warrants the capacity of each production unit running simultaneously or individually.  Flint Hills argues that the language refers to all three units operating simultaneously.  (R. 262-1 at 13.)  BP, on the other hand, contends that it refers to each unit operating one at a time.  (R. 222-1 at 14; R. 293-1, BP's Resp. to Def.'s Rule 56.1 Stmt. Add'l Facts ¶ 19 ("Nothing in the PSA represents simultaneous production capacity, much less simultaneous production at maximum rates.").)  Section 7.1(d)(ii) of the PSA warrants that the "annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons, respectively."  Looking solely at its language, the capacity representation is ambiguous as to whether the parties intended the representation to refer to the simultaneous or individual production capacity of the three units.

Flint Hills argues that the capacity representation warrants each production unit's annualized maximum demonstrated sustainable production capacity when all three units are operating simultaneously at maximum capacity.[4]  (R. 262-1 at 13.)  This is a reasonable construction of the provision.  Flint Hills' reading is buoyed by the fact that the representation

_____

[4] Flint Hills neither explicitly rejects nor embraces a third reasonable interpretation: simultaneous production of one unit at maximum capacity while the others operate at a lower capacity.  BP, in contrast, expressly disavows this reading.  The Court does not need to resolve whether Flint Hills adduces this as an alternative position for purposes of this motion because Flint Hills contends that the Joliet Plant's production units cannot produce at the represented PSA rates whether running individually or simultaneously.  (Def.'s Stmt. Add'l Facts ¶ 19.)  The Court assumes for now that neither party supports this interpretation.

for all three units is made in a single sentence and is joined by the conjunctive "and." BP, on the other hand, argues that the representation cannot reasonably be interpreted as warranting the simultaneous AMDSP capacity of the three production units. (R. 222-1 at 14.) BP notes that the provision does not explicitly state that the rates are for "simultaneous" production or production "at the same time." (*Id.*; R. 292-1, BP's Reply Br. at 14.) BP argues that Flint Hills' version impermissibly adds terms on which the parties did not agree. (R. 222-1 at 14.) Yet, neither does the provision explicitly state what BP claims, for it does not state that the represented rates are for each unit running "one at a time" or "alone." *See Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038-39 (7th Cir. 1998). Nevertheless, the plain language is also reasonably susceptible to BP's interpretation. BP further contends that the word "respectively" supports its interpretation. (R. 222-1 at 14; R. 292-1 at 14-15.) The American Heritage Dictionary defines "respectively" as "singly in the order designated or mentioned." American Heritage Dictionary, Office Ed. 712 (4th ed. 2001). BP argues that the "parties' agreement to use the word 'respectively' [] confirms that each production unit's AMDSP is given 'singly'—not on a simultaneous basis." (R. 292-1 at 15.) In arguing against Flint Hills' version, BP contends that the plain and ordinary meaning of "and" is as a conjunction to join elements of a sentence and that "the average person would not understand the word 'and' without more to mean 'simultaneous' or 'at the same time.'" (*Id.* at 14.) For like reasons, the cited definition and the plain and ordinary meaning of "respectively"—to indicate that an item in a later series refers only, or singly, to the item in the corresponding ordinal position in a prior series—does not resolve whether the represented rates refer to simultaneous or individual production. In sum, the production capacity representation is susceptible to more than one reasonable construction, and

therefore it is ambiguous on its face. Because BP—the moving party—argued only that the representation is unambiguous, it did not submit extrinsic evidence to support resolving the ambiguity in its favor. Therefore, the Court need not consider whether the extrinsic evidence can be used to resolve the ambiguity.

### 2. Meaning of "Annualized Maximum Demonstrated Sustainable Production"

The parties also dispute the meaning of the phrase "annualized maximum demonstrated sustainable production." Neither that phrase nor any of the individual words in the phrase are defined in the PSA. (BP's Stmt. Facts ¶ 26.) Citing dictionary definitions for each of the words separately in this phrase, BP contends that the "plain, ordinary, and popular meaning" of Section 7.1(d)(ii)'s production capacity numbers is the "greatest possible rate, supported by reasoning or evidence, at which each of the three different chemicals could be produced over some period of time, extrapolated into an annualized number." (R. 222-1 at 12.) Flint Hills, as discussed below, contends that the words have a different intended meaning and demand a different showing in order for the representation to be accurate. (R. 262-1 at 12.)

More specifically, the parties disagree about the meaning of the words "demonstrated" and "sustainable." (*Id.* at 13-14.) Nothing in the PSA specifies the length of time a rate must be achieved in order for it to be considered "demonstrated sustainable production," and BP does not suggest what that period of time is or what specific factors go into the determination. (*Id.*; R. 222-1 at 14.) The only specific facts BP alleges or provides to explain how it derived the represented numbers, however, indicate that it calculated the AMDSP rates by annualizing certain daily production rates that it claims were supported by evidence. (R. 222-1 at 12-13.) Yet, BP claims it calculated the PSA represented rates using a different set of evidence, factors,

