**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BP AMOCO CHEMICAL COMPANY,** | ) | |
| | ) | |
| **Plaintiff/Counter–Defendant,** | ) | |
| | ) | **Consolidated Case No. 05 C 5661** |
| **v.** | ) | |
| | ) | **Judge Amy J. St. Eve** |
| **FLINT HILLS RESOURCES LLC,** | ) | |
| | ) | |
| **Defendant/Counter–Plaintiff.** | ) | |
| | ) | |
| **FLINT HILLS RESOURCES LLC,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BP CORPORATION NORTH AMERICA INC.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |
| | ) | |

**PARTIAL SUMMARY JUDGMENT: "ENVIRONMENTAL COMPLIANCE" CLAIMS**

**BP AMOCO CHEMICAL COMPANY AND BP CORPORATION
NORTH AMERICA INC.'S MEMORANDUM IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH RESPECT TO ENVIRONMENTAL COMPLIANCE CLAIMS**

Richard C. Godfrey, P.C. (ARDC #3124358)
Scott W. Fowkes, P.C.(ARDC #6199265)
Travis J. Quick (ARDC #6280905)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

William L. Patberg (admitted *pro hac vice*)
Louis E. Tosi (admitted *pro hac vice*)
Douglas G. Haynam (admitted *pro hac vice*)
Joseph S. Simpson (admitted *pro hac vice*)
SHUMAKER, LOOP, & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43624
(419) 241-9000

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION ............................................................................................................1

ARGUMENT .................................................................................................................1

I.      BP AMOCO DID NOT BREACH THE PSA. ...............................................1

        A.      The Title V Permit Defines A Company's Obligations Under The Clean Air
                Act. ........................................................................................................1

                1.      Compliance With The Title V Permit Is, By Definition, Compliance
                        With Environmental Laws. ..........................................................2

                2.      The Joliet Plant's Title V Permit Included A Permit Shield, Which
                        Established Compliance With The Permit Is Deemed Compliance With
                        The Law. ...................................................................................3

        B.      The Undisputed Facts Establish That There Was No Breach Of The
                Environmental Representations With Respect To FHR's Environmental
                Claims. ...................................................................................................3

        C.      FHR Has No Evidence That BP Amoco Possessed "Seller's Knowledge" Of
                Any Alleged Environmental Violations. ..................................................12

        D.      BP Amoco Did Not Breach Its Condition Of Asset Representation With
                Respect To FHR's Environmental Claims. ..............................................12

        E.      FHR Has Spoliated Evidence For Three Of Its Environmental Claims. .......13

        F.      FHR's Environmental Claims Are Subject To A $2.5 Million Deductible. .......13

II.     BP AMOCO IS ENTITLED TO SUMMARY JUDGMENT ON FHR'S CLAIM
        THAT THE ENVIRONMENTAL REPRESENTATIONS WERE FRAUDULENT. ......13

CONCLUSION .............................................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Appalachian Power Co. v. Envtl. Prot. Agency*,
 208 F.3d 1015 (D.C. Cir. 2000) ........................................................................ 3

*Athey Prods. Corp. v. Harris Bank Roselle*,
 89 F. 3d 430 (7th Cir. 1996) ............................................................................. 14

*Bixby's Food Sys., Inc. v. McKay*,
 193 F. Supp. 2d 1053 (N.D. Ill. 2002) ............................................................. 14

*BP Amoco Chem. v. Flint Hills Res., LLC*,
 489 F. Supp. 2d 853 (N.D. Ill. 2007) ............................................................... 14

*Cooper v. Chicago Transit Auth.*,
 1996 WL 520855 (N.D. Ill. Sept. 10, 1996) ................................................... 14

*Cordiant MN, Inc. v. David Cravit & Assocs., Ltd.*,
 1997 WL 473883 (N.D. Ill. Aug. 14, 1997) ................................................... 14

*Davis v. G.N. Mortgage Corp.*,
 396 F. 3d 869 (7th Cir. 2005) ........................................................................... 14

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
 945 F.2d 1226 (2d Cir. 1991)............................................................................ 12

*Marusiak v. Adjustable Clamp Co.*,
 2005 WL 2420370 (N.D. Ill. Sept. 30, 2005) ................................................. 14

*Montgomery v. Amoco Oil Co.*,
 804 F.2d 1000 (7th Cir. 1986) ........................................................................... 3

*Public Citizen, Inc. v. Envtl. Prot. Agency*,
 343 F.3d 449 (5th Cir. 2003) ............................................................................. 2

*Sassak v. City of Park Ridge*,
 431 F. Supp. 2d 810 (N.D. Ill. 2006) ............................................................... 14

*Sierra Club v. Envtl. Prot. Agency*,
 536 F.3d 673 (D.C. Cir. 2008) ........................................................................... 2

*Sierra Club v. Tenn. Valley Auth.*,
 430 F.3d 1337 (11th Cir. 2005) ..................................................................... 3, 4

*Thomas Consol. Indus., Inc.*,
　　2002 WL 31049836 (N.D. Ill. Sept. 13, 2002) ................................................. 14

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers LLP*,
　　475 F.3d 824 (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996)).... 13, 14

*U.S. v. AM Gen. Corp.*,
　　34 F.3d 472 (7th Cir. 1994) ...................................................................... 5, 6

*Virginia v. Browner*,
　　80 F.3d 869 (4th Cir. 1996) ......................................................................... 2

