**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BP AMOCO CHEMICAL COMPANY, ) <br> ) <br> Plaintiff/Counter–Defendant, ) <br> v. ) <br> ) <br> FLINT HILLS RESOURCES, LLC, ) <br> ) <br> Defendant/Counter–Plaintiff. ) <br> ) <br> FLINT HILLS RESOURCES, LLC, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> BP CORPORATION NORTH AMERICA INC., ) <br> ) <br> Defendant. ) | Case No. 05 C 5661 <br><br> Judge Amy J. St. Eve |

**MEMORANDUM OF LAW IN SUPPORT OF FLINT HILLS RESOURCES, LLC'S
MOTION TO EXCLUDE
<u>EXPERT TESTIMONY FROM DR. VINCENT VAN BRUNT</u>**

| | |
|---|---|
| James R. Figliulo (#6183947) <br> Ryan P. Stiles (#6256732) <br> Marc S. Porter (#3125509) <br> Thomas D. Warman (#6280004) <br> Sara A. Paguia (#6291870) <br> FIGLIULO & SILVERMAN, P.C. <br> 10 South LaSalle Street, Suite 3600 <br> Chicago, Illinois 60603 <br> T: 312.251.4600 <br> F. 312.251.4610 | Susan M. Franzetti (#3125061) <br> NIJMAN FRANZETTI LLP <br> 10 South LaSalle, Suite 3600 <br> Chicago, Illinois 60603 <br> T: 312.251.5590 <br> F: 312.251.4610 |

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................. ii

Factual Background ..................................................................................................................1

Argument ...................................................................................................................................6

      I.      DR. VAN BRUNT'S METHODOLOGY IS NOT RELIABLE. ............................6

            A.      Dr. Van Brunt Employed No Methodology Whatsoever to His
Evaluation of the "Reasonableness" of BP's Production Capacity
Calculation .................................................................................................7

            B.      Dr. Van Brunt's Evaluation Intentionally Ignored
Production Bottlenecks at the Joliet Plant ....................................................8

            C.      Dr. Van Brunt's Conclusions Are Not Supported By His
Own Methodology .....................................................................................10

      II.     DR. VAN BRUNT'S TESTIMONY WILL NOT ASSIST THE
TRIER OF FACT ...............................................................................................11

            A.      The "Reasonableness" of BP's Production Capacity Calculation
is Irrelevant ...............................................................................................11

            B.      Dr. Van Brunt's Determination of Production Capacity is
Irrelevant Because He Did Not Make His Determination
as of the Date of the Sale ...........................................................................12

Conclusion ...............................................................................................................................14

# TABLE OF AUTHORITIES

## Cases

*Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir. 2000) ....................................................6

*BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, 05 CV 5661, --- F.Supp.2d ---,
2009 WL 449081 (N.D. Ill. Feb. 23, 2009) ...........................................................................7, 9, 12

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) ....................................................................6

*Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 675 N.E.2d 584, 222 Ill. Dec. 389
(1996) ...........................................................................................................................................12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993).......6, 7, 11

*Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 00 CV 0191,
2003 WL 1797844 (N.D. Ill. April 3, 2003) ...............................................................................7, 8

*Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 249 Ill. Dec. 45,
735 N.E.2d 649 (Ill. App. Ct. 2000) ..............................................................................................12

*Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418 (7th Cir. 1990) ............................................6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) .............6

*McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651 (7th Cir. 1998) ..................................................7

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994).........................................6

*Rodefer v. Hill's Pet Nutrition, Inc.*, 01 CV 123, 2003 WL 23096486
(S.D. Ind. Nov. 7, 2003) ................................................................................................................11

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)..................................................................7

**Statutes, Rules and Regulations**

Fed. R. Evid. 702 ................................................................................................................6

**Articles**

Chris McKellen, *Theory of Constraints*, METALWORKING PRODUCTION, May 2004 at 9 ...............9

S.S. Chakravorty and J. Brian Atwater, *Bottleneck Management: theory and practice*,
PRODUCTION PLANNING AND CONTROL, July 2006 at 441 ................................................9

W.J. Hopp and M.L. Spearman, FACTORY PHYSICS at 458 (2nd ed. 2001) ......................................9

John Brausch and Thomas Taylor, *Who is Accounting for the Cost of Capacity?*,
MANAGEMENT ACCOUNTING, February 1997 at 49 ..........................................................9

Demetri Petrides, Alexandros Koulouris, and Charles Siletti, *Throughput Analysis and
Debottlenecking of Biomanufacturing Facilities*, BIOPHARM, August 2002 at 2 ............................9

Defendant/Counter-Plaintiff Flint Hills Resources LLC ("Flint Hills") submits this memorandum of law in support of its Motion to Exclude Expert Testimony of Dr. Vincent Van Brunt.

