**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BP AMOCO CHEMICAL COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter–Defendant, | ) | |
| | ) | Consolidated Case No. 05 C 5661 |
| v. | ) | |
| | ) | |
| FLINT HILLS RESOURCES, LLC, | ) | |
| | ) | |
| Defendant/Counter–Plaintiff. | ) | |
| —————————————————— | ) | |
| | ) | |
| FLINT HILLS RESOURCES, LLC, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BP CORPORATION NORTH AMERICA INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff/Counter-Defendant BP Amoco Chemical Company ("BP Amoco") sued

Defendant/Counter-Plaintiff Flint Hills Resources, LLC ("Flint Hills") seeking a declaratory

judgment that it had not breached the Asset Purchase and Sale Agreement ("PSA") pursuant to

which it had sold a chemical manufacturing plant (the "Joliet Plant") and related assets to Flint

Hills.  (R. 8-1, Am. Compl.)  Flint Hills filed counterclaims against BP Amoco for fraud and

breach of contract.  (R. 14-3, Answer & Countercls.)  Flint Hills also asserts breach of contract

claims against the guarantor of the PSA, BP Corporation North America Inc. ("BP North

America").  (R. 103-1, Flint Hills' Third-Party Compl.)  In the present motion, BP Amoco and

BP North America (collectively, "BP") seek partial summary judgment on certain environmental compliance claims. (R. 334-1, BP's Mot. for Partial Summ. J.) For the reasons discussed below, the Court grants in part and denies in part BP's summary judgment motion. Specifically, the Court grants BP's summary judgment motion as to Flint Hills' Claims 7, 23, 43, 29, 46, 51, and the PD-700 Low Pressure Absorber in Claim 80. The Court also grants BP's summary judgment motion as to Flint Hills' fraud claims based on Claims 4, 22, and 42.

## BACKGROUND

### I.       Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule

56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 ***requires specifically*** that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement ... of any additional facts that require the denial of summary judgment.'") (emphasis in original).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon,* 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon,* 401 F.3d at 809-10. Finally, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997). With these standards in mind, the Court turns to the relevant facts of the case.

## II.     Relevant Facts

In light of the three summary judgment rulings already issued, the Court assumes the parties' familiarity with the Court's prior decisions and the facts of this case. To recap, in May 2004, BP sold a chemical plant located near Joliet, Illinois, and related assets to Flint Hills pursuant to the PSA. The parties engaged in extensive negotiations over the terms of the PSA, which includes an indemnification clause concerning potential breaches of warranties and

representations. After assuming ownership of the Joliet Plant in late May 2004, Flint Hills' employees and contractors began to experience operational problems. During the late fall and early winter of 2004-05, Flint Hills and BP engaged in a series of discussions regarding possible indemnification claims. Those claims include certain environmental compliance claims.

Specifically at issue in the present motion are Flint Hills' allegations that BP committed fraud and breached the parties' PSA with respect to certain PSA representations that relate to environmental compliance at the Joliet Plant. In its motion for partial summary judgment, BP maintains that Flint Hills has failed to create a genuine issue of material fact for trial that BP breached its representations as to twelve of these environmental compliance claims. In addition, BP contends that three of Flint Hills' fraud claims based on its environmental compliance also fail as a matter of law. The Court thus turns to a brief overview of the facts and PSA provisions pertaining to the Joliet Plant's environmental compliance.

The Joliet Plant's equipment includes numerous pollution control devices to comply with air pollution regulations and permits, including the Joliet Plant's Title V Permit that the Illinois Environmental Protection Agency ("IEPA") issued pursuant to the Clean Air Act. (R. 337-1, BP's Rule 56.1 Stmt. Facts ¶ 4.) The information required in the Title V application to the IEPA includes the identity of the pollutants that are present in the emissions from each particular emissions unit and the quantity of the emissions of that particular pollutant. (R. 447-1, FH's Rule 56.1 Stmt. Add'l Facts ¶ 6.) The Title V Permit at the time of the Joliet Plant's closing date is dated July 18, 2001. (BP's Stmt. Facts ¶ 4.)

In 2003, as part of BP's ongoing review of its chemicals segment, BP decided to divest its Performance Chemicals Business Unit ("PCBU") and sell the Joliet Plant and PCBU. (*Id* ¶

13.)  BP thus commissioned a third-party environmental consultant, URS Corporation, to prepare

an environmental health and safety assessment of the Joliet Plant, including Clean Air Act

compliance, for potential buyers of the Joliet Plant.  (*Id.*; FH's Stmt. Add'l Facts ¶ 11.)  Flint

Hills had access to the URS report and conducted its own due diligence on the environmental

compliance status of the Joliet Plant before the closing date of May 28, 2004.  (BP's Stmt. Facts

¶¶ 15, 19; FH's Stmt. Add'l Facts ¶ 11.)

Article 7 of the PSA, entitled Representations and Warranties, contains the contract

provisions concerning BP's environmental compliance.  Article 7.1(j) states in relevant part:

(i)     Except as set forth on Schedule 7.1(j)(1)-1, for the period running from
        January 1, 2004, until Closing, with regard to the Joliet Assets, Seller is in
        compliance with all Environmental Laws which require reporting of
        deviations and/or certifications of compliance.  Except as set forth on
        Schedule 7.1(j)(i)-2, as of the Closing, with regard to the Joliet Assets, to
        Seller's Knowledge, Seller is in material compliance with all
        Environmental Laws that are not subject to deviation reporting or
        compliance certification requirements.

(ii)    Except as set forth in Schedule 7.1(j)(ii), to Seller's Knowledge, with
        regard to the Joliet Assets, there are no facts or circumstances which
        would likely lead to a violation of or noncompliance with an
        Environmental Law after Closing.

(iii)   Seller has filed all notices, reports and certifications, including
        certifications of compliance, required under all Environmental Laws and
        Environmental Permits with regard to the Joliet Assets.  All such notices,
        reports and certifications are complete and accurate and were conducted
        after a reasonable inquiry into the circumstances related to the notice of
        certification.

(R. 14-3, Ex. A, PSA § 7.1(j)(i), (ii), (iii); BP's Stmt. Facts ¶ 19.)  In addition, Section

7.1(j)(viii)(B) of the PSA states:

Except as provided in Schedule 7.1(j)(viii)-2, all environmental control
equipment necessary for the operation of the Business as it is currently operated
by Seller, is installed at the Joliet Plant, is in substantial compliance with

Environmental Laws in effect on or prior to the Closing Date, and is operating in a manner sufficient to achieve and maintain such compliance; ....

(PSA § 7.1(j)(viii)(B); BP's Stmt. Facts ¶ 19.)