and calculations for each of the production units. (*Id.*; BP's Stmt. Facts ¶ 34.) In that vein, BP asserts that the represented rates were "demonstrated" as long as "undisputed evidence establishes that BP Amoco had empirical and reasonable bases supporting its determination of the AMDSP amounts for each of the production units." (R. 220-1 ¶ 8; *see* R. 222-1 at 12-13.) Under BP's interpretation, AMDSP rates are accurate as long as supported by empirical bases. Flint Hills, in contrast, argues that the word "demonstrated" requires actual production data identifying particular days (enough to be "sustainable") when the units achieved production amounts that, when annualized, equal the represented rates. (R. 262-1 at 12, 14.) One dictionary defines "demonstrate" to mean "to prove or make clear by reasoning or evidence" as well as "to illustrate and explain esp. with many examples." Merriam-Webster's Collegiate Dictionary 308 (10th ed. 1999). Requiring examples in the form of actual production data at equivalent PSA rates is a reasonable, ordinary, and popular meaning of the word "demonstrated." Further, while BP's interpretation of "demonstrated" arguably calls for softer and less easily verified proof, it too is reasonable. The term "demonstrated" does not require the represented rates to be verified by actual historical production records—other forms of "reasoning or evidence" may suffice. Both readings are reasonable but, according to the parties, will lead to different results. The plain language simply does not indicate whether "sustainable demonstrated production" requires the production unit to have actually achieved and maintained a given level of production for a specific amount of time or whether support from some amalgamation of factors is sufficient and, if so, what those factors must be.

The PSA's plain language further does not clarify whether "demonstrated sustainable" rates must have been achieved for and maintained over three hours, three days, or thirty days.

Combining the definitions from two dictionaries, BP states that "sustainable" means "able to keep an action or process going for a period of time." (R. 222-1 at 12.) BP argues that the AMDSP numbers were the maximum rates at which the chemicals "could be produced over some period of time." (*Id.*) BP's interpretation renders the term "sustainable" almost meaningless and is not reasonable in this context. One hour—and even one minute—is of course "some period of time." But BP cannot reasonably contend that a production rate achieved for one hour, if it could be measured, would constitute "demonstrated sustainable production" pursuant to the parties' reasonable expectations about the meaning of this negotiated representation of the annualized capacity of complex chemical production processes.

Flint Hills' reading of "sustainable" to mean "able to produce . . . for any duration" implies that the represented maximum demonstrated rate could be maintained forever. (R. 262-1 at 12.) This is also not a reasonable interpretation. The word "annualized" indicates that the representation refers to a production capacity rate that was demonstrated and sustainable for some period less than a year, and the word "maximum" indicates that the given rates are not the average or continuously achievable demonstrated rates. Since "sustainable" is not fairly susceptible to either proffered interpretation, it is ambiguous. *See Bourke*, 159 F.3d at 1037. Alternatively, Flint Hills would have the Court presume that "sustainable" refers to a period of at least 30 days (*id.* at 14), but as BP points out, Flint Hills bases that default time period on extrinsic evidence and not on the provision's plain language. (R. 222-1 at 14.) While such extrinsic evidence would be admissible to explain the intended meaning of this ambiguous term, the Court cannot consider it because BP has not moved for summary judgment based on extrinsic

evidence in support of its interpretation.[5]

Looking solely at the language of the production capacity representation within the context of the entire agreement, the Court cannot discern its intended meaning. Therefore, summary judgment must be denied. The phrase "annualized maximum demonstrated sustainable production" is ambiguous on its face and requires extrinsic evidence to determine its meaning.[6]

## C. The Production Capacity Representation Does Not Limit Damages

BP argues that the production capacity representation covers only the three named "production units," and therefore, Flint Hills cannot recover any damages related to items outside of the production units, specifically "support facilities, the IPA unit, and working capital." (R. 222-1 at 16-17.) BP has moved the Court to find that Flint Hills cannot recover damages related to any items outside the "production units." (*Id.*) Flint Hills argues that to the extent that shared or non-shared equipment outside the production units prevents a unit from producing at the PSA represented rates (however interpreted), it is entitled to damages in the amount necessary to make the production units capable of producing at those rates. (R. 262-1 at 16-17.)

### 1. Impact of the Term "Production Units"

---

[5] BP also argues that Flint Hills is attempting to convert the represented annualized rate into a warranted "average daily" rate. (R. 222-1 at 14-15.) Flint Hills' interpretation of the production capacity representation may be in error. But the fact that Flint Hills may treat or internally express the capacity representation as a daily rate is irrelevant to deciding the contract interpretation question. The Court is not considering extrinsic evidence at this point.

[6] The parties do not challenge the meaning of the term "maximum" and, as a matter of law, it is unambiguous. The Court, however, pauses to emphasize its agreement with BP that "the word 'maximum' does not mean . . . a rate that can be run constantly, but is instead an upper boundary which actual values may fall below." (R. 292-1 at 12.) Any interpretation of the production capacity representation must not flout this material limitation.

The parties dispute the scope of the phrase "production units" and whether Flint Hills can recover damages related to equipment that is not part of the represented "production units." (R. 222-1 at 16-17; R. 262-1 at 16.) The PSA does not define the term "production units."