*W.W. Vincent & Co v. First Colony Life Ins. Co.*,
　　814 N.E.2d 960 (Ill. App. Ct. 2004) ............................................................ 3

**Statutes and Regulations**

40 CFR 70.6(a) .............................................................................................. 2

40 CFR 70.6(c)(5)(iii)(B) ................................................................................ 2

40 CFR 70.6(c)(5)(iii)(C) ................................................................................ 2

415 ILCS 5/39.5 ............................................................................................. 2

42 U.S.C.A. §§ 7661-7661(f) ......................................................................... 1

57 Fed. Reg. 32250 (July 21, 1992) ............................................................... 2

Fed. R. Civ. P. 56(c) ..................................................................................... 1

Ill. Law & Prac. Fraud § 26 ........................................................................ 14

## INTRODUCTION

Flint Hills Resources, LLC ("FHR") continues to assert various claims alleging that BP Amoco breached the environmental representations in the parties' Asset Purchase and Sale Agreement ("PSA"). Those claims, however, are resolved by the undisputed evidence that BP Amoco complied with its environmental permit to run the Joliet Plant. The Joliet Plant operates pursuant to a permit issued under Title V of the Clean Air Act and the Illinois Clean Air Act Permit Program (the "Title V Permit"). Under federal law, compliance with the Permit is compliance with the Clean Air Act. The Permit defines how compliance will be measured and the methods to be used in measuring compliance. BP Amoco complied with the Permit, and thus, by definition, complied with the environmental law applicable to FHR's claims. Because of this central legal principle, FHR's environmental claims fail. Finally, the PSA contains a $2.5 million deductible for environmental claims, and if the Court grants summary judgment on only a few of FHR's environmental claims, the rest should be dismissed as falling below the deductible.

For three of its environmental claims, FHR also alleges that BP Amoco committed fraud as a result of the PSA's representations. FHR cannot prove the elements of a fraud claim because it cannot prove that: (i) BP Amoco made any material misrepresentation about its compliance with the Title V Permit; (ii) BP Amoco knew that its representations regarding compliance with the Title V Permit were false; or (iii) BP Amoco intended to defraud FHR. The law and undisputed facts establish that FHR has no valid environmental claims, whether those claims sound in contract or in fraud.

## ARGUMENT

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## I.     BP AMOCO DID NOT BREACH THE PSA.

### A.     The Title V Permit Defines A Company's Obligations Under The Clean Air Act.

Understanding the fallacy of FHR's environmental claims requires a brief review of the Clean Air Act ("CAA") and the Illinois Clean Air Act Permit Program ("CAAPP") implementing the CAA. In 1990, Congress amended the CAA to impose a new and comprehensive permitting requirement on all major sources of emissions, otherwise known as Title V. 42 U.S.C.A. §§ 7661-7661(f). The Title V program is implemented by the State of

1

Illinois through the Illinois Environmental Protection Agency ("IEPA") pursuant to a U.S. EPA approved state program. In Illinois, that is the CAAPP. *See* 415 ILCS 5/39.5.

The Title V Permit contains all the requirements and compliance obligations that apply to a specific source. In 1992, the U.S. EPA promulgated a set of rules—now in Part 70 of Title 40 of the Code of Federal Regulations—that defines how states are to administer the Title V permit program. Operating Permit Program, 57 Fed. Reg. 32250 (July 21, 1992). The Part 70 rules provide that permits under Title V must contain: (1) an applicability section specifying which state rules pertain to a particular emission unit; (2) recordkeeping and reporting requirements directing the facility to keep certain records and specifying the reports the source must file; and (3) monitoring requirements, including any pertinent analysis or test methods and the monitoring equipment and methods to be used to achieve compliance. 40 CFR 70.6(a). The permit also must require an annual certification of compliance which includes "identification of the method(s) or other means used by the owner or operator for determining the compliance status with each term and condition during the certification period." 40 CFR 70.6(c)(5)(iii)(B). Additionally, the Part 70 rules require that annual certifications "shall be based on the method or means designated" in the permit. 40 CFR 70.6(c)(5)(iii)(C). Pursuant to the CAA, Illinois adopted its own Title V program. 415 ILCS 5/39.5.

1.    **Compliance With The Title V Permit Is, By Definition, Compliance With Environmental Laws.**

Under federal and Illinois law, compliance with the Title V permit is compliance with the CAA. The permit contains "all CAA requirements relevant to the particular polluting source" and "is a source-specific bible for Clean Air Act compliance." *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996); *see also Public Citizen, Inc. v. Envtl. Prot. Agency*, 343 F.3d 449 (5th Cir. 2003) ("permits do not impose additional requirements on sources but, to facilitate compliance, consolidate all applicable requirements in a single document"); "Operating Permit Program," 57 Fed. Reg. 32250, 32251 (July 21, 1992).

Indeed, the Title V Permit defines precisely how compliance will be measured and the methods used to determine compliance. *Sierra Club v. Envtl. Prot. Agency*, 536 F.3d 673, 674-75 (D.C. Cir. 2008) (in addition to emission limits and reporting requirements, Title V sets forth requirements to ensure compliance with an operating permit's terms and conditions). Only the compliance methods specified in the Title V permit may be used, and methods outside the Title V permit cannot be used to determine a violation. *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d

1337, 1350-51 (11th Cir. 2005) (holding that only the compliance method specified in the permit can be used to determine a violation); *Appalachian Power Co. v. Envtl. Prot. Agency*, 208 F.3d 1015, 1027 (D.C. Cir. 2000) ("Test methods and the frequency of testing for compliance are surely 'substantive' requirements; they impose duties and obligations on those who are regulated").