## FACTUAL BACKGROUND

BP Amoco Chemical Company and BP Corporation North America, Inc. (collectively, "BP") sold a chemical plant located outside of Joliet, Illinois ("Joliet Plant") to Flint Hills Resources, LLC ("Flint Hills") in May 2004. As part of the transaction, the parties executed a Purchase and Sale Agreement ("PSA"). In Section 7.1(d)(ii) of the PSA, BP represented the production capacity of the Joliet Plant:

> The annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons, respectively, with the product produced meeting Seller's standard specifications therefor, recognizing that such demonstrated capacity does not take into account planned or unplanned downtime.

Exhibit 1; PSA at 57. Significantly, BP made the production capacity representation in Section 7.1(d) "as of the date of this Agreement, and as of the Closing." Id. at 54. The PSA was signed on March 29, 2004, and the closing occurred in May 28, 2004.

The Joliet Plant primarily manufactures three chemicals used as chemical intermediates in the production of plastics and other materials: purified isophthalic acid ("PIA"), trimellitic anhydride ("TMA") and maleic anhydride ("MAN"). The Joliet Plant is an integrated process facility, i.e., it is a single chemical manufacturing plant with production units that share common resources like cooling water, process air, steam and wastewater treatment capabilities. Exhibit 2; 01/03/09 Ogle Declaration at ¶4 (attachments omitted).

**Dr. Van Brunt's Opinions**

Dr. Vincent Van Brunt is an engineering professor at the University of South Carolina. He occasionally provides consulting services through Packer Engineering. Dr. Vincent Van Brunt was contacted by Packer Engineering in 2007 to provide his expert opinion regarding BP's production capacity representation. Packer asked Dr. Van Brunt for two opinions: "One was the reasonableness of approach of BP [], and the second one was to perform an independent evaluation of what I thought the annualized maximum sustainable production was." Exhibit 3;

VB Dep. 54:24-55:3.[1] Prior to his retention in this matter, Dr. Van Brunt had no familiarity with the PIA production process (VB Dep. 63:5-7), the TMA production process (VB Dep. 60:15-17), or the MAN production process (VB Dep. 57:20-23).

Dr. Van Brunt's Reasonableness Opinion

Dr. Van Brunt's first opinion is that BP's approach to determining the production capacity of the Joliet Plant was reasonable. To reach this opinion, he "reviewed documents and depositions." VB Dep. 69:19. He never visited the Joliet facility. VB Dep. 70:2-5.[2] He never spoke to any of the engineers at the Joliet facility. VB Dep. 70:12-14. He was not aware that there were several engineers previously employed at the Joliet Plant who currently work for BP, and never spoke to them. VB Dep. 70:15-19. He did not ask to speak to the former Joliet Plant manager who is currently being paid by BP, and who was the "technical expert" who allegedly verified the accuracy of the representations before they were made to Flint Hills.[3] VB Dep. 70:24-71:4. Although Dr. Van Brunt claims to have reviewed some depositions, he did not review the deposition testimony of process engineers that were responsible for running the PIA, TMA and MAN units, including Dr. Robert Snyder, Dan Kelly, and James Shinn. VB Dep. 72:18-73:20. Nor did Dr. Van Brunt review the deposition testimony of operational staff at the Joliet Plant, including Rick Borella and Harold Sparks. VB Dep. 73:24-74:2.

During discovery, Flint Hills produced a database that contained voluminous operational data known as the "PI database." The PI database contains over 8000 "tags" which monitor, and in most cases record, operational information relating to everything from feed rates to tank levels to temperatures and pressures in various vessels. Depending on the particular tag and the operation of the Joliet Plant, data is recorded in seconds, minutes, hours and days. Dr. Van Brunt was provided with a subset of the PI database, but apparently not the entire database. VB Dep. 76:22-77:3. He claims that he would have liked to have analyzed the hourly feed rate data, but

---

[1] Dr. Van Brunt's deposition transcript is attached in its entirety as Exhibit 3 and will be cited throughout this memorandum as "VB Dep." Dr. Van Brunt's report is attached as Exhibit 4. In Dr. Van Brunt's report, he also offers a third opinion, that Flint Hills produced at PSA rates after the sale. Id. at 3. But at his deposition, Dr. Van Brunt concedes that post-sale production data should not be taken into account for determining whether the PSA rates were accurate. VB Dep. 205:7-10.