Under the definitions section of Article 1 of the PSA, "Environmental Laws" states in pertinent part:

"Environmental Laws" means any and all Laws, including notices of violation or noncompliance, rules, permits, licenses, standards or requirements (including decrees, judicial decisions, judgments, injunctions, and administrative orders issued or approved thereunder) together with all related amendments and similar statutes and implementing regulations and all common law, pertaining to or regulating pollution, environmental protection, health or safety of persons, pipeline safety, natural resource damages, conservation of resources, wildlife, waste management, the use, storage, generation, production, treatment, emission, Remediation, design, formulation, packaging or any other activity related to Hazardous Materials, or any other environmental matter, including: … the Clean Air Act, as amended, 42 U.S.C. Section 7401 et. seq. ....

(FH's Stmt. Add'l Facts ¶ 1.)

The IEPA issued Flint Hills a Violation Notice dated April 13, 2006, for various violations of the applicable environmental laws and the Joliet Plant's Title V permit. (BP's Stmt. Facts ¶ 72; FH's Stmt. Add'l Facts ¶ 37.) In March 2008, the IEPA filed a Complaint for Injunctive Relief and Civil Penalties in the Circuit Court of Will County, Illinois against Flint Hills. (BP's Stmt. Facts ¶ 72; FH's Ex. 75, IEPA Compl.) Based on BP's alleged breach of its environmental representations, Flint Hills also brings a separate claim for indemnification against BP concerning the IEPA's civil enforcement action. The indemnification section of the PSA provides:

To the fullest extent permitted by Law, Seller, in accordance with the terms of this Article 13, hereby agrees to Indemnify Buyer, any Affiliates of Buyer, and their respective shareholders, members, partners, officers, directors, managers, employees, agents, permitted assigns and representatives (collectively, the "Buyer Indemnified Parties"), from and against, any and all Losses incurred or required

to be paid by any Buyer Indemnified Party (Losses so incurred or required to be paid collectively referred to as "Buyer Losses"), regardless of whether based in whole or in part on Law, strict liability, contract, willful or intentional misconduct, or ordinary or gross negligence or otherwise (but excluding any Buyer Losses to the extent caused by Buyer Indemnified Parties' willful or intentional misconduct, ordinary or gross negligence, except to the extent provided for in Section 13.4(l)), which arise out of, relate to or result from any of the following:

> (a) any breach of any warranty or representation of Seller contained in Section 7.1 or Section 16.1 (each such breach of warranty a "Seller Warranty Breach").

(FH's Stmt. Add'l Facts ¶ 2; PSA § 13.2(a).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Estate of Suskovich v. Anthem Health Plans of Va., Inc.,* 553 F.3d 559, 563 (7th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"

*Anderson*, 477 U.S. at 255 (quotation omitted); *see also* Fed.R.Civ.P. 56(e)(2) (requiring adverse party to "set out specific facts").

## ANALYSIS

### I.     Environmental Law Standards

Before turning to BP's specific challenges to the environmental compliance claims at issue, the Court first addresses the Clean Air Act ("CAA") provisions and standards relevant to the parties' arguments.  The CAA, "first enacted in 1970 and extensively revised in 1977 and 1990, establishes a complex and comprehensive regulatory system to reduce air pollution nationwide." *Sierra Club v. E.P.A.,* 311 F.3d 853, 854 (7th Cir. 2002).  In 1990, Congress added Title V to the CAA creating a national permitting program.  *See Citizens Against Ruining the Env't v. E.P.A.,* 535 F.3d 670, 672 (7th Cir. 2008); *see also* Clean Air Act Amendments of 1990, Pub.L. No. 101-549, §§ 501-507, 104 Stat. 2399, 2635-48 (codified at 42 U.S.C. §§ 7661-7661f). Under this national permitting program, "each permit issued must include all emissions limitations and standards applicable to the source, as well as provisions concerning inspection, monitoring, compliance certification, and reporting requirements." *Clean Air Implementation Project v. E.P.A.,* 150 F.3d 1200, 1208 (D.C. Cir. 1998).  "Because Congress found that the primary responsibility for preventing and controlling air pollution fell to states and local governments, Title V required each state to develop and implement its own permitting program which at least minimally met the regulations promulgated by the EPA." *Sierra Club v. Johnson,* 500 F.Supp.2d 936, 938 (N.D. Ill. 2007).  The State of Illinois implements its Title V program through the IEPA pursuant to the Illinois Clean Air Act Permit Program ("CAAPP").  *See* 415 ILCS 5/39.5; *see also Citizens Against Ruining the Env't,* 535 F.3d at 672 ("In Illinois, a

polluting source must apply to the IEPA for an operating permit.").

Moreover, "Title V does not impose additional requirements on sources but rather consolidates all applicable requirements in a single document to facilitate compliance." *Citizens Against Ruining the Env't,* 535 F.3d at 672 (citing 42 U.S.C. § 7661a(a)).  Specifically, "[t]he permit is crucial to the implementation of the Act:  it contains, in a single, comprehensive set of documents, all CAA requirements relevant to the particular polluting source." *Virginia v. Browner,* 80 F.3d 869, 873 (4th Cir. 1996).  In sum, Title V's permitting scheme is intended to incorporate the CAA's requirements, including the state implementation plan ("SIP") requirements, that are applicable to the specific polluting source.  *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC,* 548 F.3d 738, 742 (9th Cir. 2008) (citing S.Rep. No. 101-228, at 350 (1989)); *see also Sierra Club v. Georgia Power Co.,* 443 F.3d 1346, 1356 (11th Cir. 2006) ("[T]he permit merely consolidates in a single document all of the clean air requirements already applicable to that source.").

"Title V further creates a 'permit shield' for sources, ensuring that compliance with the permit is 'deemed compliance with other applicable provisions' of the CAA." *Sierra Club v. E.P.A.,* 551 F.3d 1019, 1022 (D.C. Cir. 2008) (citing 42 U.S.C. § 7661c(f)).  Section 7661c(f), entitled "Permit shield," states in relevant part:

> ***Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title.***  Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if –
>
> (1) the permit includes the applicable requirements of such provisions, or
>
> (2) the permitting authority in acting on the permit application makes a determination relating to the permittee that such other

provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

42 U.S.C. § 7661c(f) (emphasis added); *see also* 40 C.F.R. § 70.6(f)(1)(i).  The Joliet Plant's

Title V Permit includes a "permit shield" provision stating in relevant part:  "This permit shield

provides that compliance with the conditions of this permit shall be deemed compliance with

applicable requirements as of the date the proposed permit for this source was issued.  This

shield is granted based on the Illinois EPA's review of the permit application for this source and

its determination that all applicable requirements are specifically identified in this permit."