Flint Hills claims that shared resource constraints, namely process air capacity, well water capacity, and wastewater treatment capacity prevent the production units from simultaneously producing at their PSA represented rates. (Def.'s Stmt. Add'l Facts ¶ 19; R. 223-12, Ex. 4, App. to BP's Stmt. Facts, Flint Hills' Master Claim Chart at 9.) These are independent of and in addition to unit-specific limitations within each unit which Flint Hills contends limit production below the PSA represented rates even when the unit operates alone and without constraints from shared resources. (*Id.*) "Shared resources" are resources and facilities that are jointly utilized by more than one unit and thus are located outside any single "production unit." (*Id.* ¶¶ 2, 19; R. 292-1 at 21.)

In support of its position that the production capacity representation in the PSA explicitly excludes "Support Facilities" from its coverage and prevents Flint Hills from recovering any damages related to shared resources, BP notes that "Process Units"[7] and "Support Facilities" are separately defined terms in Schedule 2.1(a) of the PSA, and that Flint Hills seeks damages for shared resources, except for process air, that are classified as "Support Facilities." (R. 222-1 at 16; R. 292-1 at 17 n.4; R. 223-45, Ex. 36, App. to BP's Stmt. Facts, PSA Schedule 2.1(a): Major Joliet Plant Facilities at 2.) Pursuant to the express terms of the PSA, however, the Court cannot consider the classifications made in Schedule 2.1(a) in determining the meaning of the

---

[7] BP argues that "Process Units" in Schedule 2.1(a) should be equated with "production units" in Section 7.1(d)(ii) because "courts frequently give similar phrases the same meaning where called for by the context." (R. 222-1 at 16; R. 292-1 at 17 n.4.)

production capacity representation.[8]  In any case, Flint Hills admits that the representation does not explicitly cover shared resources.  (R. 262-1 at 16.)  Flint Hills instead argues that the production capacity representation is not a representation of the condition of the actual units, but rather what those units could produce.  (*Id.*)  Therefore, it is entitled to recover damages for those items—even if outside the "production units"—which prevent the units from operating at their PSA represented rates.  (*Id.*)  The Court agrees to the extent Illinois law provides for such recovery.[9]

Despite BP's assertions, Flint Hills is not seeking to rewrite the PSA capacity representation to cover the entire plant.  (*See* R. 222-1 at 16.)  BP attempts to conflate the contract language with Flint Hills' damages remedy.  Nothing BP identified in the PSA precludes Flint Hills from obtaining damages as provided by Illinois law.  Quite simply, the words "production units" do not, on their own, limit what damages Flint Hills may be entitled to.

---

[8] Section 16.4 of the PSA states: "The inclusion of particular items in any particular Schedule will have no bearing on the representation and warranties contained in this Agreement; the meaning of such representations and warranties will be determined without regard to the Schedules."  (BP's Ex. 1, PSA § 16.4, at 66.)  The Court will interpret the production capacity representation at issue as well as all other PSA representations by looking to the plain meaning of the language within the context of the entire agreement, but without regard to any of the attached Schedules.

[9] According to Flint Hills, Illinois law entitles it to damages for breach of warranty in an amount that will place it in as good a position as it would have been if the contract had been performed as agreed, including damages for repairing, improving, or replacing unwarranted items which prevent the warranted units from producing at their represented rates.  (R. 262-1 at 16-17.)  The motion now being considered raises issues of contract interpretation and whether there are genuine issues of material fact.  The parties have supplied little Illinois case law regarding the damages question and have not properly presented the issue to the Court in this motion.  BP, however, has filed a separate motion for partial summary judgment on Flint Hills' damages claims which specifically seeks a ruling on the issue of how to properly measure damages for breach of the PSA's production capacity warranty.  (R. 245-1, BP's Mot. for Partial Summ. J. on Damages ¶ 4.)  Accordingly, the Court will thoroughly consider the question of the proper measure of damages, if any, when it takes up that motion.

### 2. Damages Related to IPA Production

The parties also dispute whether the capacity representation includes the isophthalic acid or oxidation (or "IPA") unit. (BP's Stmt. Facts ¶ 6.) The PSA defines "PIA" as "purified isophthalic acid and isophthalic acid," but the capacity representation in Section 7.1(d)(ii) refers only to "purified isophthalic acid." (*Id.* ¶ 40.) BP argues that the parties, in choosing to write out "purified isophthalic acid," specifically excluded any representation as to the IPA unit. (R. 222-1 at 16.) BP further argues that the only way to give meaning to the parties' specific choice of words, as required by the canons of contract interpretation, is to find that Flint Hills is not entitled to any damages for repairs or upgrades for items in the IPA unit and to limit recovery to equipment in the purified isophthalic acid unit. (R. 292-1 at 17.) This reasoning, however, ignores the fact that IPA is merely an input/feedstock to the purified isophthalic acid production and that IPA is a nonsalable product. (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 4.) Since the PSA defines "PIA" to include both purified isophthalic acid and IPA, it made sense not to use PIA because there was no need to warrant the production of both units. The output of the IPA unit on its own is relevant only to the extent it limits production of purified isophthalic acid, so Flint Hills argues. (R. 262-1 at 17.) Accordingly, Flint Hills contends it is entitled to damages because the parties intended that purified isophthalic acid production encompass the entire process necessary to create purified isophthalic acid at the Joliet Plant. (*Id.*) Moreover, the definition of "Joliet Plant" in Section 2.1(a) lists only purified isophthalic acid, and does not mention PIA or IPA individually. (R. 223-2, Ex. 1, App. to BP's Stmt. Facts, Purchase & Sale Agreement § 2.1(a), at 31.)