> **2.      The Joliet Plant's Title V Permit Included A Permit Shield, Which Established Compliance With The Permit Is Deemed Compliance With The Law.**

Illinois EPA issued the Joliet Plant a permit pursuant to Title V and the Illinois CAAPP. (SOF at ¶ 5)  The permit includes a "permit shield" provision stating that compliance with the conditions of the permit shall be deemed compliance with any applicable requirement under the CAA.  (SOF at ¶ 6)  As such, all the applicable regulatory requirements relating to air emissions and related operations are contained within the four corners of the plant's Title V Permit.  Thus, to prevail, FHR must establish that BP Amoco was not in compliance with its Title V Permit as of the date the plant was sold to FHR—May 28, 2004 (the "Closing").  Because FHR cannot establish that BP Amoco was not in compliance with its Title V Permit through and including the Closing, BP Amoco is entitled to summary judgment.

> **B.      The Undisputed Facts Establish That There Was No Breach Of The Environmental Representations With Respect To FHR's Environmental Claims.**

FHR asserts various claims alleging that BP Amoco breached its environmental representations.  (SOF at ¶ 4)  To establish a claim for breach of contract, FHR's burden, among others, is to show an actual breach.  *See Montgomery v. Amoco Oil Co.*, 804 F.2d 1000, 1003, n.6 (7th Cir. 1986); *W.W. Vincent & Co v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967, 351 Ill. App. 3d 752 (Ill. App. Ct. 2004).  To prevail, FHR must establish a breach of the representations in sections 7.1(i) and 7.1(j) of the PSA that BP Amoco was in compliance with its Title V Permit.  FHR cannot prove that (1) BP Amoco *was not in compliance* with the Title V Permit at the time of Closing, or (2) BP Amoco *failed to properly certify its compliance* with the Title V Permit prior to Closing.   Since FHR can establish neither of these with respect to its environmental claims, BP Amoco is entitled to summary judgment.[1]

---

[1]     BP Amoco is not moving for summary judgment on Claim 24.

- ***Claim 4: IPA Silos Dust Collectors (KM-110 and KM-111)***  FHR contends that VOM emissions in the form of acetic acid from the IPA Silos Dust Collectors exceeded emission limits in the Title V Permit, and that, as a result, BP Amoco breached its environmental representations.  FHR asserts that BP Amoco was in violation of its permit based on FHR's post-Closing stack testing using methods not provided for in the permit.  FHR further contends that odor complaints related to unregulated benzoic acid emissions, a 1996 material balance calculation provided to IEPA with a permit modification application, and suspected acetic acid damage to bags used to collect dust in the silos should have triggered further investigation by BP Amoco of the emissions from the IPA Silos.

Before the sale, BP Amoco had conducted an analysis of emissions from the IPA Silos, in accordance with the Title V Permit.  Based on engineering analysis, BP Amoco concluded that these emissions were in compliance with the VOM emission limits.  (SOF at ¶ 20)  Applying compliance systems BP Amoco had in place, BP Amoco annually certified its continuing compliance with the Permit's VOM emission limit.  (SOF at ¶¶ 9, 10, 11, 20)

There is no evidence in the record that BP Amoco's original analysis and annual certification of compliance with the Title V Permit's emission limits for the IPA Silos were inaccurate or wrong.  The Title V Permit expressly specified that testing of the IPA silos was not required except upon request of Illinois EPA, and Illinois EPA never requested a test, either during BP Amoco's ownership of the Joliet Plant or subsequent to Closing.  (SOF at ¶ 26)  Moreover, FHR's post-Closing testing of emissions is invalid and irrelevant.  First, none of the tests conducted by FHR on the IPA Silos emissions were conducted in accordance with the test methods specified in the permit, and so are irrelevant to an evaluation of compliance with the Title V Permit.  (SOF at ¶ 28)  *See Sierra Club*, 430 F.3d at 1350-51; *Appalachian Power Co.*, 208 F.3d at 1027.  Second, the tests conducted by FHR were invalid and unreliable because they were not conducted under normal operating conditions or conditions that were comparable to the way BP Amoco operated the IPA Silos, and were not performed in accordance with sound scientific methods.  (SOF at ¶ 29)  Finally, FHR's citation to BP Amoco's evaluation and resolution of benzoic acid related odor complaints, a 1996 material balance that it disclosed to Illinois EPA, and the investigation of damage to baghouse dust bags are unrelated to BP Amoco's  compliance demonstration or its application of its systems to assess its continuing compliance.  (SOF at ¶¶ 22, 23, 24, 25)

• ***Claim 7: MAN Product Tank PSV Valves; Claim 23: Filter House PSV Valves (PM-510); Claim 43: MAN Equipment Washes*** In Claim 7, FHR contends that VOM emissions from conservation vents on MAN Product tanks were not permitted in the Title V Permit, and in Claim 23, FHR contends that VOM emissions in the form of acetic acid from the PIA Filter House pressure relief valves were not permitted in the Title V Permit. In Claim 43, FHR contends that VOM emissions from MAN unit equipment washes and other related maintenance activity create emissions that exceed the Illinois 8 lbs/hr rule in the Title V Permit. In none of these claims does FHR contend that BP Amoco did not comply with an applicable emission limit established in the Title V Permit.