[2] In fact, Dr. Van Brunt asked his employer, Packer Engineering, to visit the facility, but Packer told him that he could not go. VB Dep. 114:6-18.

[3] That BP plant manager, John Dueker, was also BP's Rule 30(b)(6) witness on production capacity issues. VB Dep. 71:6-11.

2

was under the mistaken belief that the PI database did not contain that type of information. VB Dep. 78:3-19. In fact, the PI database contains feed rate data not only by the hour, but in much smaller increments. VB Dep. 78:11-79:4. But the only thing that Dr. Van Brunt was provided listed feed rates on a daily basis. VB Dep. 79:3-4.

BP claims that it based its determination of the rates to represent in the PSA on a myriad of factors:

> depending on the production unit, historic data; evaluating tests; production rates that were generally accepted by personnel at the Plant; theoretical production rates based on the number of reactors at the Plant, chemical reaction rates, and other factors; investments that had been made; the nameplate capacity associated with the original investments; changes that had been made to the units and the Joliet Plant over time; and the condition of the expansions that were ongoing and has [sic] been conducted.

Exhibit 5; BP Statement of Facts, Production Capacity, ¶34. Dr. Van Brunt did not evaluate any of the underlying production data supporting BP's determination of the production capacity for PIA, TMA and MAN:

```
 9      But you didn't evaluate how BP Amoco
10   calculated the number they relied upon?
11      A.  No.
12      Q.  You didn't evaluate which specific
13   production data BP Amoco relied upon?
14      A.  No.
```

VB Dep. 107:9-14.

```
 7      Q.  Did BP Amoco rely on historical data in
 8   determining the PIA, TMA and MAN rates in the
 9   PSA?
10      A.  Yes.
11      Q.  Okay.
12       Which dates did they rely upon?
13      A.  I don't know.
```

VB Dep. 133:7-13.

Dr. Van Brunt's "Independent Evaluation" of Production Capacity

Dr. Van Brunt also claims that he performed an "independent evaluation" of the annualized maximum sustainable production of the PIA, TMA and MAN Units. Dr. Van Brunt agreed that the PSA production representation can be converted into daily rates for the evaluation of the accuracy of those representations. For the PSA representations to be true, the PIA unit

3

would need to demonstrate production at 465 tons per day (VB Dep. 195:23-196:6, "In your independent evaluation, in order for the representation to be accurate regarding the purified isophthalic acid unit, how many tons per day of purified isophthalic acid would need to be produced?  A. On tons per day?  Q. Sure.  A. It would have to be 465."), the TMA unit would need to demonstrate production at 195 tons per day (VB Dep. 179:12-15), and the MAN unit would need to demonstrate production at 140 tons per day (VB Dep. 232:20-10).

According to Dr. Van Brunt, the key to sustainability is "steady state operation."  VB Dep. 141:14-16.  Steady state operation is running the production unit in a fixed and stable manner, i.e., the temperatures, pressures and other operational parameters don't change throughout the system.  VB Dep. 141:21-142:1.  Dr. Van Brunt did not evaluate temperature and pressure change in the systems, and did not attempt to determine whether the units were in steady state operation for any of the time periods he considered in forming his opinion.  VB Dep. 142:2-19.

Instead, Dr. Van Brunt opines that for the daily rates to be sustainable, the units must produce that rate for three days.  VB Dep. 140:5-13.  Dr. Van Brunt at other times opines that 48 contiguous hours is sufficient (VB Dep. 140:24-141:9), but readily concedes that he only evaluated daily feed rates (VB Dep. 79:3-4). Dr. Van Brunt did not attempt to calculate the actual production for <u>any</u> days of production at the Joliet Plant.

For TMA, Dr. Van Brunt did not evaluate actual TMA production, only the number of batches with hypothetical, not actual, batch sizes.  VB Dep. 152:11-21.  He did not evaluate the size of the batches, i.e., the actual amount of feedstock loaded into each reactor on those days.  VB Dep. 173:15-16.  For purified isophthalic acid, he only evaluated the feed rate of metaxylene into the IPA section.[4]  Dr. Van Brunt did not evaluate the purification section of the purified isophthalic acid production unit, even though he readily acknowledges that it is possible that there are production constraints in that section:

> Q. Is it possible there was a limiting component in the purification unit?  A. It's possible.  Q. You didn't evaluate that, though?  A. No.  Q. You didn't evaluate anything having to do with the flow rate into or out of the purification unit?  A. Right.  Q. And hence, you didn't actually calculate how much actual purified isophthalic acid was made on any particular day?  A. I based that entirely on the feed of the metaxylene.