(BP's Stmt. Facts ¶ 6; Ex. 7, Title V Permit, at 98.)  Thus, based on the permit shield and 42

U.S.C. § 7661c(f), compliance with the Title V Permit's conditions is compliance with the

applicable requirements for the Joliet Plant.  *See Sierra Club v. EPA,* 551 F.3d at 1022.

Flint Hills recognizes that the permit shield protects BP from any allegations that it failed

to comply with regulatory requirements not referenced or included in the Title V Permit.  Flint

Hills, however, argues that the permit shield does not "shield" BP from Flint Hills' evidence of

BP's noncompliance with the Title V Permit conditions.  In other words, Flint Hills argues that it

can establish BP's noncompliance with the Joliet Plant's Title V Permit requirements through

any relevant and reliable evidence based on the "credible evidence rule" and not just the testing

methods specified by the Title V Permit.  *See Natural Res. Def. Council, Inc. v. E.P.A.,* 194 F.3d

130, 134 (D.C. Cir. 1999); *Clean Air Implementation Project,* 150 F.3d at 1208; 40 C.F.R. §

70.6(c)(5)(iii)(B).

To clarify, in 1997, the EPA adopted the federal credible evidence rule, as reflected in 40

C.F.R. § 52.12(c), which states in its entirety:

(c) ***For purposes of Federal enforcement***, the following test procedures and methods shall be used, provided that for the purpose of establishing whether or not a person has violated or is in violation of any provision of the plan, nothing in this part shall preclude the use, including the exclusive use, of ***any credible evidence or information,*** relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test procedures or methods had been performed:

> (1) Sources subject to plan provisions which do not specify a test procedure and sources subject to provisions promulgated by the Administrator will be tested by means of the appropriate procedures and methods prescribed in part 60 of this chapter unless otherwise specified in this part.

> (2) Sources subject to approved provisions of a plan wherein a test procedure is specified will be tested by the specified procedure.

40 C.F.R. § 52.12(c) (emphasis added). "[B]y its own terms, the federal credible evidence rule applies only '[f]or purpose of Federal enforcement.'" *Sierra Club v. Tennessee Valley Auth.*, 430 F.3d 1337, 1352 (11th Cir. 2005) (citation omitted); *see also Natural Res. Def. Council,* 194 F.3d at 134 (preamble to federal credible evidence rule "reconfirmed that credible evidence may be used in permit enforcement actions and compliance certifications"). More specifically, the EPA promulgated regulations "that gave EPA the authority to use all available data to prove Clean Air Act violations," but it "did not give any other party the authority to use all available data to prove a violation." *Tennessee Valley Auth.,* 430 F.3d at 1352 (citation and quotations omitted). In short, "the plain language of the regulation containing the federal credible evidence rule makes it unavailable in citizen suits to enforce the emissions limitations contained in a state implementation plan." *Id.* at 1352-53. EPA regulations, however, allow states to adopt their own credible evidence rule. *See id.* at 1351-52 (citing 40 C.F.R. § 51.212(c)); *see, e.g.,* Ala. Admin. Code r. 335-3-1-.13(2). The parties agree that Illinois has not adopted its own credible evidence rule. Also, the IEPA did not specifically include credible evidence as a means of

establishing noncompliance with the Joliet Plant's Title V Permit.

Although 40 C.F.R. § 52.12(c) clearly states that the federal credible evidence rule applies only in enforcement actions and Illinois does not have a credible evidence rule, Flint Hills maintains that it can use credible evidence to prove BP's noncompliance based on two district court cases in which the courts relied upon non-referenced test data in the context of citizen lawsuits. *See Unitek Envtl. Servs., Inc. v. Hawaiian Cement,* No. 95-00723, 1997 U.S. Dist. LEXIS 19261 (D. Haw. Aug. 7, 1997); *Sierra Club v. Public Serv. Co. of Colo., Inc.,* 894 F.Supp. 1455 (D. Colo. 1995).[1]  In *Sierra Club v. Public Serv. Co. of Colo.*, the district court relied upon continuous emissions opacity monitor data as competent evidence of noncompliance even though the Colorado SIP specified another testing method. *Id.* at 1460-61.  In doing so, the district court stated that "nothing in the [Clean Air] Act, its implementing regulations, or the Colorado SIP bind citizens to a particular method of proving violations." *Id.* at 1461.  As discussed above, the EPA's promulgation of the federal credible evidence rule – which became effective after the Colorado court's decision – limits the use of credible evidence to only enforcement actions. *See Tennessee Valley Auth.,* 430 F.3d at 1352; 40 C.F.R. § 52.12(c).  As such, this District of Colorado decision is not persuasive under the circumstances. *See LM Ins. Corp. v. Spaulding Enter. Inc.,* 533 F.3d 542, 553 (7th Cir. 2008) (district court opinions lack precedential value).

Similarly, in *Unitek*, the District of Hawaii relied upon evidence that was not within the

---

[1]  The EPA has referred to *Sierra Club v. Public Serv. Co. of Colo., Inc.,* 894 F.Supp. 1455 (D. Colo. 1995) and *Unitek Envtl. Servs., Inc. v. Hawaiian Cement,* No. 95-00723, 1997 U.S. Dist. LEXIS 19261 (D. Haw. Aug. 7, 1997), as examples of citizen suits in which the courts examined credible evidence. *See Sierra Club v. Tennessee Valley Auth.,* 430 F.3d 1337, 1353 (11th Cir. 2005) (citing Credible Evidence Revisions, 62 Fed.Reg. at 8318, 8320).

applicable testing method, including information from permit applications and investigations, as well as eyewitness accounts. *See Unitek,* 1997 U.S. Dist. LEXIS 19261, at *3-7. Significantly, although the District of Hawaii decided *Unitek* after the federal credible evidence rule became effective on April 25, 1997, the district court made no mention of this rule in its opinion. Without any discussion of the federal credible evidence rule, *Unitek* is not persuasive or useful to the Court's determination in this matter. *See, e.g., Zurich Ins. Co. v. Amcor Sunclipse N. Am.*, 241 F.3d 605, 608 (7th Cir. 2001).

In its response to BP's *Daubert* motion relating to post-closing stack tests, Flint Hills also relies upon *Grand Canyon Trust v. Public Serv. Co. of N. Mexico,* 294 F.Supp.2d 1246, 1247 (D.N.M. 2003), in which the district court allowed non-referenced test data as evidence of noncompliance. (R. 494-1, FH Mem. Opp., at 3-4.) The *Grand Canyon Trust* court based its analysis on *Unitek*, *Sierra Club v. Public Serv. Co. of Colo.*, and several law review articles. *See id.* at 1247-48. In addition, although the District Court of New Mexico recognized the federal credible evidence rule, it made no mention of the unequivocal language in 40 C.F.R. § 52.12(c) that such evidence is "[f]or purposes of Federal enforcement."[2] Without any discussion of the regulation's clear language, *Grand Canyon Trust* is not persuasive authority.