The Court cannot determine from the plain language of the contract whether the parties

intended the capacity representation to incorporate IPA capacity.  If the parties intended the representation to refer to purified isophthalic acid and its component IPA production as a single process and if the production capacity of IPA at the Joliet Plant is less than the amount needed for an AMDSP of 170,000 metric tons of purified isophthalic acid, the production capacity representation is false.  In that case, Flint Hills may be entitled to recover damages associated with the IPA unit to the extent necessary to permit purified isophthalic acid production of 170,000 metric tons and thereby compensate it for the breach of warranty with respect to the purified isophthalic acid unit.  Given the factual issues involved, the Court cannot make this determination at this stage of the litigation.

## II.      Genuine Issues of Material Fact Exist Under BP's Interpretation

To prevail on a breach of contract claim under Illinois law, Flint Hills must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract by Flint Hills; (3) a breach by BP; and (4) resultant damages.  *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007); *Zirp-Burnham, LLC v. E. Terrell Assoc., Inc.*, 356 Ill. App. 3d 590, 600, 292 Ill. Dec. 289, 826 N.E.2d 430 (Ill. App. Ct. 2005).  BP argues that Flint Hills cannot establish that BP breached the production capacity representation as interpreted by BP because the "undisputed evidence establishes that BP Amoco had empirical and reasonable bases supporting its determination of the AMDSP amounts for each of the production units."  (R. 220-1 ¶ 8; *see* R. 222-1 at 12-13.)  Flint Hills responds with evidence, such as internal memoranda, communications, and studies, challenging the accuracy of the empirical bases and information BP relied on to calculate the AMDSP rates and which contradicts the accuracy of those rates.  (Def.'s Resp. to BP's Stmt. Facts ¶¶ 3-6.)  Flint Hills

claims that the PSA representation is false under any reasonable interpretation of the provision. (R. 262-1 at 11.)

As discussed in detail above, the term "demonstrated sustainable production" is ambiguous. Even if BP's interpretation of the provision were the unambiguous meaning, however, genuine issues of material fact remain as to whether BP accurately represented the rates for each of the three chemicals—whether in fact the "annualized maximum demonstrated sustainable production" capacity of the Joliet Plant production units for TMA, purified isophthalic acid, and MAN was as represented in the PSA. BP defines "demonstrated" as "hav[ing] been shown to be true by reasoning or evidence." (R. 222-1 at 11.) Even though, as BP correctly points out, the PSA does not require that AMDSP rates be calculated pursuant to a specific formula (*id*. at 14), the represented rates must be accurate. Therefore, the necessary factual inquiry under BP's interpretation will be whether the "reasoning or evidence" underlying its AMDSP determinations was accurate.

To succeed on this motion under its own PSA interpretation, BP would have to show that the undisputed evidence establishes the accuracy of the empirical or other bases upon which it relied in its AMDSP calculations, and that such accurate data supports the represented numbers. Accordingly, BP maintains that the "undisputed evidence establishes that it had empirical and reasonable bases supporting its determination of the AMDSP amounts for each of the production units." (R. 220-1 ¶ 8.) BP contends (and Flint Hills disputes) that BP Amoco considered numerous bases for the represented AMDSP numbers, including,

> depending on the production unit, historic data; evaluating tests; production rates that were generally accepted by personnel at the Plant; theoretical production rates based on the number of reactors at the Plant, chemical reaction rates, and other factors; investments that had been made; the nameplate capacity associated with the original

investments; changes that had been made to the units and the Joliet Plant over time; and the condition of the expansions that were ongoing and has [sic] been conducted.

(BP's Stmt. Facts ¶ 34.)  Despite the voluminous briefing and supporting evidence supplied to the Court, BP does not indicate how these listed factors impacted or were used to adjust or inform its calculations.  The Court is left to examine the only verifiable supporting evidence BP has identified: the annualized daily rates from a variety of sources.[10]  (R. 222-1 at 12-13; BP's Stmt. Facts ¶¶ 35-37.)  BP alleges the PSA production capacity rates for each unit were "demonstrated" by either actual production results over the course of several days (for purified isophthalic acid), rates found in contemporaneous internal BP Amoco operating plans (for TMA), or historical production data and rates generally accepted by personnel at the Plant (for MAN).  (R. 222-1 at 12-13.)  As described below, Flint Hills sets forth sufficient evidence challenging the accuracy of the empirical bases and information BP Amoco relied on to calculate the PSA represented rates to permit a reasonable trier of fact to find that BP breached the production capacity representation, even under BP's interpretation of "demonstrated."

BP argues that much of Flint Hills' supporting evidence is irrelevant, immaterial, and cannot be relied on because it does not specifically measure AMDSP.  (R. 292-1 at 20.)  The Court rejects that argument.  It is nonsensical for BP to assert that Flint Hills cannot rely on evidence which does not specifically reference AMDSP or which measures capacity differently than AMDSP—BP Amoco did precisely that when it initially calculated the PSA represented rates.  When BP Amoco calculated the AMDSP rates for the first time, it could not have relied only on documents that themselves calculated AMDSP.  BP does not assert that the daily rates

---

[10] The Court cannot determine whether the unspecified evidence BP relied on was accurate or whether it is undisputed and must assume that BP does not intend to rely on those sources of evidence to prove the accuracy of the represented rates.

upon which it based its AMDSP calculations were special daily rates developed to be used in AMDSP calculations.