There are no emission limits in the Title V Permit for the conservation vents on the MAN product tanks, the PSVs on the PIA filter house, or the MAN equipment washes. (SOF at ¶¶ 31, 33, 35) FHR is essentially asking this Court to rewrite the Title V Permit to include additional permit requirements for emissions from the conservation vents, the PSV's, and the MAN washes. In *U.S. v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir. 1994), the Seventh Circuit held that even U.S. EPA could not "mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been granted …." Condition 8.1 of the Title V Permit expressly states that the Title V Permit is "based on the Illinois EPA's review of the permit application for this source and its determination that all applicable requirements are specifically identified in this permit." (SOF at ¶ 6) While the Title V Permit expressly states that the permit could be reopened and revised in the event that IEPA or U.S. EPA determined that the permit "contains a material mistake or that inaccurate statements were made in establishing the emission standards or limitations" (Title V Permit Condition 9.12.2 c.), no such determination had been made and the Title V Permit had not been revised or reopened as of the Closing. (SOF at ¶ 8)

With regard to the MAN washes, BP Amoco determined that the emissions from that activity were fugitive emissions and appropriately listed equipment washes as fugitive emission sources in its Title V Permit, and reported such fugitive emissions as required by the Title V Permit.[2] (SOF at ¶ 35) Accordingly, BP has complied with the permit provisions that applied to the MAN wash activities. BP Amoco is entitled to summary judgment on Claims 7, 23 and 43.

---

[2] Indeed, FHR itself initially reported the emissions from the MAN washes as fugitive emissions (SOF at ¶ 35), but in January 2005, FHR initiated an inquiry of a representative from Illinois EPA about the applicability of the 8 pound per hour rule to MAN washes and maintenance activities. Initially, the Illinois EPA representative stated that Illinois EPA "had not seen these types of emissions reported with respect to the eight-pound per hour rule from other facilities in Illinois." Subsequently, Illinois

- **Claim 10: Open-Ended Lines** FHR contends that when it acquired the Joliet Plant from BP Amoco that certain valves, which it refers to as "Strahman/Fetterolf valves," were open-ended lines that did not meet regulatory requirements of the Leak Detection And Repair ("LDAR") program applicable to the plant in the Title V Permit. BP Amoco analyzed the valves it had at the Joliet Plant for compliance with the LDAR requirements for open-ended lines and specifically determined that the valves complied with the LDAR open-ended valve requirements and certified compliance with the LDAR requirements. (SOF at ¶ 37) IEPA had conducted LDAR inspections of the Joliet Plant and had never cited BP Amoco for violating the LDAR open-ended valve requirements. (SOF at ¶ 39) FHR has no evidence to support its assertion that the valves it replaced were non-compliant "open-ended" valves. Indeed, FHR's own expert could not describe the valves that FHR contends violated the requirement. (SOF at ¶ 38) FHR cannot prove that BP Amoco was not in compliance with the Title V Permit at Closing with respect to these valves.

- **Claim 22: Acetic Acid Tank and Condenser (HF-1404 and HE-1404)** FHR contends that VOM emissions in the form of acetic acid from the IPA Acetic Acid Tank exceeded limits in the Title V Permit at the time of Closing. FHR bases this claim on three contentions: (1) an error in a BP Amoco 1998 permit application submitted to IEPA which was later corrected; (2) a preliminary design data sheet for a condenser that would remove acetic acid from emissions from the acetic acid tank; and (3) post-sale calculations by FHR employee Scott Goffinet which were based on the preliminary design data sheet and, which purportedly showed that under some conditions the HE-1404 condenser in place at the time of closing could not achieve a 95% removal efficiency, but that it could achieve that removal efficiency under other operating conditions. None of these facts establish a violation of the Title V Permit or the emission limits on the IPA Acetic Acid Tank.

FHR's claim is premised on its determination that BP Amoco and IEPA were wrong in their collective conclusion that the HE-1404 condenser that was in place at the time the Title V

---

EPA informed FHR that the rule did apply and FHR implemented equipment modifications and procedural modifications to limit emissions. (SOF at ¶ 36) FHR asks the Court to ignore the fact that all this took place more than eight months *after* Closing. IEPA's subsequent determination more than eight months after Closing that a different approach was preferable (or even required) may have triggered an opportunity for Illinois EPA to reopen or revise the permit, but does not establish any pre-Closing non-compliance by BP Amoco. *See U.S. v. AM Gen. Corp.*, at 475.

Permit was issued could not meet a 95% removal efficiency of VOM.[3]  IEPA did not include a 95% removal efficiency requirement in the Title V Permit as an emission limitation, but rather established a specific ton per year limit on the emissions from the IPA Acetic Acid Tank.  (SOF at ¶ 41)  Accordingly, FHR's assertion that the HE-1404 could not meet a 95% removal efficiency is irrelevant to BP Amoco's compliance with the Title V Permit, as that was not the compliance method specified in the Permit.  (SOF at ¶ 42)  The sole limit on emissions from the IPA Acetic Acid Tank in the Title V Permit is a limit of 4.4 tons per year.  (SOF at ¶ 41)  BP Amoco properly certified compliance with this permit requirement annually as required by the Title V Permit.  FHR performed calculations that confirmed emissions from the IPA Acetic Acid Tank never exceeded this annual emission limit.  (SOF at ¶ 44)