---

[4]  Dr. Van Brunt acknowledges that purified isopthalic acid only comes out of the purification unit; isophthalic acid is produced in the IPA section.  VB Dep. 186:1-187:9.

4

VB Dep. 188:24-189:14; see also VB Dep. 187:7-12.  Dr. Van Brunt never determined how much purified isophthalic acid was made on any specific day.  VB Dep. 188:18-23.  Nor did Dr. Van Brunt calculate the actual production of MAN for any specific days. VB Dep. 234:12-235:11.

Other Data Not Evaluated by Dr. Van Brunt

As previously noted, Dr. Van Brunt did not review the deposition testimony of process engineers at the Joliet Plant who worked on the units he evaluated.  He admits that he "would like to know what they have to say", but those deposition transcripts were not provided to him.  VB Dep. 237:21-238:12.  Dr. Van Brunt also did not independently evaluate any production bottlenecks in any of the units or the Joliet Plant: "I didn't consider bottlenecks."  VB Dep. 268:18.  Nor did Dr. Van Brunt consider any of the other bottleneck studies already conducted and published by BP engineers.  VB Dep. 247:17-19 ("Did you evaluate bottleneck studies in this case? A. No.").  In Dr. Van Brunt's other engagements to evaluate production capacity, he considered bottleneck studies.  VB Dep. 247:6-11.  In fact, in every other production capacity determination he has performed, this is the only one where he did not consider bottlenecks as part of his analysis.  VB Dep. 272:5-21.

The Timing of Dr. Van Brunt's Production Capacity Determination

As noted above, BP represented and warranted that the PSA representations (including production capacity) were true as of the date of the sale.  Dr. Van Brunt was not aware of the timing of the representations, and did not consider it when forming his opinion:

```
 9    Q.  Are you also aware that BP represented
10   that that was true as of the date of the signing
11   of the Purchase and Sale Agreement and as of the
12   date of the closing?
13    A.  That I'm unaware of.
14    Q.  Okay.
15        You didn't consider that in forming
16   your opinions?
17    A.  No.
```

VB Dep. 228:9-17.

5

**ARGUMENT**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court performs a gatekeeping function to determine whether expert scientific evidence is admissible under Rule 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-95, 113 S. Ct. 2786 (1993); see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). The purpose of the court's gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S. Ct. 1167.

Under this framework, courts determine whether the expert testimony is both relevant and reliable. It is a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," (Fed. R. Evid. 702); the expert's reasoning or methodology underlying the testimony must be scientifically reliable (*Daubert,* 509 U.S. at 592-93, 113 S. Ct. 2786); and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue (Fed. R. Evid. 702).

**I.   DR. VAN BRUNT'S METHODOLOGY IS NOT RELIABLE**

To be reliable, "the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case." Fed. R. Evid. 702 advisory committee's note (2000 Amend.). "Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions" unless those opinions are based upon some recognized or reliable methodology. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *Kumho Tire*, 526 U.S. at 149-50 (whether methodology has been generally accepted is an indicia of reliability); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994) (literature did not support the methodology used). "Expert opinions are worthless without data and reasons." *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 420 (7th Cir. 1990). "Talking off the cuff – deploying neither data nor analysis – is not acceptable methodology." *Bourelle v. Crown Equip. Corp.*,

6

220 F.3d 532, 539 (7th Cir. 2000). "'An expert who supplies nothing but a bottom line provides nothing of value to the judicial process.'" *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) (internal citation omitted).

"In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In determining reliability, *Daubert* also sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-94, 113 S. Ct. 2786. In forming an opinion, it is improper for an expert to "cherry-pick" the facts considered to form an opinion: "such selective use of facts failed to satisfy the scientific method and *Daubert.*" *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 00 CV 0191, 2003 WL 1797844, at *2 (N.D. Ill. April 3, 2003) (attached as Exhibit 6). In other words, it is improper for an expert to consider only the facts that support his opinion and ignore those facts that contradict his opinion.