Meanwhile, *Unitek, Sierra Club v. Public Serv. Co. of Colo.,* and *Grand Canyon Trust* – district court decisions from other circuits – were citizen suits brought pursuant to 42 U.S.C. § 7604, which allows citizens to bring lawsuits to remedy specific violations of the Clean Air Act.

---

[2]  Flint Hills' reliance on *United States v. B & W Inv. Prop.,* 38 F.3d 362, 368 (7th Cir. 1994), does not support its argument that the Court can rely on credible evidence in determining BP's alleged noncompliance with the Joliet Plant's Title V Permit conditions because *B&W* was a civil enforcement action filed by the United States EPA. *See* 40 C.F.R. § 52.12(c).

*See, e.g., Sierra Club v. Franklin County Power of Ill., LLC,* 546 F.3d 918, 923 (7th Cir. 2008). Here, the parties are not bringing a citizen lawsuit under Section 7604, but instead are litigating whether BP complied with certain representations made in the PSA relating to environmental controls at the Joliet Plant.

Flint Hills also argues that BP's compliance representations in the PSA go beyond the Title V Permit requirements because the PSA warranted compliance with all "Environmental Laws" and the definition of "Environmental Laws" expressly includes the "Clean Air Act, as amended" and its regulations. Flint Hills' circular argument, much of which is hidden in footnotes, fails to take into account that Title V "consolidates all applicable requirements in a single document to facilitate compliance," including all relevant CAA requirements. *See Citizens Against Ruining the Env't,* 535 F.3d at 672; *see also United States v. White,* 879 F.2d 1509, 1513 (7th Cir. 1989) (arguments made in footnotes are waived). As such, despite Flint Hills' arguments to the contrary, proof of noncompliance is limited to the means and methods specified in the Title V Permit.

On a final note, the Court rejects BP's argument, based on PSA Section 7.1(j)(ii), that its environmental representations are limited to "Seller's Knowledge," which is defined as the actual knowledge of 26 individuals. (BP's Stmt. Facts ¶ 19.) Specifically, BP argues that Flint Hills must show that at least one of these 26 individuals actually knew about BP's noncompliance as of the closing date in order for Flint Hills to establish its environmental compliance claims. Section 7.1(j)(ii) of the PSA, however, simply states that these 26 identified individuals had no knowledge of circumstances that would lead to noncompliance with the environmental laws after closing. BP's similar argument based on Section 7.1(i) is unavailing

because this section is not the subject of Flint Hills' environmental compliance claims.

## II.     Breach of Contract Claims

In the present motion, BP maintains that Flint Hills has failed to establish a genuine issue of material fact for trial as to twelve of its breach of environmental representations claims.  To prevail on a breach of contract claim under Illinois law, Flint Hills must establish:  (1) the existence of a valid and enforceable contract; (2) Flint Hills' substantial performance of the contract; (3) BP breached the contract; and (4) resultant damages.  *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 967 (Ill.App.Ct. 2004)).

The focus of this partial summary judgment motion is whether BP breached its environmental representations made in the PSA, namely, whether (1) BP was in compliance with the requirements of the Joliet Plant's Title V Permit at the closing date of May 28, 2004, or (2) BP failed to properly certify its compliance with the Title V Permit prior to closing.  Whether BP failed to properly certify compliance under the second prong is controlled by Article 7 of the PSA, which states in relevant part:

> Seller has filed all notices, reports and certifications, including certifications of compliance, required under all Environmental Laws and Environmental Permits with regard to the Joliet Assets.  All such notices, reports and certifications are ***complete and accurate*** and were conducted after a ***reasonable inquiry*** into the circumstances related to the notice of certification.

PSA § 7.1(j)(iii) (emphasis added).

### A.     Claim 4 – IPA Silo Dust Collectors (KM-110, KM-111)

First, Flint Hill maintains that – at the time of closing – the volatile organic material

("VOM") emissions from the IPA Silo Dust Collectors exceeded the emission limits set forth in the Title V Permit. Condition 7.2.6(a) of the Title V Permit provides that VOM emissions limits from the IPA Silos are 8.0 lbs/hr and 17.5 tons/year. (BP's Stmt. Facts ¶ 21; Ex. 7, Title V Permit, at 53.)

Without citation to the record, BP argues that before the closing date it had conducted an "analysis" of emissions from the IPA Silos in accordance with the Title V Permit. Flint Hills, however, has presented evidence creating a genuine issue of material fact for trial that BP did not perform any tests on the IPA Silos to determine VOM emissions rates before the closing date. (FH's Stmt. Add'l Facts ¶ 22.) In fact, even though BP certified its compliance with the Title V Permit's VOM emissions limit, evidence in the record suggests that BP merely relied on estimates in determining the relevant emissions limits. (BP's Stmt. Facts ¶ 20; Ex. 6, Darji Dep., at 251.) Also, Flint Hills offers evidence that a BP engineer determined that prior to the closing date a scrubber was needed to control the IPA Silos' VOM emissions and requested this change, yet BP did not install any such scrubber. (FH's Stmt. Add'l Facts ¶ 20.) Finally, Flint Hills presents evidence that both benzoic and acetic acids are VOM emissions within the meaning of the Title V Permit, and not just acetic acid as BP argues. (*Id.* ¶ 17.) Thus, BP's argument limiting the emissions at issue to acetic acid fails at this juncture.

Viewing the evidence and all reasonable inferences in Flint Hills' favor – as the Court is required to do at this procedural posture – Flint Hills has created a genuine issue of material fact for trial that BP failed to properly certify its compliance with the Title V Permit prior to closing because the compliance certifications were not "complete and accurate" and not "conducted after a reasonable inquiry into the circumstances." *See* PSA Section 7.1(j)(iii). Accordingly, the

Court denies BP's summary judgment motion as to Claim 4.

**B.     Claims 7, 23  – MAN Product Tank PSV Valves, Filter House PSV Valves**

In Claims 7 and 23, Flint Hills contends the conservation vents on the MAN Product Tanks and the Filter House Pressure Relief Valves ("PSV") are plugged, and thus cause the conservation vents to lift and release VOMs into the atmosphere.  BP, on the other hand, maintains that because there are no emissions limits in the Title V Permit pertaining to the conservation vents on the MAN Product Tanks or the PSVs on the Filter House, Flint Hills' claims must fail.