## A.    Purified Isophthalic Acid

The PSA provides that the "annualized maximum demonstrated sustainable production" of the purified isophthalic acid production unit is 170,000 metric tons.  BP maintains that undisputed evidence verifies the empirical bases it used to calculate that number.  (R. 222-1 at 12.)  According to deposition testimony and a March 2003 email, BP Amoco determined the AMDSP for the purified isophthalic acid production unit on the basis of, among other support, actual production results from the unit over the course of several days in the fall of 2002.  (BP's Stmt. Facts ¶ 35.)  Specifically, BP's verified Supplemental Answers to Flint Hills' Interrogatories state that "the annualized maximum demonstrated sustainable production for the PIA unit was determined based on a conclusion reached from a test that supported a 155 kmt/yr equivalent rate assuming a 28 day shutdown and a 98% reliability factor."  (R. 223-55, Ex. 46, App. to BP's Stmt. Facts, Supp'l Ans. to Interrogatories, at 8.)  When annualized and adjusted to assume 100% reliability and no shutdowns, those daily production rates equal 170,000 metric tons.  (BP's Stmt. Facts ¶ 35.)  Flint Hills does not challenge BP's arithmetic.  Rather, Flint Hills contends that no actual production data from 2002 demonstrates sustainable production, and that the information upon which BP Amoco relied to measure the AMDSP for purified isophthalic acid was inaccurate.  (Def.'s Resp. to BP's Stmt. Facts ¶ 35.)  In support of its position, Flint Hills cites a September 2002 memorandum—the Dray memorandum[11]—which concludes that

_____

[11] Curiously, the Dray memorandum is dated September 12, 2002, but it references demonstrated capacity during "September and early October of 2002."  (R. 264-6, Ex. 6, App. to Def.'s Stmt. Add'l Facts, Dray Mem. at 21.)

"Purification dryer seals limit PIA production to 154 kmt/yr, assuming 92% operating factor."
(R. 264-6, Ex. 6, App. to Def.'s Stmt. Add'l Facts, Dray Mem. at 25.)  In the Dray
memorandum, "PIA" refers to purified isophthalic acid, as it uses IPA to refer to isophthalic
acid, and a 92% operating factor accounts for 30 days of downtime per year.  (*Id.* at 20.)
Eliminating the 30 days of downtime, the Dray memorandum supports a production capacity of
approximately 167,000 metric tons per year.  (R. 264-6, Ex. 3A, App. to Def.'s Stmt. Add'l
Facts, Expert Report of Dr. Russell A. Ogle at 16 (sealed).)  The Dray memorandum does not
indicate whether a reliability percentage less than 100% was assumed.  Nevertheless, at this
stage of the litigation, the memorandum raises an issue of fact regarding the reliability of the
information upon which BP relied to formulate the AMDSP rate and the accuracy of BP's
measurement.

According to BP, another section of the Dray memorandum supports the 170,000
AMDSP representation.  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 3.)  The portion of the
memorandum BP cites in support, however, refers to the production capacity of the "Oxidation"
section/unit (R. 264-6, Dray Mem. at 21), also known as the IPA unit, which BP vigorously
contends is not covered by the PSA representation.  (BP's Stmt. Facts ¶ 6; R. 222-1 at 16.)  More
importantly, the portion that BP cites does not necessarily contradict the author's finding that
Purification dryer seals limit purified isophthalic acid production to 154 kmt/yr at a 92%
operating factor.  IPA production is a preliminary, upstream step in the PIA production process,
which converts IPA into purified isophthalic acid or purified IPA.  (BP's Stmt. Facts ¶ 6.)
Purification dryer seals are necessary to the process that occurs *after* IPA has been produced.
(*See* R. 264-6, Dray Mem. at 25 ("Assuming a 92% operating factor, the IPA production limit is

163 kmt/yr, or 160 kmt/yr PIA. The Purification dryer seals limit PIA production to 154 kmt/yr, assuming 92% operating factor.").) BP further argues that the memorandum does not purport to be calculating AMDSP for the purified isophthalic acid production unit. (R. 292-1 at 20.) While this may be true, as explained above, that does not prevent Flint Hills from relying on it.

Furthermore, Flint Hills points to a March 2003 email BP Amoco's plant manager sent to the BP deal team with the subject line "RE: PIA Capacity" which stated: "We cannot run much beyond 140 kmt without investing capital. Everyone knows that already." (Def.'s Stmt. Add'l Facts ¶ 4.) BP responds that, according to the deposition testimony of the author of the email, the statement was made while the evaluation of the AMDSP rates was still in progress. (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 4.) The Court, however, cannot weigh the evidence in deciding a summary judgment motion as that is a job for the factfinder. *See Payne*, 337 F.3d at 770. In sum, even under BP's proposed construction of the representation, Flint Hills has produced evidence creating a genuine question of material fact as to whether accurate evidence supported BP's calculation of the AMDSP rate for purified isophthalic acid.