• **_Claim 25: PIA Purification Scrubbers (LM-305 and LM–313/314)_**  FHR contends that BP Amoco failed to comply with a requirement in its Title V Permit to conduct performance testing on the LM-313/314 IPA scrubbers and therefore breached its representations.  FHR's contention that the Title V Permit required testing of the PIA Purification Scrubbers is inconsistent with the permit.  Testing was not required except upon request of IEPA, and the agency never requested that BP Amoco or FHR conduct any testing.  (SOF at ¶¶ 49, 50)  BP Amoco had previously conducted testing that IEPA deemed sufficient to issue the Title V Permit.  (SOF at ¶ 48)  Thereafter, BP Amoco annually certified compliance and was in compliance with the other aspects of the Title V Permit on recordkeeping and reporting for this unit as required by the Title V Permit.  (SOF at ¶ 48)

---

[3]  FHR's assertion that the HE-1404 condenser could not meet the 95% removal efficiency requirement is itself unsupportable.  First, when BP Amoco purchased and installed the HE-1404 condenser it was aware of the 95% removal efficiency requirement and specified that it meet that removal efficiency.  (SOF at ¶ 43)  Second, the calculations that Goffinet did show that under certain operating conditions the HF-1404 condenser could meet the 95% removal efficiency it was designed to meet.  (SOF at ¶ 46)  Finally, Goffinet's calculations were based on a preliminary design data sheet, which on its face states that the final HE-1404 condenser to be installed would need 10% additional surface area, yet Goffinet acknowledges he did not consider the impact of a larger surface area in his calculations.  (SOF at ¶ 45)  FHR cannot prove the actual removal capability of the HE-1404 condenser it acquired from BP Amoco as part of its acquisition of the Joliet Plant because it disposed of the condenser prior to testing it, analyzing its size or allowing BP Amoco to inspect it.  (SOF at ¶ 47)  This spoliation of evidence by FHR has been addressed in a separate motion to the Court.  (Doc. No. 249.)

- **Claim 29: TMA Fume Scrubber**  FHR contends that BP Amoco improperly calculated Illinois Air Oxidation Rule TRE's[4] for the TMA fume scrubber, thus failing to comply with its Title V Permit and breaching its representations.  Specifically, FHR contends that BP Amoco did not calculate TRE values for each inlet stream to the MD-705 fume scrubber.  (SOF at ¶ 52)

FHR's claim is based on a misinterpretation of the requirement in the permit.  Consistent with condition 7.4.3(a)(i)(E) of the Title V Permit, BP Amoco calculated a TRE index for each of the four process vent streams identified in condition 7.4.3 of the Title V permit, as well as a TRE index for those streams combined.  (SOF at ¶ 51)  BP Amoco properly understood the Illinois Air Oxidation Rule to require that a TRE be calculated at the outlet from MD-705, and was in compliance with its Title V Permit.  FHR wrongly assumed that the federal HON TRE requirement to calculate TRE's on the inlet also applied to the Illinois Air Oxidation Rule TRE. (SOF at ¶ 51)  As a result, FHR conducted a stack test on the MD-705 fume scrubber in order to calculate TRE's on three additional inlet streams to MD-705, which TRE calculations were not required by the Title V Permit.  (SOF at ¶ 52)  Further, the Title V Permit expressly provided that testing of MD-705 for "VOM emission rate and other variable[s] necessary to calculate a TRE" was only required upon request of IEPA.  (SOF at ¶ 52)  IEPA never requested such a test. (SOF at ¶ 52)  In short, FHR conducted an expensive compliance stack test to develop TRE calculations that were not required under the Title V Permit and were inconsistent with the requirements of the Permit.

- **Claim 42: MAN Vent Scrubber (ND-1500)**  FHR contends that VOM emissions in the form of orthoxylene from the ND-1500 Scrubber at the time of Closing exceeded limits in the Title V Permit and that, as a result, BP Amoco breached its environmental representations.  This claim is based on FHR's invalid and unreliable post-Closing stack testing of emissions from the ND-1500, as well as calculations and analyses based upon those test results.  FHR alleges two violations of the Title V Permit:  (1) the ND-1500 was in violation of an 8 lbs/hr VOM emission limit; and (2) the ND-1500 failed to comply with an applicable HON regulation requiring that

---

[4]  A TRE calculation under the Illinois Air Oxidation Rule is a regulatorily mandated analysis of the cost effectiveness of additional control equipment in reducing VOM emissions from a regulated air contaminant stream.

ND-1500 reduce hazardous air pollutants (in this instance, o-xylene) by 98% or achieve a HON TRE index of greater than 4.[5]

With regard to both contentions, FHR relies on invalid test results. More than six months after Closing, on December 9, 2004, FHR tested emissions from ND-1500 and relies on that test to allege BP Amoco's noncompliance with the 8 lb/hr VOM limit. (SOF at ¶ 56) A subsequent test on January 13, 2005, which FHR contends showed compliance with the 8 lb/hr limit, supplied the data for calculating the HON TRE index that FHR claims violated the permit. (SOF at ¶¶ 58, 59, 60, 61) Neither of FHR's tests was conducted using the test methods required by the Title V Permit. (SOF at ¶¶ 57, 59) As a result, the tests are not valid to establish the compliance status of ND-1500.[6] Accordingly, there is no evidence that BP Amoco did not operate ND-1500 in compliance with the Title V Permit limit.