> A. **Dr. Van Brunt Employed No Methodology Whatsoever to His Evaluation of the "Reasonableness" of BP's Production Capacity Calculation.**

Although Dr. Van Brunt claims that he evaluated BP's calculation of "annualized maximum demonstrated sustainable production", it is clear from his deposition testimony that he did little besides simply accepting BP's statements as true without replicating or verifying BP's calculations. Dr. Van Brunt never visited the Joliet Plant (even though he wanted to), and he never spoke with engineers who were familiar with the processes at the Joliet Plant (even though BP currently employs former Joliet plant engineers). VB Dep. 70:2-23. He did not review or replicate any of the historical data that BP allegedly relied upon in determining the PIA, TMA and MAN rates in the PSA.[5] VB Dep. 133:7-13. How can a scientist testify that any calculation

---

[5] Dr. Van Brunt's failure to evaluate the historical data that BP used to calculate AMDSP is not surprising; BP itself still has not identified any specific historical data that it used in 2003 to perform its calculations for the PSA rates. *See also BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, --- F.Supp.2d ----, 2009 WL 449081 at *9 (N.D. Ill. 2009) ( "Despite the voluminous briefing and supporting evidence supplied to the Court, BP does not indicate how these listed factors impacted or were used to adjust or inform its calculations.").

7

was reasonable without evaluating or replicating the calculations? That purported "methodology" is no methodology at all; it is the complete lack of one.

The limited information that Dr. Van Brunt did consider was apparently chosen for his review because it supported his conclusions. He did not review the deposition testimony of former BP engineers and staff, even though their testimony flatly contradicts BP's claims.[6] In essence, Dr. Van Brunt determined that BP's calculations were reasonable based upon the testimony of BP's Rule 30(b)(6) witness, and ignored testimony that contradicted his opinion. In *Holden*, this District Court evaluated rejected an expert's testimony that similarly ignored relevant data. *Holden Metal*, 2003 WL 1797844, at *2. The *Holden* expert had similarly "failed to familiarize himself" with data and tests that contradicted his own opinions. Id. Just as in *Holden*, Dr. Van Brunt "did not adequately explain why he ignored certain facts and data while accepting others". Id. His opinions should be similarly rejected by this Court.

    **B.    Dr. Van Brunt's Evaluation Intentionally Ignored Production Bottlenecks at the Joliet Plant.**

As an initial matter, Dr. Van Brunt's "independent evaluation" also fails to take into account the contrary deposition testimony and facts discussed previously in Section I.B, and can be barred on that basis alone for again cherry-picking the evidence he considered. *See Holden Metal*, 2003 WL 1797844, at *2.

Perhaps even more fatal to his analysis is Dr. Van Brunt's failure to account for production bottlenecks, a common method for evaluating production capacity. Production

---

[6] For example, engineer Mike Yerkes testified that it was "nuts" that the TMA unit could produce at the represented PSA rates, and that if you asked the TMA operators they would say "you're crazy, there's absolutely no way we can do that." Exhibit 7; Yerkes Dep. 262:1-14. Dr. Robert Snyder, another former BP engineer, testified that it was not possible to sustainably achieve more than 70 TMA reactions a day at the time of the sale. Exhibit 8; Snyder Dep. 194:4-195:1. (Dr. Van Brunt's determination of TMA capacity was based upon an assumed 72 reactions/day. VB Dep. 289:18-24.) Rick Borella, a PIA operator, testified that the purification unit could not produce purified isophthalic acid at the PSA rates because the seals on a product dryer dusted at that rate and would cause the operators to scale back production. Exhibit 9; Borella Dep. 146:16-150:22. He also testified that the alleged high PIA rates run in September and October 2002 were not run consistently, and caused temperature, water and filter issues in the unit. Id. at 205:14-206:10. Harold Sparks, the MAN and wastewater treatment supervisor under BP and current BP employee, testified that PIA production was constrained in February 2004 to 135,000 metric tons per year by wastewater treatment capacity and worsening every day (Exhibit 10; Sparks Dep. 77:4-9:22), and that the MAN catalyst was not performing in line with the Plant's expectations with the yield declining faster than expected (Id. at 215:25-216:8). Dr. Van Brunt reviewed none of this testimony when forming his opinion on the reasonableness of BP's calculations.