Recognizing that the Title V Permit did not list these emissions, Flint Hills argues that because BP did not list the MAN Product Tanks or Filter Housing as emissions units in its Title V permit application, BP has failed to comply with Conditions 9.2.2 and 9.12.3 of the Title V and 35 Ill. Adm. Code 201.144.  Flint Hills, however, fails to explain in its legal memorandum what Conditions 9.2.2 and 9.12.3 require or how the pertinent Illinois Administrative Code specifically applies to the facts of this case.  *See Argyropoulos v. City of Alton,* 539 F.3d 724, 738 (7th Cir. 2008) (undeveloped and perfunctory arguments are waived); *see also United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) ("[I]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel") (citation omitted)).

Moreover, it appears that Flint Hills is collaterally attacking the regulatory requirements, limitations, and conditions of the Title V Permit issued by the IEPA in this private cause of action.  Flint Hills, however, fails to cite legal authority that the Court has jurisdiction to entertain its arguments under these circumstances and the Court could find none.  In fact, courts

have concluded that even the United States EPA and litigants in citizen suits cannot collaterally attack a facially valid state permit. *See National Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1326 (11th Cir. 2007); *United States v. AM Gen. Corp.,* 34 F.3d 472 (7th Cir. 1994). Without legal authority that the Court has jurisdiction to collaterally review the underlying conditions and limitations of the Title V Permit, Flint Hills' arguments fail and the Court grants BP's summary judgment motion as to Claims 7 and 23.

### C.     Claim 43 – MAN Unit Equipment Washes

BP maintains that because it determined that the MAN Unit Equipment Washes emitted fugitive emissions, it reported these emissions as such to the IEPA in its Title V Permit application. Accordingly, BP contends that the Title V Permit does not regulate these fugitive emissions under 35 Ill. Adm. Code 218.301, as Flint Hills maintains. On the other hand, Flint Hills argues that there was a significant rate of organic material ("OM") being emitted during the equipment washes and that BP should have listed these emissions in its Title V Permit application.

In its legal memorandum, Flint Hills fails to develop its argument supporting this claim, but directs the Court's attention to its arguments made in its Rule 56.1(B)(3)(B) Response to BP's Statement of Facts. *See Cady*, 467 F.3d at 1060 (it is inappropriate to make legal arguments in Rule 56.1 statements and responses). Furthermore, Flint Hills fails to set forth any evidence in its Rule 56.1(b)(3)(C) Statement of Additional Facts in support of this claim. To clarify, at summary judgment Flint Hills must do more than attempt to refute BP's factual statements – it must establish the existence of the elements upon which it would bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *Salas v. Wisconsin Dept. of Corr.,* 493 F.3d

913, 921 (7th Cir. 2007). To do so, Flint Hills must support its factual allegations by relying on its Rule 56.1(b)(3)(C) Statement of Additional Facts. *See Ciomber,* 527 F.3d at 643; *Cichon,* 401 F.3d at 809. Here, Flint Hills has failed to set forth any facts in its Rule 56.1(b)(3)(C) Statement of Additional Facts pertaining to the MAN Equipment Washes and the Court will not scour the record to find evidence supporting Flint Hills' burden of production. *See Rawoof v. Texor Petroleum Co., Inc.,* 521 F.3d 750, 758 (7th Cir. 2008).

Accordingly, construing the facts and all reasonable inferences in Flint Hills' favor, Flint Hills has failed to create a genuine issue of material fact for trial that either (1) BP was not in compliance with the requirements of the Joliet Plant's Title V Permit at closing or (2) BP failed to properly certify its compliance with the Title V Permit prior to closing. The Court thereby grants BP's summary judgment motion as to Claim 43.

### D.     Claim 10 – Strahman/Fetterholf Valves

Next, Flint Hills maintains that when it acquired the Joliet Plant there were certain valves, namely, the Strahman/Fetterolf valves, that were open-ended lines which did not meet the EPA's and IEPA's double-closure requirements under the Leak Detection and Repair ("LDAR") program. Specifically, Flint Hills argues that BP failed to properly certify its compliance with the Title V Permit prior to closing because BP's compliance certification with respect to the Strahman/Fetterolf valves was not "complete and accurate" and was not certified "after a reasonable inquiry into the circumstances." On the other hand, BP asserts that it analyzed the Strahman/Fetterholf valves for compliance with the LDAR requirements and concluded that the valves were in compliance, especially because the valves were not open-ended. (BP's Stmt. Facts ¶ 37.) Neither BP nor Flint Hills cite to the specific regulatory

requirements or any Title V Permit conditions pertaining to this claim in their legal memoranda. *See Dal Pozzo v. Basic Mach. Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006) ("An advocate's job is to make it easy for the court to rule in his client's favor; at a minimum, this means stating the legal grounds for a motion.")

Open-ended lines or valves are defined as "any valve, except safety relief valves, having one side of the valve seat in contact with process fluid and one side open to the atmosphere, either directly or through open piping." 40 C.F.R. § 60.481. Federal law requires that "[e]ach open-ended valve or line shall be equipped with a cap, blind flange, plug, or a second valve." *Id.* at § 63.167. Under the Illinois Administrative Code:

> (a) Each open-ended valve shall be equipped with a cap, blind flange, plug, or a second valve, except during operations requiring fluid flow through the open-ended valve.

> (b) Each open-ended valve equipped with a second valve shall be operated in a manner such that the valve on the process fluid end is closed before the second valve is closed.

35 Ill. Admin. Code 218.428.

Here, BP maintains that the valves at issue were not open-ended lines, and thus Flint Hills' claim that BP was not in compliance with the LDAR is without merit. (BP's Stmt. Facts ¶¶ 37, 38.) In response, Flint Hills' relies upon the expert opinion of Jay Hoover to establish that the valves were open-ended, and therefore, were not in compliance with regulatory requirements. As discussed in the Court's order granting BP's *Daubert* motion as to this expert – which will be issued after this summary judgment order – Hoover admitted at his deposition that he had not seen or examined the valves that Flint Hills removed and replaced, nor did he talk to anyone who examined these valves. (BP's Ex. 41, Hoover Dep., at 276.) Instead, Hoover based his opinion

on drawings and pictures of valves manufactured by Strahman.  (*Id.* at 277-78.)  Hoover

conceded, however, that he did not know whether any of these valves upon which he based his

opinion were in use at the Joliet Plant during the time that BP operated the facility.  (*Id.* at 279.)

Because Hoover's opinion testimony is not supported by accurate data, Hoover's opinions are

unreliable.  *See Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).  Thus,

Hoover's opinions are not admissible as evidence at trial or in support of the present motion.  *See*

*Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 704 (7th Cir. 2009) (to defeat summary

judgment, party must rely on admissible evidence).