### B. TMA

The PSA represented rate for TMA is 71,000 metric tons. BP argues that the AMDSP for the TMA production unit was based on several factors, most importantly, the production rate of 195 metric tons per day "as expressed in contemporaneous internal BP Amoco operating plans." (R. 222-1 at 13.) Specifically, BP states that the "195 metric tons per day was multiplied by 365 to arrive at an annualized figure of 71,175 metric tons of TMA, which was then rounded down to the 71,000 metric tons for the represented AMDSP in the PSA." (*Id.*) BP does not identify any other factors that went into its calculation. The only evidence BP produces in support of its

assertion that 195 metric tons per day was the generally known number is the deposition

testimony of (and Answers to Interrogatories verified by) its 30(b)(6) witness, John Dueker.

(BP's Stmt. Facts ¶ 36.)  BP has not provided the Court with a copy of an operating plan or any

other contemporaneous supporting evidence confirming the source or accuracy of the 195 metric

tons per day number.  (*See id.*)  Flint Hills contends that the TMA production unit could not in

fact produce 195 metric tons per day.  (Def.'s Stmt. Add'l Facts ¶ 5.)  An internal BP Amoco

study from May 2003 found that the "maximum sustainable daily rate" ("MSDR") of the TMA

unit was 190.8 metric tons per day, which is equivalent to 69,642 metric tons per year.  (*Id.*)  BP

contends that meaning of "sustainable" as used in MSDR calculations is different than the

intended meaning of "sustainable" in AMDSP.  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶¶ 5, 10,

13; R. 292-1 at 11-12.)  Nevertheless, Flint Hills is entitled to rely on this document to challenge

the validity of BP's claim that 195 metric tons per day was the "generally known number within

the business unit" of the daily production of TMA "as expressed in contemporaneous internal BP

Amoco operating plans."  (BP's Stmt. Facts ¶ 36; R. 222-1 at 3.)  BP further responds that the

May 2003 study included a reduction in batch size which BP Amoco adopted in order to increase

the efficiency and reliability of the TMA reactors and that it is therefore consistent with the PSA

rate of 71,000 metric tons.  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 5; R. 292-1 at 20-21.)  In

sum, the parties dispute the correct interpretation of the May 2003 study.  The jury is responsible

for resolving that dispute; the Court will not weigh the evidence in deciding a summary

judgment motion.  *Payne*, 337 F.3d at 770.

Flint Hills' expert found that as of May 28, 2004 (the date the PSA closed), the TMA unit

could not produce at the PSA represented rate even when operating alone.  (Def.'s Stmt. Add'l

Facts ¶ 19.)  On the other hand, BP's expert identified actual days in April 2001 on which the feedrates for the TMA reactant exceeded the rate necessary to produce at the PSA rate.[12]  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 21.)  While this does not directly support BP's claim that it relied on a production rate of 195 kte/day found in contemporaneous operating plans to calculate the PSA represented rate, it is evidence supporting BP's measurement of the AMDSP for the TMA production unit.  Nonetheless, viewing the disputed study and other evidence in the light most favorable to Flint Hills, genuine issues of material fact exist as to whether the TMA represented rate was supported by an accurate empirical basis and was true at the time of the sale, even under BP's contractual interpretation.

## C.     MAN

BP argues that there are no genuine issues of material fact regarding the MAN representation in the PSA because the representation was based on "a variety of factors, including historical production data, rates generally accepted by personnel at the Plant, and other production rate information."  (R. 222-1 at 13.)  Flint Hills responds that a July 2003 study by BP Amoco engineers revealed that the MAN production unit could not produce 51,000 metric tons per year (the PSA represented rate) even when the catalyst was new and that it would have a declining yield going forward.  (Def.'s Stmt. Add'l Facts ¶ 6.)  Although BP asserts that undisputed evidence shows that the July 2003 study relied on measurements from an inaccurate

_____

[12] This evidence was produced for the first time in reply.  In its reply memorandum, BP provided input feedrate data, not output or production data, from its production capacity expert for all three units.  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 21.)  BP claims that actual production output is not measured on a daily basis.  (*Id.*)  Since it was produced for the first time in reply, Flint Hills did not have an opportunity to respond to it.  The Court, however, notes that Flint Hills disputes its accuracy and/or reliability on the basis of its own expert's contrary opinion on the point.  (R. 264-6, Ex. 3B, App. to Def.'s Stmt. Add'l Facts, Rebuttal Report of Dr. Ogle at 6-12 (sealed).)

flowmeter and that its conclusions were affected by a 9-16% error, the Court cannot conclusively weigh the impact of such evidence.[13]  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 6.)

As additional evidence of the PSA represented rate's falsity, Flint Hills notes that a BP Amoco employee questioned the high sales numbers of MAN in the CIM, the fact that BP cannot identify any particular days when the MAN unit demonstrated production at the PSA rate, and that its production capacity expert confirmed that the MAN unit could not produce at the represented rate.  (Def.'s Stmt. Add'l Facts ¶¶ 9, 19, 21; R. 262-1 at 16.)  BP disputes Dr. Ogle's findings, arguing that he evaluated the accuracy of the AMDSP rates under a flawed interpretation of the meaning of AMDSP.  (BP's Resp. to Def.'s Stmt. Add'l Facts ¶ 19.)  Also, BP's expert witness identified dates when the input feedrate into the MAN unit exceeded the rate necessary to produce at the PSA rates.  (*Id.* ¶ 21.)  In light of the conflicting evidence and drawing all reasonable inferences in favor of Flint Hills, a genuine question of material fact exists as to whether the MAN production unit is capable of achieving the represented PSA rate.