BP Amoco had previously tested emissions from ND-1500 and calculated the HON TRE index during its ownership of the Joliet Plant and determined that emissions from ND-1500 met the 8 lbs/hr limit in the Title V Permit. (SOF at ¶ 54) In addition, BP Amoco had properly analyzed and certified compliance with the HON TRE requirement in the Title V Permit. (SOF at ¶ 55) BP Amoco, thereafter, annually certified compliance as required. (SOF at ¶ 53) BP Amoco was in compliance with its Title V Permit as it applied to ND-1500 at Closing.

• ***Claim 46: Air Emissions Testing*** FHR contends that BP Amoco did not comply with the requirement in its Title V Permit that it certify compliance with the permit requirements, and that it was necessary for FHR to conduct extensive testing to confirm compliance with the Title V Permit. FHR also contends that BP Amoco was not in compliance with its Title V Permit

---

5  The HON regulation is a separate set of regulatory requirements designed to establish specific controls on hazardous organic pollutants. A HON TRE index is a calculation specified in the HON regulation, which is designed to evaluate removal efficiencies of control equipment based on emission levels entering the control equipment.

6  Further, the December test was conducted *during* a process "upset" in that an upstream piece of equipment, the NE-618 jet condenser, was fouled which resulted in elevated levels of orthoxylene being routed to the ND-1500. (SOF at ¶ 57) After FHR performed maintenance on the NE-618 condenser and with it functioning properly, the subsequent test conducted on January 13, 2005, yielded results that were well below the 8 lbs/hr limit. (SOF at ¶¶ 58, 60) FHR subsequently installed a temporary chiller at a cost of over $400,000 ostensibly to achieve compliance with the 8 lb/hr limit until a more permanent solution could be implemented, although FHR's own expert could not testify that the chiller was necessary to achieve compliance. (SOF at ¶61) BP Amoco is entitled to summary judgment on FHR's claim for the cost of the chiller.

because there did not exist sampling ports or other equipment necessary to timely conduct tests if such tests were requested by IEPA. Based upon these two contentions, FHR asserts that BP Amoco breached its environmental representations.

First, FHR asserts that it needed to conduct extensive testing of emission sources at the Joliet Plant because it was required to certify compliance with the Title V Permit and it lacked confidence in BP Amoco's certifications of compliance. (SOF at ¶ 63) FHR cites as the basis for that lack of confidence its own erroneous testing and calculations. (SOF at ¶ 63) To address FHR's own unease, it launched an extensive testing regimen of fifteen emission points. (SOF at ¶ 66) FHR's claim here is not based on a case-by-case analysis of BP Amoco's certifications of compliance with the equipment that FHR tested, and in fact all the testing relating to this claim *showed compliance* and confirmed BP Amoco's certifications. (SOF at ¶ 66)

The stack tests for which FHR seeks recovery in this claim were not requested by IEPA, and were not required by the Title V Permit. (SOF at ¶ 67) In each instance, BP Amoco had separately certified compliance in accordance with the methods of compliance specified in the Title V Permit. (SOF at ¶ 67) Finally, FHR's installation of equipment to facilitate testing which IEPA never requested, and which equipment was not required in the Title V Permit, is unrelated to any of BP Amoco's compliance obligations under the Title V Permit. (SOF at ¶¶ 65, 67)

- *Claim 51: TMA REECO (MB-1050)* FHR contends that VOM emissions from the REECO Regenerative Thermal Oxidizer exceeded limits in the Title V Permit and that the REECO did not meet a permit requirement to achieve 98.5% VOM removal efficiency. FHR bases this claim on stack testing of emissions from the REECO that FHR conducted long after Closing (initially in August of 2005) using methods not provided for in the Permit. (SOF at ¶ 68) Again, FHR's post-Closing testing is invalid and irrelevant. (SOF at ¶ 69)

BP Amoco performed its own test on the REECO in May of 2000 that showed compliance with the emissions limits and the removal efficiency specified in the Permit. (SOF at ¶ 70) BP Amoco further complied with the recording and recordkeeping requirements as the compliance method specified in the Permit, and annually certified compliance with the Title V Permit requirements. (SOF at ¶ 70) BP Amoco also performed a March 2002 study to ensure compliance with the REECO's VOM emission limit. (SOF at ¶ 70) BP Amoco did regular maintenance on the valves in the REECO. FHR, however, did not do any maintenance work on the valves in the sixteen months from Closing to the time of the first test in August of 2005.

(SOF at ¶ 71)   After conducting the testing and concluding that the REECO was not in compliance with the Title V Permit, FHR treated the repairs that it did to the valves as maintenance and expensed the cost of repair.   (SOF at ¶ 71)   FHR cannot establish that BP Amoco was not in compliance with its Title V Permit at Closing.

•      *Claim 80: IEPA Violation Notice*   After Closing FHR reported certain "deviations" from the requirements of the Title V Permit to IEPA, and as a result, IEPA issued a "Violation Notice" to FHR in April 2006 (the "VN").   IEPA subsequently referred the matter to the Illinois Attorney General for further enforcement and suit was filed against FHR in March of 2008 (the "FHR Enforcement Case").   FHR contends that the VN and the FHR Enforcement Case are the result of BP Amoco's breach of its environmental representations.   FHR specifically seeks recovery of its costs of defending the VN and the FHR Enforcement Case, even though all of the violations alleged by the State of Illinois arise after Closing, and the State did not cite BP Amoco for any violations during its ownership of the Joliet Plant.   (SOF at ¶ 72)   As outlined above, FHR cannot establish any violation of the Title V Permit.