facilities frequently evaluate their own production capacity, often in conjunction with determining whether or not to expand an existing facility or perhaps even build a new one. Not surprisingly, that decision usually begins with a determination of the current production capacity. Production facilities commission "bottleneck studies" to identify and quantify the area or areas of a facility that constrain production. A "bottleneck" operation is "one which restricts the output of a department, manufacturing cell or process." Exhibit 11; Chris McKellen, *Theory of Constraints*, METALWORKING PRODUCTION, May 2004 at 9.[7] The bottleneck is "a critical resource, which determines the throughput rate." Exhibit 13; S.S. Chakravorty and J. Brian Atwater, *Bottleneck Management: theory and practice*, PRODUCTION PLANNING AND CONTROL, July 2006 at 441. To find the maximum rate for a process, management must identify the bottleneck: "[T]he rate of a line is ultimately determined by the bottleneck, or slowest, process." Exhibit 14; W.J. Hopp and M.L. Spearman, FACTORY PHYSICS at 458 (2nd ed. 2001). "Bottlenecks, then, define or set limits on the overall capacity of the facility". Exhibit 15; John Brausch and Thomas Taylor, *Who is Accounting for the Cost of Capacity?*, MANAGEMENT ACCOUNTING, February 1997 at 49.

      The general discussion of bottleneck studies and analyses in the previous paragraph is not foreign to BP and its engineers at the Joliet plant. BP engineers frequently evaluated the production capacity of the Joliet production units by performing bottleneck studies.[8]

      Dr. Van Brunt purposefully ignored these studies and analyses. VB Dep. 247:17-19. In fact, he did not consider bottlenecks at all in his analysis. "I didn't consider bottlenecks." VB Dep. 268:18. Dr. Van Brunt claims that he did not consider bottlenecks because those studies were not evaluating annualized maximum demonstrated sustainable production ("AMDSP"). But this Court has already determined that it "is nonsensical for BP to assert that Flint Hills cannot rely on evidence which does not specifically reference AMDSP or which measures capacity differently than AMDSP—BP Amoco did precisely that when it initially calculated the PSA represented rates." *BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, 05 CV 5661, ---

---

[7]    A bottleneck is just what it sounds like: the limiting factor in a process or stream. "Bottlenecks are everywhere, from the freeway overpass during the morning commute to the long lines at the supermarket." Exhibit 12; Demetri Petrides, Alexandros Koulouris, and Charles Siletti, *Throughput Analysis and Debottlenecking of Biomanufacturing Facilities*, BIOPHARM, August 2002 at 2.

[8]    A selection of bottleneck studies and similar analyses is collected at Exhibit 16.

F. Supp. 2d ---, 2009 WL 449081, at *9 (N.D. Ill. Feb. 23, 2009).  Dr. Van Brunt repeats his client's error by consciously disregarding studies *prepared by BP itself* which demonstrate that the production capacity representation was untrue (at a minimum, the studies call into question his conclusions).[9]  Notably, Dr. Van Brunt does not disagree with the findings of any of those studies.[10]  He just chose to disregard them.

In at least one instance, Dr. Van Brunt even chose to ignore BP's own Rule 30(b)(6) witness.  John Dueker, the former plant manager under BP, testified that in BP's understanding of the production capacity representation, BP would not have represented a rate that ran afoul of environmental limitations. Exhibit 17; Dueker 30(b)(6) Dep. 25:18-26:15.  Flint Hills' asserts that at least two environmental issues prevent the purified isophthalic acid unit from producing at PSA rates: emissions from intermediate storage silos and emissions from a drum identified as LD-305.  Despite BP's corporate position, and even though Dr. Van Brunt agrees that "[e]nvironmental constraints can limit production", Dr. Van Brunt did not factor into his conclusions any possible environmental limitations.  VB Dep. 205:14-206:1.  Dr. Van Brunt's approach to performing his "independent evaluation" of the annualized maximum demonstrated sustainable production is a classic case of cherry-picking facts to support the conclusion he was already looking for.

### C.  Dr. Van Brunt's Conclusions Are Not Supported By His Own Methodology.

Dr. Van Brunt's conclusions are discredited even under his own methodology. According to Dr. Van Brunt, for a production rate to be sustainable, "the processes as in the case with purified isophthalic acid, TMA and MAN have demonstrated a certain production volume over a period of three consecutive days." Exhibit 4 at 4.  The key to sustainability is "steady state operation", i.e., running the unit without temperature, pressure and other changes

---

[9]  Dr. Van Brunt does credit a portion of one of the studies, the September 2002 memo included in Exhibit 16.  But he only credits the portion that refers to the metaxylene feedrate and ignores the other limitations discussed in the memorandum, notably production constraints caused by process air capacity, the sizing of the HT-504 dehydration tower and the purification dryer seals.