Nonetheless, Flint Hills argues that instead of asking the regulatory agencies whether

these valves were compliant with the LDAR, two BP employees made their own incorrect

determination that the valves were "exempt" from the LDAR's requirements because the valves

were not open-ended.  Indeed, evidence in the record reveals that BP's Rule 30(b)(6) witness,

John Duecker, did not testify that the Strahman/Fetterholf valves were not open-end, but instead

stated that they were "essentially a double-valve system in a single system."  (BP's Stmt. Facts ¶

37; Ex. 9, Duecker Dep., at 124.)  In addition, there is evidence in the record that after the

closing date, Flint Hills' employees observed several areas with open-ended lines.  (FH's Ex. 47,

Houslet Dep., at 471-72, Ex. 26, Preschler Dep., at 64-65.)  Thus, BP's assertion that the valves

were not open-ended in the first instance is a disputed question of fact.

Viewing the facts and reasonable inferences in Flint Hills' favor, Flint Hills has presented

evidence raising a genuine issue of material fact for trial that the valves in place at closing were

open-ended, and thus regulated by the LDAR.  Accordingly, there is question of fact for trial

whether BP's compliance certifications with respect to the Strahman/Fetterolf valves were

complete and accurate and conducted after a reasonable inquiry into the circumstances as required under PSA Section 7.1(j)(iii). The Court thereby denies BP's summary judgment motion as to Claim 10.

### E.      Claim 22 – Acetic Acid Tank (HF-1404) and Condenser (HE-1404)

Flint Hills further maintains that BP was not in compliance with the emissions requirements of the Title V Permit at the time of closing for the Acetic Acid Tank and Condenser. Condition 7.2.6(a) imposes VOM emissions limits of 1.2 lb/hr and 4.4 tons per year on the Acetic Acid Tank. (Title V Permit, at 52; BP's Stmt Facts ¶ 41.) Condition 7.2.3(c)(iii) imposes the requirement that the Condenser achieve 95% control of VOM emissions. (*Id.* ¶ 41; Title V Permit, at 51.)

Again, Flint Hills relies on its Rule 56.1(b)(3)(B) Response to BP's Statement of Facts instead of its own Rule 56.1(b)(3)(C) Statement of Additional Facts in support of its argument that BP did not comply with the 1.2 lb/hr limit for the Acetic Acid Tank and failed to comply with Condition 7.2.3(c)(iii) requiring the Condenser to achieve 95% control of VOM emissions. As discussed, the Court will not consider evidence that Flint Hills has improperly presented in its Rule 56.1(b)(3)(B) Response. *See Cichon,* 401 F.3d at 809 (local rules require nonmovant to file a statement of additional facts requiring denial of summary judgment).

The Court accordingly turns to the specific facts and evidence that Flint Hills properly presents in its Rule 56.1(b)(3)(C) Statement of Additional Facts to determine whether there is a genuine issue of material fact for trial concerning Claim 22. First, Flint Hills sets forth evidence that in BP's August 1998 Expansion Permit Application to the IEPA, BP stated that it would perform emissions testing after installation of the Condenser to determine its emissions factor,

yet BP did not conduct this emissions testing.  (FH's Stmt. Add'l Facts ¶ 27.)  Flint Hills also presents evidence of April 24, 2001 and August 2, 2001 emails from an employee at the Joliet Plant asking Balvant Darji, the BP employee responsible for reviewing and preparing the application for the Title V Permit, about the appropriate testing for the Acetic Acid Tank and Condenser.  (*Id.* ¶¶ 5, 28.)  These emails specifically requested information about the Acetic Acid Tank and Condenser's emissions and how BP tested these emissions units in order to complete compliance certifications, yet there is no evidence that Darji or BP responded to these emails.  (*Id.* ¶ 28.)  Flint Hills also sets forth a consultant's report concluding that the Acetic Acid Tank emissions would need to be reviewed before the Title V Permit was renewed in April 2005 because the then current estimation of the tank emissions were outdated.  (*Id.* ¶ 29.)

Viewing these facts and all reasonable inferences in Flint Hills' favor, Flint Hills has presented sufficient evidence raising an issue of material fact for trial that BP did not accurately and completely report the Acetic Acid Tank's and Condenser's relevant emissions to the IEPA, and that BP did not conduct a reasonable inquiry into the relevant emissions before filing compliance certifications to the IEPA.  Therefore, the Court denies BP's summary judgment motion as to Claim 22.

###    F.        Claim 25 – PIA Purification Scrubbers (LM-305, LM-313, LM-314)

Flint Hills also argues that BP was in noncompliance with its annual compliance certifications as to the PIA Purification Scrubbers (LM-305, LM-313, LM-314) under the Title V Permit Condition 7.3.3(c), which requires BP to measure the VOM emissions for the PIA Purification Scrubbers under US EPA Method 18.  (FH's Stmt. Add'l Facts ¶ 31; Title V Permit, at 51.)  Section 7.3.3(c) provides, in part:

The PIA process reactor venting to vent scrubber (LM-305) and Venturi scrubbers (LM-313 and LM-314) are subject to 35 IAC Subpart Q (218.431 through 218.436) for a SOCMI reactor process.

This permit is issued based on volatile organic material (VOM) from PIA process reactor venting to vent scrubber (LM-305) and Ventura scrubbers (LM-313 and LM-314) having a total VOM concentration of less than 500 ppmv, less methane and ethane, as measured by USEPA Method 18 and therefore exempt from VOM emission control requirements of 35 IAC 218.432 pursuant to 35 IAC 218.431(b)(5). The Permittee need only comply with the applicable performance and testing requirements of 35 IAC 218.433 and the recordkeeping and reporting requirements of 35 IAC 218.435. See Condition 7.3.9.

(Title V Permit, at 61.) Section 7.3.7(b) of the Title V Permit states: "Upon request by the Illinois EPA, the Permittee shall measure VOM concentration (ppmv) and/or emission rate (lb/hr) to determine compliance with Conditions 7.3.3(c) and 7.3.6(b), or variables necessary for calculating a TRE index value." (*Id.,* at 63-64.)

Based on the plain language of the Title V Permit, BP – and now Flint Hills – was only required to test the VOM concentration (ppmv) and/or emission rate (lb/hr) to determine compliance with Conditions 7.3.3(c) as it pertains to the vent scrubbers at issue (LM-305, LM-313, LM-314), if the IEPA requested such testing. It is undisputed that the IEPA never requested Flint Hills to test these vent scrubbers after the closing date. (BP's Stmt. Facts ¶ 50.)

Nonetheless, it is also undisputed that when BP did its initial compliance testing of the vent scrubbers in 1999, it did not use US EPA Method 18 to test LM-313 and LM-314. (BP's Stmt. Facts ¶ 48; Ex. 52, Darji Dep., at 141.) Also, it is factually disputed whether the US EPA Method 18 testing was properly administered when BP tested LM-305 in 1999. (*Id.* ¶ 48.) As such, Flint Hills has raised a genuine issue of material fact for trial whether BP was in noncompliance with its annual compliance certifications as to the PIA Purification Scrubbers (LM-305, LM-313, LM-314) under the Title V Permit Condition 7.3.3(c) at closing. The Court

thus denies BP's summary judgment motion as to Flint Hills' environmental compliance Claim 25.