## III.    Fraud Claims

Flint Hills maintains that BP fraudulently induced Flint Hills to enter into the PSA by making the production capacity representation.  "The elements of common-law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."  *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 497, 675 N.E.2d 584, 222 Ill. Dec. 389 (Ill. 1996); *see Ass'n Benefit Serv., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007).  Under

---

[13] That evidence was filed with the Court for the first time in its reply, and so the Court cannot conclude that it is undisputed.

Illinois law, a party must prove fraud by clear and convincing evidence. *Caremark*, 493 F.3d at 852.

## A.     Fraud Claims Based on Ambiguous Statements

BP argues, for the first time in its reply memorandum, that ambiguous statements cannot, as a matter of law, support a fraud claim. (R. 292-1 at 24.) Even though arguments raised for the first time in a reply memorandum waived, *see Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005), the Court will briefly address this argument. Contrary to BP's contentions, the law is clear that an ambiguous statement can serve as the basis for a fraud claim. According to Section 527 of the Restatement (Second) of Torts:

> A representation that the maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made:
> (a) with the intention that it be understood in the sense in which it is false, or
> (b) without any belief or expectation as to how it will be understood, or
> (c) with reckless indifference as to how it will be understood.

Restatement (Second) of Torts § 527 (1977). The Seventh Circuit (applying the Illinois Consumer Fraud Act) noted that "ambiguous statements by the salesperson may be considered as factual representations if it would be reasonable for the other party to treat it as such." *See Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997). BP misinterprets the cases it cites. For example, BP points to an Illinois case which stated that "to support an action in fraud, the statement (representation) must be certain and definite." *Commonwealth Eastern Mortgage Co. v. Williams*, 163 Ill. App. 3d 103, 113, 114 Ill. Dec. 360, 367, 516 N.E.2d 515, 522 (Ill. App. Ct. 1987). BP takes that statement out of context. The court made that statement in the context of discussing what must be proven in order to satisfy an exception to the general rule prohibiting fraud claims based on promises to perform a future act when the false promise or representation

of future conduct is a scheme to defraud. *Id.* at 113-114, 114 Ill. Dec. at 367, 516 N.E.2d at 522. The case here is readily distinguishable, and any supposed "unambiguous" requirement does not apply. To the extent the cases BP cites concern fraud regarding present facts, the Court refuses to rely on them. Those cases find that statements which are general and indefinite are not statements of fact. *See, e.g.*, *Evertz v. Aspen Med. Group*, 169 F. Supp. 2d 1027, 1031 (D. Minn. 2001) (holding that statements that employee was "doing a good job" are "more akin to opinions, than statements of fact and on this basis are not actionable in fraud," and citing a state case as holding that "neither opinions nor statement that are 'general and indefinite' are representations of fact giving rise to a misrepresentation claim" ); *Pig Improvement Co. v. Middle States Holding Co.*, 943 F. Supp. 392, 406 (D. Del. 1996). The statement here is ambiguous because it is subject to multiple interpretations, but it is neither general nor indefinite. The PSA capacity representation is an express statement of fact which purports to precisely specify each production unit's AMDSP capacity as of the day of closing.

**B.     Flint Hills' Fraud Claims Arising from the PSA's Production Capacity Representation**

BP contends that Flint Hills cannot introduce sufficient admissible evidence for a jury to find fraud by clear and convincing evidence. Specifically, BP asserts that Flint Hills cannot prove the following elements of its fraud claim: (1) that the production capacity representation is false; (2) that BP knew the representation was false; (3) that BP intended to deceive Flint Hills; and (4) that Flint Hills reasonably relied on the PSA figures. (R. 222-1 at 17-21.) BP does not appear to challenge that the damages element a result of its alleged reliance on the statement. (*See id.*) In order to find a genuine issue, the evidence presented by Flint Hills must be of sufficient caliber or quantity to allow a rational finder of fact to find the elements of fraud by

clear and convincing evidence. *See Anderson*, 477 U.S. at 254 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."). Viewing the facts in a light most favorable to Flint Hills, Flint Hills has presented sufficient evidence for a reasonable jury to find by clear and convincing evidence that BP is liable for fraud.

As discussed above, Flint Hills has produced sufficient evidence to create a genuine issue of fact as to whether the capacity representation is accurate. Thus, whether the representation was false is a question of fact.

Next, Flint Hills has set forth evidence that would permit a jury to find that BP knew of, or recklessly disregarded, the falsity of the production capacity representation. Flint Hills, for example, points to a March 2003 email from BP Amoco's plant manager to the individuals involved in the sale of the plant to Flint Hills which states that the PIA unit "cannot run much beyond 140 kmt without investing capital. Everyone knows that already . . . . This is old news." (Def.'s Stmt. Add'l Facts ¶ 4.) In addition, a BP Amoco employee raised his concern to BP Amoco managers that the capacity rates proposed for and included in the CIM were too high. (*Id.* ¶ 9.) Further, Flint Hills claims that BP Amoco memoranda written prior to the sale discussed bottlenecking issues and capacity limitations that prevented the production units from producing at the rates represented in the PSA, but were not provided to it during due diligence. (*Id.* ¶¶ 3-6.) As detailed above, BP claims that it could not have known the PSA capacity representation was false because it was in fact accurate. (R. 222-1 at 20.)