FHR also seeks recovery of costs it incurred "to address PD-700."   FHR contends that when it tested the PD-700 Low Pressure Absorber in April, June, and July 2005 and August 2006 the tests showed non-compliance with emission limits in the Title V Permit.   The Title V Permit did not require stack testing as a means of demonstrating compliance.   Even so, FHR did not employ the compliance test methods required by the Title V Permit in conducting its tests.   (SOF at ¶ 76)   Furthermore, FHR's tests were eventually shown to be subject to interferences that overstated emissions.   (SOF at ¶ 77)   FHR's tests were fatally flawed and incapable of establishing emissions from PD-700.

BP Amoco had previously demonstrated compliance with the applicable emission limits in the Title V Permit as applied to PD-700, and had certified compliance with those limits in annual compliance certifications.   (SOF at ¶ 73)   The Title V Permit, rather than requiring testing, established operational limitations on PD-700 and recordkeeping requirements as the method for demonstrating compliance.   (SOF at ¶ 74)   BP Amoco demonstrated compliance in accordance with those requirements. (SOF at ¶ 72)   Indeed, FHR was in compliance with the operational limitations specified in the Permit at the time it conducted its invalid testing.   (SOF at ¶ 78)   Accordingly, FHR cannot establish that BP Amoco was out of compliance with its Title V Permit at Closing.

11

### C. FHR Has No Evidence That BP Amoco Possessed "Seller's Knowledge" Of Any Alleged Environmental Violations.

FHR alleges that BP Amoco breached PSA sections 7.1(i) and 7.1(j)(ii). These environmental representations were made and limited "to Seller's Knowledge." (SOF at ¶ 19) The PSA defines "Seller's Knowledge" as the "actual knowledge" of 26 identified individuals employed by BP Amoco prior to Closing. (SOF at ¶ 19) Thus, to establish a breach of these representations, FHR cannot rely simply on allegations that some employee had knowledge or "should have known" about alleged facts resulting in a violation of the Title V Permit. Instead, under the plain language of the PSA, FHR must prove actual knowledge by at least one of these 26 individuals identified in the PSA. FHR has not produced evidence that any individual had actual knowledge that BP Amoco was not in compliance with its Title V Permit. At most, FHR alleges that BP Amoco employees demonstrated a "conscious disregard" of facts and information that, if they had investigated, would have led BP Amoco to determine it was not in compliance. (SOF at ¶ 4) That is not the "actual knowledge" that is specified in the PSA, and FHR cannot prevail on its claims that BP Amoco breached PSA sections 7.1(i) and 7.1(j)(ii).

### D. BP Amoco Did Not Breach Its Condition Of Asset Representation With Respect To FHR's Environmental Claims.

For certain environmental compliance claims, FHR also alleges a violation of the "condition of assets" representation contained in PSA § 7.1(d)(ii). BP Amoco has already moved for summary judgment on the condition-of-asset-representation in Section 7.1(d)(ii), and that motion fully applies to FHR's alleged breach of that representation arising out of its environmental claims. [Docket No. 224] To the extent that FHR contends a breach of the condition-of-asset representation based on FHR's allegation that equipment was not in compliance with environmental requirements, that argument is factually baseless because FHR cannot prove that BP Amoco was not in compliance with its Title V Permit. In addition, FHR's argument is legally baseless because Sections 7.1(i) and 7.1(j) contain extensive representations regarding compliance with the environmental laws and environmental permits. Where there are extensive and detailed representations relating to environmental compliance elsewhere in the PSA, there is no basis to infer an additional meaning to the condition-of-asset representation. *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1247 (2d Cir. 1991) (if a general provision guaranteed the accuracy of all estimated items on a balance sheet, the specific guarantees regarding balance sheet items would have been superfluous).

12

**E.      FHR Has Spoliated Evidence For Three Of Its Environmental Claims.**

Summary judgment should be granted on three of FHR's environmental claims because it is undisputed that FHR destroyed the equipment on which it bases those claims.  For Claim 10, FHR alleges it replaced the valves that it claims were open-ended valves, and then disposed of the valves that it replaced without making them available to BP Amoco for inspection.  (SOF at ¶ 40)  For Claim 22, FHR cannot prove the actual removal capability of the HF-1404 condenser at issue because FHR disposed of the condenser before testing it, analyzing its size, or allowing BP Amoco to inspect it.  (SOF at ¶ 47)  In Claim 51, FHR alleges that it had to repair valves in the REECO unit, but FHR removed the original valves and did not preserve them, despite the fact that neither BP Amoco nor its experts had examined the original valves.  For the reasons explained in BP Amoco's motion for sanctions, supporting memorandum and reply memorandum (Motion of BP Amoco Chemical Company And BP Corporation North America Inc. For Sanctions Against Flint Hills Resources, LLC For The Spoliation And Destruction Of Material Evidence (Doc. Nos. 249, 251 and 329)), these claims should be dismissed.