[10]  Dr. Van Brunt does not disagree with the Snyder/Kelly bottleneck study which determined the maximum sustainable daily rate of the TMA unit was below the PSA rate.  VB Dep. 184:22-185:20.  He has no reason to disagree with the conclusions of the Scott/Goffinet bottleneck study that indicated wastewater treatment capacity at the Joliet Plant constrained production at rates below the PSA rates. VB Dep. 266:11-24.  Dr. Van Brunt has "no reason whatsoever" to disagree with the Goffinet process air study that concluded the Joliet Plant did not have enough process air to produce purified isophthalic acid and TMA at rates below the PSA rates.  VB Dep. 270:11-271:2.

10

throughout the unit. VB Dep. 141:14-142:1. But Dr. Van Brunt never attempted to determine whether or not any of the units were in steady state operation for any of the particular days he evaluated. VB Dep. 142:2-14. It is thus impossible, according to his own methodology, for him to opine on the sustainability of any of the production units.

Dr. Van Brunt's "independent evaluation" also fails because he uses hypothetical, and not actual, production. Dr. Van Brunt agrees that "demonstrated" means that the unit's production "has actually been done before", not just the ability to produce at that level. VB Dep. 139:18-140:4. But Dr. Van Brunt did not calculate or evaluate actual production for any day. And he apparently only evaluated actual feed rate data for his isophthalic acid analysis. For TMA, Dr. Van Brunt did not evaluate actual TMA production, only the number of batches with hypothetical, not actual, batch sizes. VB Dep. 152:11-21. He did not evaluate the size of the batches, i.e., the actual amount of feedstock loaded into each reactor on those days. VB Dep. 173:15-16. For MAN, Dr. Van Brunt applies a yield factor from a much lower production rate, even though he knew that yield declines at higher production rates. VB Dep. 244:1-245:7. Dr. Van Brunt also applies this hypothetical yield to both MAN reactors equally, even though he knows that MAN yield differs in each reactor. VB Dep. 246:3-247:5. In summary, while Dr. Van Brunt agrees that for production to be "demonstrated", the production units must actually produce at the rates represented in the PSA, his analysis does not evaluate any actual production for any of the three products. His own "independent evaluation" thus fails to follow the accepted method of determining production capacity – bottleneck analysis – and his own flawed methodology. Dr. Van Brunt's work is far short of the "scientific method" required by *Daubert*.

## II. DR. VAN BRUNT'S TESTIMONY WILL NOT ASSIST THE TRIER OF FACT

An expert's opinion must not only be based upon sound methodology, it must relate to a fact at issue in the matter. "Evidence is relevant under *Daubert* if it is 'helpful' to the trier of fact and 'fits' the issues in the case." *Rodefer v. Hill's Pet Nutrition, Inc.*, 01 CV 123, 2003 WL 23096486 (S.D. Ind. Nov. 7, 2003) (attached as Exhibit 18).

### A. The "Reasonableness" of BP's Production Capacity Calculation is Irrelevant.

Flint Hills asserts that BP breached the production capacity representation in the PSA, and that BP made the representation knowing that it was false. Dr. Van Brunt's first opinion, that BP used a reasonable methodology to calculate the annualized maximum demonstrated

11

sustainable production for the units in the PSA, is not relevant to either of those issues. As this Court has already noted, "To prevail on a breach of contract claim under Illinois law, Flint Hills must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract by Flint Hills; (3) a breach by BP; and (4) resultant damages." *BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, 05 CV 5661, --- F.Supp.2d ---, 2009 WL 449081, at *8 (N.D. Ill. Feb. 23, 2009) (citations omitted). Flint Hills does not have to prove that the basis for BP's representation was unreasonable. Nor is the reasonableness of BP's calculations an affirmative defense to a breach of contract claim. The key issue for the factfinder is whether or not the warranty was true. *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 427-28, 249 Ill. Dec. 45, 54-55, 735 N.E.2d 649, 658-59 (Ill. App. Ct. 2000) ("An express warranty given by a seller in a purchase agreement . . . amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.") "[T]he necessary factual inquiry under BP's interpretation will be whether the 'reasoning or evidence' underlying its AMDSP determinations was accurate". *BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, 2009 WL 449081, at *8. The accuracy of BP's representation is the issue for the factfinder to resolve, not the reasonableness of any underlying calculations.