### G.    Claim 29 – TMA Fume Scrubber

Flint Hills also contends that BP did not properly calculate a Total Resource Effectiveness ("TRE") Index for each of the individual process vent streams of the TMA Fume Scrubber pursuant to Title V Permit Condition 7.4.3(a)(i)(E) and the Illinois TRE regulations at 315 Ill. Adm. Code 218, and thus BP's annual compliance certifications submitted to the IEPA were incorrect and not conducted after a reasonable inquiry in violation of PSA Section 7.1(j)(iii).  Title V Permit Condition 7.4.3(a)(i)(E) states in its entirety:

> TRE index calculations shall be performed using the equation and procedures in 35 IAC 218.520(c)(2) and the coefficients in Appendix D of 35 IAC.  If there is more than one process vent stream, the TRE shall be the more stringent of either the TRE based upon a combination of the process vent streams or the TRE based upon each individual process vent stream.

(Title V Permit, at 69.)

In its partial summary judgment motion, BP asserts that it properly calculated a TRE index for each of the four process vent streams identified in Condition 7.4.3, and thus was in compliance with the Title V Permit.  (BP's Stmt. Facts ¶ 51.)  Flint Hills, on the other hand, contends that BP used the wrong vent streams when calculating the TRE index and did not calculate the TRE index on each of the individual vent streams as BP maintains.  Flint Hills also argues that BP improperly calculated the TRE from outlet MD-705 in violation of the Illinois Air Oxidation Rule, 35 Ill. Adm. Code 218.520.

The vast majority of Flint Hills' arguments rebutting BP's assertions are found in its Rule 56(b)(3)(B) Response to BP's Statement of Facts.  As discussed above, it is inappropriate to

make legal arguments in Rule 56.1 statements and responses, and thus the Court will not consider these arguments. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n.2 (7th Cir. 2008); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006)("district courts are entitled to expect strict compliance with Local Rule 56.1"). Furthermore, Flint Hills fails to set forth any evidence supporting its argument in its Rule 56(b)(3)(C) Statement of Additional Facts, and thus has failed in its burden of presenting specific facts creating a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 255; Fed.R.Civ.P. 56(e)(2). Because Flint Hills has not presented evidence raising a genuine issue of material fact for trial, the Court grants BP's summary judgment motion as to Claim 29.

### H.    Claim 42 – ND-1500 Vent Scrubber

Next, Flint Hills maintains that the VOM emissions from the ND-1500 Vent Scrubber at the time of closing exceeded the limits in the Title V Permit, and therefore, BP breached the PSA's environmental representations. Flint Hills also argues that the ND-1500 failed to comply with the applicable HON regulation that it reduce hazardous air pollutants by 98% or achieve a HON TRE index of greater than 4. Once again, the parties do not indicate which Title V Permit conditions are relevant to the Court's analysis – nor do the parties cite to the relevant EPA or IEPA regulations – in their legal memoranda. *See Dal Pozzo,* 463 F.3d at 613.

Nevertheless, OM emissions from the ND-1500 scrubber are subject to 35 Ill. Adm. Code 218.301, which is referenced in Title V Permit Condition 7.1.3(a)(iii). Condition 7.1.3(a)(iii) states in relevant part, "[n]o person shall cause or allow the emission of more than 8 lb/hr of organic material into the atmosphere from any emission unit." (Title V Permit, at 37.) It is undisputed that BP certified compliance with the 8 lb/hr emission limit based upon a September

3, 1993 stack test showing emission of 6.56 lb/hr, which is under the 8 lb/hr restriction. (BP's Stmt. Facts ¶ 54.) Flint Hills, however, offers evidence that BP did not properly administer the 1993 stack test – which formed the basis of BP's initial compliance with Condition 7.1.3(a)(ii). (FH's Stmt. Add'l Facts ¶ 34.) Therefore, there is an issue of material fact for trial whether BP's compliance certification was "complete and accurate" and "conducted after a reasonable inquiry into the circumstances" pertaining to Condition 7.1.3(a)(iii).

In addition, the Hazardous Organic National Emission Standards for Hazardous Air Pollutants ("HON") are incorporated into the Title V Permit Condition 7.1.3(c)(ii), which requires that the relevant process vents (ND-500, ND-603) must show TREs of greater than 4. *See also* 40 C.F.R. § 63.115(d)(3) (calculating TRE index); 40 C.F.R. § 63.152(b) (HON compliance regulation). Flint Hills argues that BP did not properly analyze or certify compliance with this requirement and presents evidence raising an issue of material fact for trial that BP's TRE calculations relied upon in the HON Notification of Compliance Status – which formed the basis for the applicable requirements in the Title V Permit – were erroneous based on improper testing. (FH's Stmt. Add'l Facts ¶ 35.) More specifically, Flint Hills offers evidence that BP analyzed the ND-1500 Vent Scrubber's process vessels, ND-500 and ND-603, using EPA Tanks 2.0 software, which is designed for use with atmospheric storage tanks, and thus is not an appropriate tool to estimate the relevant process vessels. (*Id*.) Accordingly, Flint Hills has presented evidence creating a genuine issue of material fact for trial that BP's compliance certification was not complete and accurate and not conducted after a reasonable inquiry pertaining to the Title V Permit Condition 7.1.3(c)(ii) for the ND-1500 Vent Scrubber. The Court thereby denies BP's summary judgment motion as to Claim 42.

## I.    Claim 46 – Air Emissions Testing

Furthermore, Flint Hills maintains that after it purchased the Joliet Plant, it evaluated each emissions unit's compliance with the Title V Permit emissions limits as part of its reasonable inquiry to prepare for certifying compliance.  Flint Hills further asserts that as part of this process, it assembled a team to review the Joliet Plant's compliance after which it scheduled emissions testing, namely, stack tests, to certify its compliance.  Based on these post-closing stack tests, Flint Hills argues that BP failed to accurately and completely certify its compliance with the Title V Permit prior to closing.  Flint Hills also contends that BP failed to accurately and completely certify its compliance with the Title V Permit because Flint Hills needed to install sample ports on certain emissions units to conduct its own emissions testing.