Flint Hills has also produced sufficient evidence to allow a reasonable trier of fact to find that the representation was made in order to induce Flint Hills to act. It is undisputed that Flint

Hills requested that the PSA include a production capacity representation. (BP's Stmt. Facts ¶ 23.) According to Flint Hills, it expressly told BP during negotiations that it would not move forward with the deal without a representation on production capacity. (Def.'s Stmt Add'l Facts ¶ 12.) BP provided a data room to Flint Hills that, according to BP, contained information explaining BP Amoco's internal ways of discussing capacity and the differences in the production capacity figures used in certain historical documents and those used in the Joliet Plant sales process. (*Id.* at 20-21; BP's Stmt. Facts ¶ 18.) BP contends that this evidence precludes finding that it knew the capacity representation was false or that it intended to mislead Flint Hills. (R. 222-1 at 21.) Flint Hills has produced enough evidence to create a triable issue of fact as to whether BP knew of the representation's falsity, if any, and that BP intended the representation to induce Flint Hills to purchase the Joliet Plant.

Finally, a disputed question of fact exists as to whether Flint Hills reasonably relied on the PSA production capacity representation in deciding to proceed with the purchase of the Joliet Plant. BP argues that this evidence conclusively shows that Flint Hills did not in fact rely on the PSA representation. (R. 222-1 at 18.) The undisputed evidence shows that Flint Hills used the "effective capacity" numbers from the CIM in its financial model and in its presentation to the board of directors of its parent company. (BP's Stmt. Facts ¶¶ 20-22.) BP refused to warrant the "effective capacity" rates stated in the CIM, however, because the effective capacity after the sale would depend on Flint Hills' ability to maintain and operate the Joliet Plant's production units in an efficient manner, which BP could not control or guarantee. (*Id.*) Flint Hills responds that it informed BP that it would not purchase the Joliet Plant without a representation on production capacity. (Def.'s Stmt Add'l Facts ¶ 12.) Flint Hills claims it agreed to the AMDSP

representation in recognition that it would take on the risk for its ability to operate the Joliet Plant at levels similar to those allegedly achieved by BP Amoco. (*Id.*) Flint Hills further argued that the AMDSP representation was necessary to calculating the effective capacity rates which were included in its financial model. (*Id.*) "Effective capacity" is calculated by multiplying "nameplate capacity"—defined in the CIM as "annualized maximum demonstrated sustainable production"—by the appropriate operating factor, which represents how efficiently the plant operates. (*Id.*; BP's Ex. 2, Descriptive Mem. at 30.) As such, the PSA capacity representation specifically states that it "does not take into account planned or unplanned downtime." (BP's Stmt. Facts ¶ 26.) Thus, there is a genuine dispute as to whether Flint Hills relied only on the effective capacity numbers in the CIM (*id.* ¶ 21) or also relied on the existence of the PSA's representation of AMDSP in deciding to proceed with the deal (Def.'s Stmt. Add'l Facts ¶ 12).

Flint Hills had access to a data room prior to the sale which, as noted above, BP claims contained information about BP Amoco's historical production capacity figures and explaining differences between the capacity measures in the CIM and those found in internal BP Amoco documents. (BP's Stmt. Facts ¶ 18.) BP claims that those documents refute Flint Hills' current interpretation of the PSA capacity representation. (*Id.*) BP reasons that Flint Hills therefore could not have reasonably relied on its interpretation. (R. 222-1 at 19.) BP does not explain how the information provided in the data room conclusively refutes Flint Hills' current interpretation of the PSA representation. (*Id.* at 19-20.) In response, Flint Hills points to documents which were not included in the data room that support its current interpretation (Def.'s Stmt. Add'l Facts ¶¶ 3-6, 9) and, as the discussion above suggests, support its contention that it reasonably relied on the PSA capacity representation as Flint Hills' interpreted it.

Viewing the evidence and all reasonable inferences in a light most favorable to Flint Hills, there are genuine issues of material fact for trial concerning whether Flint Hills reasonably relied on the production capacity representation in the PSA.

In sum, Flint Hills has set forth evidence creating a genuine issue of material fact on each of the challenged elements of its fraud claim. Accordingly, the Court denies BP's motion for partial summary judgment with respect to the fraud claim.

## CONCLUSION

BP is not entitled to summary judgment on the breach of contract claims for two reasons. First, the production capacity representation is ambiguous. Second, disputed issues of material fact exist as to whether the AMDSP rates, however defined, are accurate. As for its fraud claims, Flint Hills has set forth sufficient evidence for a jury to find by clear and convincing evidence that BP fraudulently induced Flint Hills to enter into the PSA. Accordingly, the Court denies BP's Motion for Partial Summary Judgment.

DATED: February 23, 2009     ENTERED

                _____
                AMY J. ST. EVE
                United States District Court Judge