**F.      FHR's Environmental Claims Are Subject To A $2.5 Million Deductible.**

Under the plain language of the PSA, FHR has assumed the first $2.5 million of any losses from environmental claims.  (SOF at ¶ 19)  For the reasons described above, FHR's environmental claims should be dismissed.  But, if the Court decides to dismiss certain environmental claims but not all of them, any remaining environmental claims should be dismissed if the alleged damages are less than $2.5 million.  (SOF at ¶ 19)

**II.     BP AMOCO IS ENTITLED TO SUMMARY JUDGMENT ON FHR'S CLAIM THAT THE ENVIRONMENTAL REPRESENTATIONS WERE FRAUDULENT.**

FHR alleges that BP Amoco fraudulently represented that it was in compliance with the Title V Permit with regard to Claim 4 relating to the IPA Silos, Claim 22 relating to the IPA Acetic Acid Tank, and Claim 42 relating to the ND-1500 Vent Scrubber.  The elements of fraud are "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."  *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers LLP,* 475 F.3d 824, 841 (quoting *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 591 (Ill. 1996)).  FHR's fraud claim as it applies to these environmental claims fails as a matter of law because FHR cannot establish each

13

of these essential elements of fraud—let alone by clear and convincing evidence, as the law requires. *See Davis v. G.N. Mortgage Corp.,* 396 F. 3d 869, 881-882 (7th Cir. 2005).[7]

First, BP Amoco did not breach its environmental representations regarding the IPA Silos, the IPA Acetic Acid Tank, or the ND-1500 Scrubber. Because those representations were accurate, FHR's fraud claim fails. *See Marusiak v. Adjustable Clamp Co.*, 2005 WL 2420370, at *7-8 (N.D. Ill. Sept. 30, 2005) (granting summary judgment on fraud and fraud in the inducement claims where plaintiff "failed to show [defendant] ever breached the Agreement"); *Thomas Consol. Indus., Inc.*, *v. Koster Group, Inc.,* 2002 WL 31049836, at *4 (N.D. Ill. Sept. 13, 2002) (granting summary judgment because plaintiffs presented no evidence that representations were false); ILL. LAW & PRAC. FRAUD § 26 ("representation is not actionable as fraud unless it is false"); *see also BP Amoco Chem. v. Flint Hills Res., LLC,* 489 F. Supp. 2d 853, 859-60 (N.D. Ill. 2007).

Second, FHR cannot prove that BP Amoco had knowledge of any alleged environmental misrepresentations in the PSA. As addressed above in Section I.B., BP Amoco had numerous systems in place to ensure compliance with its Title V Permit. Moreover, BP Amoco properly certified compliance based upon the compliance demonstration methods set forth in the Permit.[8] (SOF at ¶ 12) As explained above in Section I.C., FHR cannot establish that any BP Amoco employee had actual knowledge that BP Amoco was not in compliance with its Title V Permit.

Third and finally, FHR's fraud claim fails because it cannot show that BP Amoco *intended* to defraud it. *See Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 818 (N.D. Ill. 2006); *Cordiant MN, Inc. v. David Cravit & Assocs., Ltd.*, 1997 WL 473883, at *9 (N.D. Ill. Aug. 14, 1997). BP Amoco provided FHR full access to its Title V Permit compliance-related

---

7    *Accord Tricontinental Indus., Ltd.,* 475 F.3d at 841; *Bixby's Food Sys., Inc. v. McKay,* 193 F. Supp. 2d 1053, 1065 (N.D. Ill. 2002); *Athey Prods. Corp. v. Harris Bank Roselle,* 89 F. 3d 430, 434-35 (7th Cir. 1996) ("speculation, possibilities, and reasonable explanations for [defendant's ] conduct do not satisfy [plaintiff's] burden of showing fraud by clear and convincing evidence"); *see Cooper v. Chicago Transit Auth.*, 1996 WL 520855, at *15 (N.D. Ill. Sept. 10, 1996) (denying summary judgment because plaintiff presented only "nebulous" assertions that "simply reiterate[d] the Illinois standard for common law fraud and fill[ed] in some facts").

8    Indeed, it would be impossible for BP Amoco to have known much of the information upon which FHR now relies to allege environmental violations. FHR frequently relies on stack testing conducted months or even years *after* Closing in an effort to show environmental violations. BP Amoco employees could not have known of such test results during the time BP Amoco owned the Joliet Plant. Moreover, because such tests are not required or authorized by the Title V Permit, such testing could not give rise to knowledge of a potential violation in any case.

14

documents and even permitted FHR personnel involved in due diligence to interview key BP Amoco employees with responsibility for environmental compliance.  As a result, FHR had a full understanding of the methods employed by BP Amoco to certify compliance with the Title V Permit.  (SOF at ¶¶ 13, 14, 15, 16, 17, 18)  On the other hand, FHR has not alleged a single, solitary fact that shows BP Amoco intended to defraud it with respect to these units.  Nor can it identify any such facts.

## CONCLUSION

For the foregoing reasons, BP Amoco and BPCNA request that the Court grant summary judgment in their favor on FHR's Claim Nos. 4, 7, 10, 22, 23, 25, 29, 42, 43, 46, 51, and 80.

Respectfully submitted,

/s/ Travis J. Quick_____
Richard C. Godfrey, P.C. (ARDC #3124358)
Scott W. Fowkes, P.C.(ARDC #6199265)
Travis J. Quick (ARDC #6280905)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

William L. Patberg (admitted *pro hac vice*)
Louis E. Tosi (admitted *pro hac vice*)
Douglas G. Haynam (admitted *pro hac vice*)
Joseph S. Simpson (admitted *pro hac vice*)
SHUMAKER, LOOP, & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio  43624
(419) 241-9000

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2009, I caused a true and correct copy of the foregoing

to be served electronically via the CM/EMF system on the following:

James Figliulo, Esq.
FIGLIULO & SILVERMAN, PC
10 South LaSalle Street, Suite 3600
Chicago, IL 60603

Susan M. Franzetti, Esq.
FRANZETTI LAW FIRM, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603

/s/ Travis J. Quick

16