Nor is the "reasonableness" of BP's calculation relevant to Flint Hills' fraud claim. "The elements of common-law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 497, 675 N.E.2d 584, 222 Ill. Dec. 389 (1996). Again, the unreasonableness of BP's calculation method is not an element of the claims that Flint Hills must prove, nor is it an affirmative defense. The "reasonableness" of BP's calculation has no impact on whether or not BP defrauded Flint Hills.

### B. Dr. Van Brunt's Determination of Production Capacity is Irrelevant Because He Did Not Make His Determination as of the Date of the Sale.

BP made the representations in Section 7 "as of the date of this Agreement, and as of the Closing." Yet Dr. Van Brunt was unaware of the timing of the representations. VB Dep. 228:9-13. His failure to consider the timing of the representation is not simply hypertechnical or semantic, it is fatal to his analysis. For example, Dr. Van Brunt admits that the performance of

12

the catalyst in the MAN reactors declines over time. VB Dep. 298:5-8. Catalyst performance is highest immediately after the catalyst is replaced. Van Brunt 297:16-19. The Joliet Plant last replaced the catalyst in the MAN reactors in mid-2002, two years before BP sold the facility to Flint Hills. VB Dep. 297:20-22. Dr. Van Brunt explicitly acknowledges that the MAN production unit could not produce at PSA rates as of the date of the sale:

> 21   Q.  Given what we know about the MAN
> 22  catalyst degradation, on May 28th, 2004, was it
> 23  possible for the MAN unit to actually produce
> 24  140 tons of MAN on that day?
>  1   A.  I would have to look at the -- I would
>  2  have to look at the data to confirm it, but I
>  3  would expect that it probably didn't, wouldn't
>  4  have that capacity.

VB Dep. 298:21-291:4. Even if this Court were to determine that Dr. Van Brunt's methodology in evaluating MAN production were acceptable, it is clear that Dr. Van Brunt did not determine whether MAN production was sustainable as of the date of the sale. In fact, to the extent he has any opinion on the ability of the MAN unit to produce at PSA rates (140 tons/day) on May 28, 2004, his opinion is that the MAN unit probably <u>did not</u> have that capacity. Id. Similarly, a current BP employee testified that purified isophthalic acid production was constrained to 135,000 metric tons per year in February 2004 by the performance of the Plant's wastewater treatment unit, and the performance continued to decline over time. <u>Exhibit 10</u>; Sparks Dep. 77:4-79:22. Van Brunt, by his own admission, did not evaluate whether or not the represented production rates were "sustainable" as of the date of the sale. The sustainability of production of the TMA, purified isophthalic acid, and MAN production units for some other unspecified time is not relevant to any issue in this case. Accordingly, even if this Court were to determine that Dr. Van Brunt used an appropriate methodology to reach his conclusions, his opinions must be barred because he evaluated the annualized maximum demonstrated sustainable production as of some time period not at issue in the case.

## **CONCLUSION**

For the foregoing reasons, Flint Hills Resources, LLC respectfully requests that the Court grant Flint Hills' Motion to Preclude Expert Testimony from Dr. Vincent Van Brunt.


Dated: April 10, 2009

Respectfully submitted,

FLINT HILLS RESOURCES, LLC


By: /s/ James R. Figliulo
     One of Its Attorneys

James R. Figliulo (#6183947)
Ryan P. Stiles (#6256732)
Marc S. Porter (#3125509)
Thomas D. Warman (#6280004)
Sara A. Paguia (#6291870)
FIGLIULO & SILVERMAN, P.C.
Ten South LaSalle Street, Suite 3600
Chicago, Illinois 60603
T: 312.251.4600
F. 312.251.4610


Susan M. Franzetti (#3125061)
NIJMAN FRANZETTI LLP
Ten South LaSalle, Suite 3600
Chicago, Illinois 60603
T: 312.251.5590
F: 312.251.4610

# CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused a copy of the attached

**MEMORANDUM OF LAW IN SUPPORT OF FLINT HILLS RESOURCES, LLC'S MOTION TO TO PRECLUDE EXPERT TESTIMONY FROM DR. VINCENT VAN BRUNT**

to be served upon all individuals listed below on April 10, 2009 via electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) and Local Rules 5.9 and 83.15.

Richard C. Godfrey
Scott W. Fowkes
Drew G. Peel
Travis J. Quick
Hariklia Carrie Karis
Erica Blaschke Zolner
Bernard Taylor
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
Fax: 312-861-2200

William L. Patberg
Douglas G. Haynam
Joseph M. Simpson
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, OH 43604
Fax: 419-241-6894

/s/ James R. Figliulo