Here, BP has set forth evidence that the IEPA did not request the post-closing stack tests and that the Title V Permit did not require these stack tests.  (BP's Stmt. Facts ¶ 67.)  Indeed, the Court discusses these post-closing stack tests in detail in its order granting BP's *Daubert* motion pertaining to the post-closing stack testing in which the Court precludes the admission of these stack tests as evidence at trial.  Moreover, Flint Hills does not point to any Title V Permit condition relevant to its argument, and the majority of Flint Hills' legal arguments concerning this claim are buried in its Rule 56.1(b)(3)(B) Response to BP's Statement of Facts.  Also, Flint Hills does not present any facts in its Rule 56.1(b)(3)(C) Statement of Additional Facts to support this claim.  *See Celotex,* 477 U.S. at 322-23; *Ciomber,* 527 F.3d at 643.  Even if the Court were to consider the arguments and evidence in Flint Hills' Rule 56.1(b)(3)(B) Response, as discussed under the Environmental Law Standards section of this opinion, proof of BP's noncompliance is limited to the means and methods specified in the Title V Permit.  Therefore,

Flint Hills' attempt to use the stack tests as credible evidence in this private cause of action must fail. *See* 40 C.F.R. § 52.12(c). The Court thus grants BP's summary judgment motion as to Claim 46.

### J.     Claim 51 – TMA Unit Regenerative Thermal Oxidizer (MB-1050)

Flint Hills further argues that the Regenerative Thermal Oxidizer ("REECO") VOM emissions exceeded Condition 7.4.5(b) of the Title V Permit, which states in relevant part:

> The thermal oxidizer (MB-1050) shall be operated so as to destroy at least 98.5% of the VOM and 95% of the CO which would otherwise be emitted to the atmosphere, and shall be on stream at least 95% of the time the emission equipment is operating, determined on an annual basis.

(Title V Permit, at 71.)

In support of its argument, Flint Hills again relies upon stack tests – conducted approximately fourteen months after the closing date – that used methods not provided for in the Title V Permit. As discussed, proof of BP's noncompliance is limited to the means and methods specified in the Title V Permit. Nevertheless, Flint Hills maintains that its claim is not solely based on the August 2005 stack testing, yet Flint Hills fails to set forth any facts in its Rule 56.1(b)(3)(C) Statement of Additional Facts in support of this claim. *See Cracco,* 559 F.3d at 632 ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules." (citation omitted)). Because Flint Hills has failed to present specific evidence establishing an issue of material fact for trial, the Court grants BP's summary judgment motion as to Claim 51. *See* Fed.R.Civ.P. 56(e)(2).

### K.     Claim 80 – IEPA Violation Notice and Enforcement Action

The IEPA issued Flint Hills a Violation Notice dated April 13, 2006, for various violations of the applicable environmental laws and the Joliet Plant's Title V permit. (BP's Stmt. Facts ¶ 72; FH's Stmt. Add'l Facts ¶ 37.) In March 2008, the IEPA filed a Complaint for Injunctive Relief and Civil Penalties in the Circuit Court of Will County, Illinois against Flint Hills. (BP's Stmt. Facts ¶ 72; FH's Ex. 75, IEPA Compl.) Flint Hills maintains that the Violation Notice and civil enforcement action are the result of BP's breach of its environmental representations. Accordingly, Flint Hills seeks to recover its costs in defending the Violation Notice and the IEPA enforcement action under the PSA's indemnification provision Section 13.2(a). (FH's Stmt. Add'l Facts ¶¶ 38, 39.)

The remaining environmental claims in this lawsuit Claims 4 (IPA Silo Dust Collectors), 10 (Strahman/Fetterolf valves), 22 (Acetic Acid Tank and Condenser), 25 (PIA Purification Scrubbers), and 42 (ND-1500 Scrubber), form the basis of certain claims in the IEPA's civil enforcement action. And, despite BP's arguments to the contrary, two of the Counts in the IEPA's Complaint that are relevant to the remaining environmental claims state that certain violations began from at least May 28, 2004 – the closing date. (FH's Ex. 75, IEPA Compl., Count I ¶ 7, Count VII ¶ 36.) Therefore, as to Counts I and VII, if Flint Hills establishes that BP did in fact breach any such warranties or representations under PSA § 13.2(a), BP may be liable under the indemnification provision of the PSA. At this juncture, however, Flint Hills has not established that BP breached its representations as a matter of law. Therefore, the Court denies BP's summary judgment motion as to the indemnification of these claims.

Flint Hills also seeks to recover the costs it incurred in addressing the PD-700 Low Pressure Absorber concerning its noncompliance with emissions limits based on 2005 and 2006 stack testing. (BP's Stmt. Facts ¶ 76.) Not only were these stack tests done after the closing date, the stack testing was not required by the Title V Permit, and thus cannot show BP's noncompliance. Also, in granting BP's *Daubert* motion concerning the post-closing stack test, the Court precluded the admission of these stack tests as evidence at trial, and consequently, in support of this summary judgment motion. Accordingly, Flint Hills has failed to set forth evidence that BP was not in environmental compliance concerning the PD-700 as of the closing date.

## III.    Fraudulent Misrepresentation Claims

Next, Flint Hills argues that BP's representations as to Claims 4, 22, and 42 were fraudulent. Under Illinois law, the elements of fraudulent misrepresentation include: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) with the intent to induce the other party to act; (4) the other party's justifiable reliance on the truth of the statement; and (5) damages resulting from reliance on the statement. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.,* 128 Ill.2d 179, 193, 131 Ill.Dec. 155, 538 N.E.2d 530 (Ill. 1989) (citation omitted); *see also Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 841 (7th Cir. 2007) (citing *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 496, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill. 1996)). Further, "it is well established that a misrepresentation is fraudulent either where a party makes the representation knowing it is false *or* where the misrepresentation was made with a reckless disregard for its truth or falsity." *Gerill Corp.,* 128 Ill.2d at 193 (emphasis in original).

Here, Flint Hills focuses on whether BP's representations were knowingly false or made with reckless disregard for the truth, yet fails to argue or present any evidence that BP made any such false representations with the intent to induce Flint Hills to act as required under the third element of its fraudulent misrepresentation claims under Illinois law. *See Tricontinental Indus.,* 475 F.3d at 841; *Connick,* 174 Ill.2d at 496. Because Flint Hills has failed to establish the third element of its common law fraudulent misrepresentation claims, the Court grants BP's summary judgment motion as to Flint Hills' fraud claims based on its environmental compliance Claims 4, 22, and 42.

## IV. PSA Deductible on Environmental Claims

Under Sections 2.4(d) and 13.4(d)(iii) of the PSA, Flint Hills assumed the first $2.5 million of losses related to its environmental claims. (BP's Stmt. Facts ¶ 19.) Because Flint Hills has alleged over $2.5 million in damages on the remaining environmental claims in this lawsuit, namely, Claims 4, 10, 22, 25, and 42, BP's argument that any remaining environmental claims must be dismissed is without merit.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' Partial Summary Judgment Motion pursuant to Federal Rule of Civil Procedure 56.

**Dated:** May 20, 2009

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**