# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BP AMOCO CHEMICAL COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter–Defendant, | ) | |
| | ) | Case No. 05 C 5661 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| FLINT HILLS RESOURCES LLC, | ) | |
| | ) | |
| Defendant/Counter–Plaintiff. | ) | |
| | ) | |

**BP AMOCO CHEMICAL COMPANY'S MEMORANDUM IN SUPPORT**
**OF ITS RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF**
**LAW UNDER FRCP 50(b), ITS MOTION FOR A NEW TRIAL UNDER FRCP 59,**
**AND ITS MOTION FOR A STAY UNDER FRCP 62(b)**

Richard C. Godfrey, P.C. (ARDC #3124358)
Scott W. Fowkes, P.C. (ARDC #6199265)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Attorneys for BP Amoco Chemical Company*

Dated: November 25, 2009

## <u>TABLE OF CONTENTS</u>

**Page**

ARGUMENT ...............................................................................................................................1

I.  JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL SHOULD BE
    GRANTED ON FLINT HILLS' ALLEGED DAMAGES. ................................................2

      A.  Flint Hills Failed To Produce The Necessary and Required Evidence To
            Support Its Estimated Future Damages for Claims 9, 21, 56, and 77.  (Dkt.
            858, 889) ...............................................................................................................2

            1.  Flint Hills Failed To Submit Evidence Proving That It Is
                    Reasonably Certain To Incur The Estimated Future Damages....................2

            2.  Flint Hills Failed To Submit Evidence Proving The Amount Of Its
                    Estimated Future Damages With Reasonable Certainty.............................3

            3.  Flint Hills' Purported Evidence Did Not Satisfy The Requirements
                    Of The Federal Rules Of Evidence..............................................................4

      B.  Flint Hills Sought Cost-of-Repair Damages That Are Barred By The PSA
            Or Otherwise Precluded.  (Dkt. 852, 877) ..............................................................5

II. A NEW TRIAL SHOULD BE HELD...............................................................................7

      A.  BP Amoco Did Not Breach The Production Capacity Warranty. ...........................7

            1.  The Interpretation Of The PSA's Production Capacity Warranty
                    Presented To The Jury By Flint Hills Was Legally Incorrect.  (Dkt.
                    220, 222, 292) ...............................................................................................7

            2.  Flint Hills Failed To Establish Any Meaning Of The Production
                    Capacity Representation And Failed To Introduce Admissible
                    Evidence Of The AMDSP Rates....................................................................8

                  a.  Flint Hills Bore The Burden Of Proving The Meaning Of
                            The Supposedly Ambiguous Language. ..........................................9

                  b.  Flint Hills' Witnesses Offered Contradictory Definitions Of
                            AMDSP, And Those Definitions Violated The PSA's
                            Language...........................................................................................9

                  c.  Flint Hills Also Interpreted The AMDSP Representation To
                            Warrant Effective Capacity, Which BP Amoco Explicitly
                            Refused To Warrant..................................................................12

3.  Flint Hills Did Not Produce Admissible Evidence Of The AMDSP Rates.........................................................................................13

4.  The Joliet Plant's PIA Production Was Independently Constrained By The Lack Of Metaxylene..............................................................14

B.  The Interpretation Of The PSA's Condition-of-Assets Warranty Presented To The Jury Was Legally Incorrect.  (Dkt. 280, 281, 296)....................................15

C.  The Jury Was Improperly Instructed, Including By Not Being Instructed That Flint Hills' Damages Were Limited To The Lesser Of Proven Cost-of-Repair Or Diminution-In-Value Damages.  (Dkt. 245, 247, 352, 708, 726, 901) ...........................................................................................15

D.  A New Trial Should Be Awarded On Flint Hills' Alleged Damages....................16

1.  Flint Hills' Damages Were Based On Improperly Admitted Evidence And Documents.  (Dkt. 603, 644, 682).........................................16

2.  Jeffrey Baliban's Opinions And Testimony Should Have Been Excluded.  (Dkt. 247, 352, 378, 383, 498, 816, 818)..............................18

3.  Sharon Moore Bettius' Opinions And Testimony Should Have Been Excluded.  (Dkt. 247, 352, 378, 383, 498).......................................18

E.  Flint Hills Spoliated Evidence And Should Have Been Precluded From Pursuing Its Claims.  (Dkt. 249, 251, 340, 355) ...................................................19

F.  The Notes Rick Morris Used To Refresh His Recollection On The Stand Should Have Been Produced. ....................................................................20

G.  A New Trial Should Be Granted For Errors In Admitting Or Excluding Evidence....................................................................................21

1.  Flint Hills' Late Production Of Documents Should Have Led To The Dismissal Of Claims 67, 72, 77 And Portions Of Claim 21. (Dkt. 547, 548, 610)...............................................................................21

2.  Evidence Of BP Amoco's Price Concessions Should Have Been Admitted.  (Dkt. 661)..................................................................21

3.  Evidence Of Flint Hills' Modus Operandi To Seek Purchase Price Adjustments Through Litigation Should Have Been Admitted. (Dkt. 709)...................................................................................22

4.  Evidence Of The PCBU's Post-Transaction Profitability Should Have Been Admitted For Its Substance.  (Dkt. 654, 750, 817) ................23

5.    The Admission Regarding Contract Compliance By Flint Hills'
      30(b)(6) Witness Should Have Been Admitted.  (Dkt. 881).....................23

III.   THE COURT SHOULD GRANT A STAY OF THE JUDGMENT UNTIL IT
       HAS RULED ON THIS MOTION......................................................................................24

CONCLUSION...........................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Albany Ins. Co. v. Bengal Marine, Inc.*,
    857 F.2d 250 (5th Cir. 1988) ........................................................................ 6

*Allison v. Ticor Title Ins. Co.*,
    979 F.2d 1187 (7th Cir. 1993) ...................................................................... 2

*Allstate Ins. Co. v. Sunbeam Corp.*,
    53 F.3d 804 (7th Cir. 1995) ........................................................................ 19

*Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. Snapp Sys., Inc.*,
    2008 WL 5383372 (E.D. Mich. Dec. 23, 2008) ........................................ 17

*Barnhill v. United States*,
    11 F.3d 1360 (7th Cir. 1993) ...................................................................... 19

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
    476 F. Supp. 2d 887 (N.D. Ill. 2007) .......................................................... 1

*Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*,
    247 F.3d 79 (3d Cir. 2001) ........................................................................... 9

*City of Columbia v. Omni Outdoor Adver., Inc.*,
    499 U.S. 365 (1991) ..................................................................................... 2

*Cole Energy Dev. Co. v. Ingersoll-Rand Co.*,
    913 F.2d 1194 (7th Cir. 1990) ...................................................................... 6

*Cygnar v. City of Chicago*,
    865 F.2d 827 (7th Cir. 1989) ....................................................................... 1

*Datamatic Servs., Inc. v. United States*,
    909 F.2d 1029 (7th Cir. 1990) .................................................................... 17

*Dispatch Automation, Inc. v. Richards*,
    280 F.3d 1116 (7th Cir. 2002) .................................................................... 15

*Duckworth v. Ford*,
    83 F.3d 999 (8th Cir. 1996) ........................................................................ 23

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980) ................................................................... 24

*First Nat'l Bank of Elgin v. Dusold*,
    180 Ill. App. 3d 714, 536 N.E.2d 100 (Ill. App. Ct. 1989) ...................... 16

*Flint Hills Resources, LP v. Kerr-McGee Corp. & Southwestern Refining Co.*,
    No. 04-5441-E (148th Judicial Dist., Texas, filed Jan. 28, 2005) ................................... 22

*Fort Howard Paper Co. v. Standard Havens, Inc.*,
    901 F.2d 1373 (7th Cir. 1990) ...................................................................................... 1

*FSC Paper Corp. v. Sun Ins. Co. of New York*,
    744 F.2d 1279 (7th Cir. 1984) ...................................................................................... 8

*Gastineau v. Fleet Mortgage Corp.*,
    137 F.3d 490 (7th Cir. 1998) ...................................................................................... 23

*GPF Waikiki Galleria, LLC v. DFS Group, L.P.*,
    2007 WL 3195089 (D. Haw. 2007) .............................................................................. 12

*Gvillo v. Stutz*,
    306 Ill. App. 3d 766, 715 N.E.2d 285 (Ill. App. Ct. 1999) .............................................. 16

*Happel v. Wal-Mart Stores, Inc.*,
    2007 WL 495277 (N.D. Ill. Feb. 9, 2007) ..................................................................... 21

*Hartford Accident & Indem. Co. v. Case Found. Co.*,
    10 Ill. App. 3d 115, 294 N.E.2d 7 (Ill. App. Ct. 1973) ................................................... 5

*Hawthorne Partners v. AT&T Tech., Inc.*,
    831 F. Supp. 1398 (N.D. Ill. 1993) .............................................................................. 22

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
    858 A.2d 342 (Del. Ch. 2004) ..................................................................................... 15

*Horina v. City of Granite City, Ill.*,
    538 F.3d 624 (7th Cir. 2008) ....................................................................................... 5

*Hossack v. Floor Covering Assocs.*,
    2004 WL 2423825 (N.D. Ill. Oct. 22, 2004) ................................................................. 1

*Houben v. Telular Corp.*,
    309 F.3d 1028 (7th Cir. 2002) .................................................................................... 24

*In re Envirodyne Indus. Inc.*,
    29 F.3d 301 (7th Cir. 1994) ....................................................................................... 15

*In re Old Banc One S'holders Sec. Litig.*,
    2005 WL 3372783 (N.D. Ill. Dec. 8, 2005) .................................................................. 19

*In re Pioneer Hi-Bred Int'l, Inc.*,
    238 F.3d 1370 (Fed. Cir. 2001) .................................................................................. 20

*In re S.N.A. Nut Co.*,
  210 B.R. 140 (Bankr. N.D. Ill. 1997) ............................................................... 17

*Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*,
  381 Ill. App. 3d 312, 885 N.E.2d 532 (Ill. App. Ct. 2008) ................................ 8

*Invista B.V. v. E.I. du Pont de Nemours & Co.*
  No. 08 CV 3063 (S.D.N.Y., filed Mar. 26, 2008) ............................................ 22

*Judson Atkinson Candies, Inc., v. Latini-Hohberger Dhimantec*,
  529 F.3d 371 (7th Cir. 2008) ........................................................................... 17

*Klingler Farms, Inc. v. Effingham Equity, Inc.*,
  171 Ill. App. 3d 567, 525 N.E.2d 1172 (Ill. App. Ct. 1988) ............................ 14

*Koch Business Holdings, LLC v. Amoco Pipeline Holding Company*,
  554 F.3d 1134 (11th Cir. 2009) ....................................................................... 22

*Kokomo Opalescent Glass Co. v. Arthur W. Schmid Int'l, Inc.*,
  371 F.2d 208 (7th Cir. 1966) ........................................................................... 22

*La Montagne v. Am. Convenience Prods., Inc.*,
  750 F.2d 1405 (7th Cir. 1984) ........................................................................... 1

*Lucas v. Chicago Transit Auth.*,
  367 F.3d 714 (7th Cir. 2004) ............................................................................. 3

*Magee v. Paul Revere Life Ins. Co.*,
  172 F.R.D. 627 (E.D.N.Y. 1997) ..................................................................... 20

*Marquette Cement Mfg. Co. v. Louisville & Nashville R.R. Co.*,
  406 F.2d 731 (6th Cir. 1969) ............................................................................. 6

*Mathis v. Phillips Chevrolet, Inc.*,
  269 F.3d 771 (7th Cir. 2001) ........................................................................... 23

*Meade v. Kubinski*,
  277 Ill. App. 3d 1014, 661 N.E.2d 1178 (Ill. App. Ct. 1996) .......................... 16

*Mefer S.A.R.L. of Paris, France v. Naviagro Maritime Corp.*,
  533 F. Supp. 337 (S.D.N.Y. 1982) .................................................................... 9

*Movitz v. First Nat'l Bank of Chicago*,
  148 F.3d 760 (7th Cir. 1998) ............................................................................. 5

*Newton v. City of New York*,
  640 F. Supp. 2d 426 (S.D.N.Y. 2009) ............................................................. 20

*Nohcra Commc'ns, Inc. v. AM Commc'ns, Inc.*,
909 F.2d 1007 (7th Cir. 1990) ........................................................ 16

*Normand v. Orkin Exterminating Co.*,
193 F.3d 908 (7th Cir. 1999) .......................................................... 16

*OCI Wyoming, L.P. v. PacifiCorp*,
2005 WL 5985388 (D. Wyo. Feb. 25, 2005) ................................... 20

*Outboard Marine Corp. v. Liberty Mutual Ins. Co.*,
154 Ill. 2d 90, 607 N.E.2d 1204 (Ill. 1992) ..................................... 7

*Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*,
373 Ill. App. 3d 384, 869 N.E.2d 784 (Ill. App. Ct. 2007) ............... 8

*PPM Fin., Inc. v. Norandal USA, Inc.*,
392 F.3d 889 (7th Cir. 2004) .......................................................... 8

*Prairie Land Constr., Inc. v. Vill. of Modesto*,
213 Ill. App. 3d 364, 571 N.E.2d 1210 (Ill. App. Ct. 1991) ............ 9

*Price v. Code-Alarm, Inc.*,
2002 WL 1870041 (N.D. Ill. Aug. 13, 2002) .................................. 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ......................................................................... 3

*S.M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc.*,
39 Ill. App. 3d 353, 350 N.E.2d 321 (Ill. App. Ct. 1976) ................ 6

*Sabatini v. Its Amore Corp.*,
2009 WL 3878245 (M.D. Pa. Nov. 19, 2009) ................................ 24

*Salgado v. General Motors Corp.*,
150 F.3d 735 (7th Cir. 1998) .......................................................... 21

*Sparton Corp. v. United States*,
77 Fed. Cl. 1 (Fed. Cl. 2007) .......................................................... 11

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ......................................................................... 2

*Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*,
2003 WL 22433086 (N.D. Ill. 2003) ................................................ 1

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
370 U.S. 19 (1962) ........................................................................... 2

*Thompson v. County of Cook*,
    154 Ill. 2d 374, 609 N.E.2d 290 (Ill. 1993) ..................................................... 15

*Traveler's Ins. Co. v. Eljer Mfg., Inc.*,
    197 Ill. 2d 278, 757 N.E.2d 481 (Ill. 2001) ...................................................... 8

*Union Pac. R.R. Co. v. Kansas City S. Ry. Co.*,
    2009 WL 2489279 (S.D. Ill. 2009) .................................................................. 9

*United States v. Given*,
    164 F.3d 389 (7th Cir. 1999) ......................................................................... 16

*United States v. Mietus*,
    237 F.3d 866 (7th Cir. 2001) ...................................................................... 1, 2

*United States v. Price*,
    516 F.3d 597 (7th Cir. 2008) ......................................................................... 16

*United States v. Santos*,
    201 F.3d 953 (7th Cir. 2000) ......................................................................... 17

*Westfield Ins. Co. v. Sheehan Constr. Co.*,
    564 F.3d 817 (7th Cir. 2009) ......................................................................... 12

*Wiginton v. Ellis*,
    2003 WL 22439865 (N.D. Ill. Oct. 27, 2003) ................................................. 19

*Wis. Alumni Research Found. v. Xenon Pharms., Inc.*,
    2006 WL 2034577 (W.D. Wis. July 18, 2006) ................................................ 24

*Witty v. C. Casey Homes, Inc.*,
    102 Ill. App. 3d 619, 430 N.E.2d 191 (Ill. App. Ct. 1981) .............................. 16

*Zelinski v. Columbia 300, Inc.*,
    335 F.3d 633 (7th Cir. 2003) ........................................................................... 1

**Statutes**

Fed. R. Civ. P. 62 ............................................................................................. 1, 24

Fed. R. Civ. P. 30 ........................................................................................... 21, 23

Fed. R. Civ. P. 50 ............................................................................................. 1, 24

Fed. R. Civ. P. 59 ............................................................................................. 1, 24

Fed. R. Evid. 1006 ................................................................................................ 17

Fed. R. Evid. 404 ................................................................................................. 23

Fed. R. Evid. 612 ................................................................................................ 20

Fed. R. Evid. 702 .................................................................................................. 5

Fed. R. Evid. 803 ........................................................................................... 16, 17

**Other Authorities**

4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE,
    § 612.04 (2d ed. 2007) ................................................................................ 20

AM. HERITAGE COLLEGE DICTIONARY 35 (4th ed. 2007) ............................................ 15

WEBSTER'S II NEW COLLEGE DICTIONARY 35 (3d ed. 2005) ...................................... 15

For the reasons outlined in BP Amoco's motion and described in further detail below, BP Amoco moves for a new trial pursuant to FRCP 59.[1] For the most part, these issues have been raised in prior briefing. Thus, to avoid unnecessary repetition, in the headings and text this memorandum provides citations to BP Amoco's prior filings on the issues, which prior filings BP Amoco incorporates in their entirety by reference. BP Amoco also, pursuant to FRCP 50(b), renews its motions for judgment as a matter of law on Flint Hills' estimated future damages (Dkt. 858, 889) and on all or a portion of Flint Hills' repair cost damages for certain claims (Dkt. 852, 877). Finally, under FRCP 62(b), BP Amoco moves for a stay of execution of the judgment while this motion is pending.

## ARGUMENT

Judgment as a matter of law should be granted unless the jury "'was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict.'" *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887, 891 (N.D. Ill. 2007) (St. Eve, J.) (quoting *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003)). "In considering a motion for judgment as a matter of law, the court must review all the evidence in the record, drawing all inferences in favor of the nonmoving party and disregarding all evidence favoring the moving party that the jury was not required to believe." *Hossack v. Floor Covering Assocs.*, 2004 WL 2423825, at *1 (N.D. Ill. Oct. 22, 2004). The court must "weigh the evidence to the extent of determining whether the evidence to support the verdict is *substantial*; a mere scintilla of evidence will not suffice." *La Montagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1410 (7th Cir. 1984) (italics in original).

"The test to be applied in determining whether a motion for a new trial should be granted is whether the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Cygnar v. City of Chicago,* 865 F.2d 827, 835 (7th Cir. 1989). "Rule 59 affords trial courts broad discretion in determining the propriety of a new trial, although 'it is always an abuse of discretion to base a decision on an incorrect view of the law.'" *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.,* 2003 WL 22433086, at *1 (N.D. Ill. 2003) (citing *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir. 1990) and quoting *United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001)).

---

[1] In its Order dated May 19, 2009 (Dkt. 539), the Court realigned the parties for trial such that Flint Hills became the plaintiff and BP Amoco became the defendant.

"The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." *Id.* "A new trial may be granted if in the court's discretion the previous trial was 'unfair to the moving party.'" *Id.* (quoting *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1993)).

The verdict in this case was a general verdict. (Dkt. 912) Such a verdict's "generality prevents [a court] from perceiving upon which plea [the jury] found." *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 30 (1962). "If, therefore, upon any one issue error was committed, either in the admission of evidence or in the charge of the court, the verdict cannot be upheld." *Id.*; *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459-60 (1993); *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 384 (1991).

## I. JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL SHOULD BE GRANTED ON FLINT HILLS' ALLEGED DAMAGES.

### A. Flint Hills Failed To Produce The Necessary and Required Evidence To Support Its Estimated Future Damages for Claims 9, 21, 56, and 77. (Dkt. 858, 889)

Over half of the damages Flint Hills sought at trial, approximately $56 million, were for future estimated costs that Flint Hills has not yet spent for Claims 9, 21, 56 and 77. (Dkt. 889 at 1) As explained in BP Amoco's prior briefing, Flint Hills failed at trial to establish the legal prerequisites of its alleged future estimated damages for Claims 9, 21, 56 and 77: (i) that the future estimated costs Flint Hills seeks to recover are "reasonably certain to occur," and (ii) that the future estimated costs "can be calculated with reasonable certainty." (Dkt. 889 at 2-3) Therefore, BP Amoco should be granted judgment as a matter of law on Flint Hills' claims for estimated future damages on these four claims or, at a minimum, a new trial should be granted where those alleged damages are excluded for those claims.

#### 1. Flint Hills Failed To Submit Evidence Proving That It Is Reasonably Certain To Incur The Estimated Future Damages.

At trial, Flint Hills failed to meet its burden of establishing that future damages were reasonably certain to occur. For example, Flint Hills failed to introduce evidence of specific facts showing that the projects at issue in Claims 9, 21, 56, and 77 would be completed in the future. Instead, the evidence it offered was simply the self-serving, conclusory statements of witnesses agreeing with Flint Hills' counsel's questions that the projects are "reasonably certain to occur" or "reasonably likely to occur" but without any supporting facts, factual basis for the conclusory statement, or other necessary evidence. (*E.g.*, Ex. 1, 10/7/09 Tr. (Morris) at 4203:8-

18; Ex. 2, 10/13/09 Tr. (Nicol) at 5109:18-20; Ex. 3, 10/14/09 Tr. (Nicol) at 5136:22-24, 5285:19-21) The Seventh Circuit "repeatedly ha[s] held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004). "And the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). Thus, conclusory statements such as those made by Flint Hills' witnesses at trial are insufficient to survive judgment as a matter of law.

Indeed, the evidence shows that there was no basis for the jury to conclude that it was reasonably certain that the estimated futures damages would ever be spent by Flint Hills. (Dkt. 889 at 3-8) For the estimated future damages for Claims 9, 21, 56 and 77, Flint Hills did not know with any level of certainty when, or even if, the costs would be spent. (*E.g.*, Ex. 1, 10/7/09 Tr. (Morris) at 4175:3-6, 4203:8-18; Ex. 3, 10/14/09 Tr. (Nicol) at 5240:13-16, 5247:3-6) In some cases, Flint Hills had not spent a single penny for the projects at issue. (*E.g.*, Ex. 3, 10/14/09 Tr. (Nicol) at 5177:6-14, 5246:16-18) Moreover, Flint Hills had not even authorized the funding at issue. (*E.g.*, Ex. 1, 10/7/09 Tr. (Morris) at 4353:19-4354:2, 4358:11-13; Ex. 3, 10/14/09 Tr. (Nicol) at 5233:23-5234:6, 5246:14-15) And for Claim 77 and portions of Claim 21, Flint Hills had not decided whether to proceed with the project at all, or it had not decided what type of repair or replacement to make. (*E.g.*, Ex. 4, 10/8/09 Tr. (Roman) at 4637:9-17, 4662:5-10; Ex. 5, 10/9/09 Tr. (Roman) at 4692:25-4693:7, 4700:15-23)

### 2. Flint Hills Failed To Submit Evidence Proving The Amount Of Its Estimated Future Damages With Reasonable Certainty.

In addition to failing to prove that the costs are reasonably certain to be incurred in the future, for Claims 21, 56, and 77 Flint Hills failed to prove that the amount of such costs could be calculated with reasonable certainty. Flint Hills' witnesses explained that it has a phased approach for completing projects. The early phases such as Phase 0 or 1 involve only conceptual ideas and preliminary cost estimates that can vary by up to plus or minus 50 percent. (Ex. 4, 10/8/09 Tr. (Roman) at 4620:7-10; Ex. 5, 10/9/09 Tr. (Roman) at 4697:23-4698:1; Ex. 4, 10/8/09 (Morris) at 4390:20-23) Phase 2 is Flint Hills' "process design phase." (Ex. 4, 10/8/09 Tr. (Roman) at 4620:20-21) Flint Hills does not typically fully fund a project based on a Phase 1 or a Phase 2 estimate. (Ex. 5, 10/9/09 Tr. (Roman) at 4697:8-11, 4698:5-8)

For Claims 21, 56, and 77, Flint Hills' projects are in the earliest stages of Flint Hills' phased process, and thus any estimates are subject to wide variances. (Dkt. 889 at 8-13) Indeed, some of these projects are pre-Phase 0, meaning Flint Hills has done no work on or analysis of the projects. (Ex. 4, 10/8/09 Tr. (Roman) at 4620:7-10; *see, e.g.*, Ex. 3, 10/14/09 Tr. (Nicol) at 5178:3-5, 5240:17-20, 5246:14-15) Flint Hills also used damages figures based on old documents that for the most part it did not prepare and which provided no support or explanation for how the cost figure was calculated. (Ex. 3, 10/14/09 Tr. (Nicol) 5137:12-24, 5179:17-22, 5240:5-8; Ex. 6, Trial Ex. 36 at FHR-00188325; Ex. 7, Trial Ex. 1037 at FHR-00188279; Ex. 8, Trial Ex. 974; Ex. 9, Trial Ex. 34 at BPACC0006258) Other estimates were for equipment that is dissimilar from what Flint Hills plans to install. (Ex. 10, 9/15/09 Tr. (Kelly) at 1083:6-1084:6; Ex. 3, 10/14/09 Tr. (Nicol) at 5182:7-9) Because of these facts, Flint Hills did not show that its estimated future damages could be calculated with reasonable certainty.

### 3. Flint Hills' Purported Evidence Did Not Satisfy The Requirements Of The Federal Rules Of Evidence.

Flint Hills relied on damages "evidence" that does not satisfy the Federal Rules of Evidence, the decisions of this Court, or other requirements. The Court held that for Flint Hills to be able to use third-party estimates to prove its damages, Flint Hills must prove that it integrated those documents into its records as well as relied upon the documents in its day-to-day operations. During prior briefing on its estimated future damages, Flint Hills contended that it integrated and relied on the documents by "integrating the estimates into the development of 'Authorizations for Expenditure' ('AFE')" (Dkt. 767 at 4), but at trial Flint Hills presented no evidence of AFEs for the equipment at issue in Flint Hills' estimated future damages for Claims 21, 56, and 77. (Dkt. 889 at 2-3, 14-15) In fact, it did not even have AFEs for the amounts at issue for these claims.

Flint Hills' third-party estimates also were not "accompanied by sufficient indicia of reliability" to support the damages Flint Hills sought. (Dkt. 889 at 15-16) Flint Hills had not authorized funding for the damages it sought based on any of the third-party estimates for Claims 56, 77, and the long-term waste water treatment plant project portion of Claim 21. (Ex. 4, 10/8/09 Tr. (Roman) at 4637:9-17; Ex. 5, 10/9/09 Tr. (Roman) at 4692:25-4693:7; Ex. 1, 10/7/09 Tr. (Morris) at 4353:19-4354:2, 4358:11-13, 4360:21-25; Ex. 3, 10/14/09 Tr. (Nicol) at 5233:23-5234:6)

Finally, Flint Hills employee-witnesses lacked the "knowledge, skill, experience, training, or education" to qualify as expert witnesses under FRE 702. (Dkt. 767 at 5) The record testimony and evidence demonstrates that those witnesses, particularly Timothy Nicol and George Roman, do not have the "specialized knowledge of a matter [that] is sufficient" for them to provide expert testimony. (Dkt. 889 at 16-17) Yet they were the only witnesses that discussed damages for certain claims, including Claims 21 and 77. Similarly, there was no evidence that Richard Morris had experience with electrical equipment such as those at issue in Claims 9 and 56.

**B.** **Flint Hills Sought Cost-of-Repair Damages That Are Barred By The PSA Or Otherwise Precluded. (Dkt. 852, 877)**

Flint Hills' own evidence demonstrated fundamental problems with its repair cost damages. For example, Flint Hills sought—and presented to the jury—damages that were unrecoverable under the terms of the PSA and/or that were not supported at trial. For this reason, judgment as a matter of law should be granted against Flint Hills' alleged damages or, at a minimum, a new trial should be awarded where these alleged damages are barred and excluded.

*First*, for many of its claims Flint Hills seeks to recover for expenses described only as "FHR INTERNAL JOURNAL ENTRIES." (*E.g.*, Ex. 11; Ex. 12; Ex. 13; Ex. 14) But Flint Hills provided no explanation of what these journal entries are for or how they could constitute damages in this case. When Matthew Daugherty, who sponsored Flint Hills' damages summaries, was asked about particular internal journal entries, he could not provide any explanation of what they were for and what the basis was for them. (Ex. 2, 10/13/09 Tr. at 4905:17-20) The costs for these internal journal entries thus were unsupported and should not have been presented to the jury. *See*, *e.g.*, *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 765 (7th Cir. 1998); *Horina v. City of Granite City, Ill.*, 538 F.3d 624, 637 (7th Cir. 2008). The particular entries and additional detail is provided in Dkt. 877 at 2-3.

*Second*, PSA Section 13.6 prohibits Flint Hills from recovering "special, indirect, incidental or consequential damages." (Trial Ex. 1.001 at 121 § 13.6 ¶ 3 (capitalization removed)) "Consequential damages mean loss or injury that does not flow directly and immediately from the wrongful act of a party but are the consequences or results of such an act." *Hartford Accident & Indem. Co. v. Case Found. Co.*, 10 Ill. App. 3d 115, 124, 294 N.E.2d 7, 14 (Ill. App. Ct. 1973). In particular, courts have held that costs to rent a substitute for a lost or

damaged piece of equipment are incidental or consequential damages. *See*, *e.g., Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 913 F.2d 1194, 1202 (7th Cir. 1990); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir. 1988). Flint Hills presented millions of dollars of such rental costs to the jury, including over $850,000 in rental costs for Claim 17, over $730,000 for Claim 77, and almost $40,000 in rental costs for a temporary storage system under Claim 47. (Ex. 15; Ex. 16; Ex. 17; *see also* Dkt. 877 at 3-5)

*Third*, expenses for the inspection and testing of equipment are incidental costs or are otherwise indirect costs. *See*, *e.g.*, *S.M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc.*, 39 Ill. App. 3d 353, 358, 350 N.E.2d 321, 325 (Ill. App. Ct. 1976); *Marquette Cement Mfg. Co. v. Louisville & Nashville R.R. Co.*, 406 F.2d 731, 732 (6th Cir. 1969). As with rental costs, Flint Hills asked the jury to award millions of dollars in prohibited inspection and testing costs, including over $450,000 in testing costs under Claim 15 alone. (Ex. 18; *see also* Ex. 19; Ex. 20; Dkt. 877 at 5-9)

*Fourth*, Flint Hills sought various other improper cost-of-repair damages, as detailed in Dkt. 877 at 9-13. For example:

• For Claim 15, Flint Hills sought damages to excavate piping based upon a test showing 14 "anomalies," where another company found that for 10 of the 14 anomalies there were either no leaks, no anomalies, or not even any piping in the locations. (Ex. 21, 10/6/09 (Morris) at 4025:11-14; Ex. 1, 10/7/09 (Morris) at 4316:14-4317:10)

• For Claim 17, Flint Hills did not seek any damages to repair water well #4, but instead sought costs to build a new water well #5, and thus Flint Hills has no actual cost-of-repair damages for this claim. (Ex. 15)

• For Claim 18, Flint Hills sought damages to buy a new MAN sump, even though the costs for repairing the existing MAN sump was lower, and thus Flint Hills should have been limited to those repair damages under mitigation principles. (Ex. 21, 10/6/09 Trial Tr. (Morris) at 4028:13-4030:4; Ex. 1 10/7/09 Tr. at 4327:15-19, 4328:10-15; (Ex. 22)

• The KF silo portion of Claim 21 included alleged damages based on invalid tests as well as costs paid to Koch Modular Process Systems ("KMPS"), an affiliate of Flint Hills. (Ex. 2, 10/13/09 Tr. (Daugherty) at 4919:20-4920:13; Ex. 3, 10/14/09 Tr. (Nicol) at 5165:8-14) But the PSA prohibits Flint Hills from recovering for time charged by personnel of KMPS. (Trial Ex. 1.001 at 114 § 13.4(q))

- One of the supposed production capacity constraints for Claim 21 was MAN supplemental air, but Flint Hills failed to produce any evidence of the costs to remedy this alleged constraint.

- Claim 54 involved the HE-1306A vent recuperative heater, but Flint Hills also sought costs to inspect the HE-1306***B*** vent recuperative heater, the condition of which Flint Hills did not allege violated the PSA. (Ex. 23; Ex. 24, 2/13/09 Claim Chart at 10)

- Claim 66 sought $2,500.36 for testing that Iris Power LP performed, but Iris is a sister company of Flint Hills (Ex. 25, 10/21/09 Tr. (McKinney) at 6166:11-25), and all costs for the time of its personnel are barred under § 13.4 of the PSA. (Trial Ex. 1.001 at 114 § 13.4(q))

In sum, Flint Hills' damages claims were not proper, not properly supported, and sought damages for items barred by the PSA. The damages claims as made should not have been sent to the jury, and thus judgment as a matter of law should be entered on them, or at a minimum, a new trial on damages should be held.

## II.     A NEW TRIAL SHOULD BE HELD.

A new trial should be granted on the issues of BP Amoco's liability for breach of contract and Flint Hills' alleged breach-of-contract damages. BP Amoco respectfully suggests that the verdict on Flint Hills' breach-of-contract claim resulted from errors in interpreting the plain meaning of the PSA, the legal standard for the proper measure of damages, and the application of the rules of evidence, among others. These errors should be corrected, and a new trial should be held.

### A.     BP Amoco Did Not Breach The Production Capacity Warranty.

#### 1.     The Interpretation Of The PSA's Production Capacity Warranty Presented To The Jury By Flint Hills Was Legally Incorrect. (Dkt. 220, 222, 292)

At trial, Flint Hills presented to the jury theories that contradicted the proper interpretation of the PSA's unambiguous production capacity warranty, as explained previously by BP Amoco in Dkt. 220 at 3-4, Dkt. 222 at 4-11, and Dkt. 292 at 3-14.

Unless otherwise defined, terms in a contract are generally given their "plain, ordinary, and popular meaning." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 115-16, 607 N.E.2d 1204, 1215-16 (Ill. 1992). The plain meaning of a phrase is "that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal person." *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill. 2d 278, 30-102, 757 N.E.2d 481,

7

496 (Ill. 2001). Under this plain language meaning, the production capacity numbers set forth in PSA Section 7.1(d)(ii) unambiguously represented the greatest possible rate, supported by reasoning or evidence, at which each of the three different chemicals could be produced over some period of time, extrapolated into an annualized number—but, as the PSA expressly states, without accounting for planned or unplanned downtime.

The contract interpretation Flint Hills presented to the jury improperly rewrote the PSA, contradicting established case law. *E.g.*, *FSC Paper Corp. v. Sun Ins. Co. of New York*, 744 F.2d 1279, 1281 (7th Cir. 1984); *Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*, 381 Ill. App. 3d 312, 324-25, 885 N.E.2d 532, 543 (Ill. App. Ct. 2008). Nor could Flint Hills' improper interpretation render the PSA's plain language ambiguous. *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 892-93 (7th Cir. 2004); *Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*, 373 Ill. App. 3d 384, 391, 869 N.E.2d 784, 790 (Ill. App. Ct. 2007).

In particular, Flint Hills argued to the jury that the PSA representation required sustainable production over a month-long period, but nothing in the PSA requires the use of such a period, and Flint Hills' arguments improperly added a new term to the PSA. Flint Hills also claimed before the jury that the representation is for simultaneous production of all three units, but terms such as "simultaneous" or "at the same time" appear nowhere in the capacity representation. Instead, the production capacity representation provides a separate number, "respectively," for each of the specified "production units at the Joliet Plant." Moreover, Flint Hills' interpretation rewrote the PSA by deleting the words "maximum" and "annualized" from the representation. In addition, the representation is expressly limited to the "production units" and does not include "Support Facilities," such as "Waste Storage," "Waste Treatment & Filtration," "Sewage" and the "Potable Water System." The production capacity representation—which refers to the "production unit" for "purified isopthalic acid"—likewise excludes the IPA unit, which includes items such as air compressors, cooling towers, and silos that Flint Hills sought damages for from the jury.

### 2. Flint Hills Failed To Establish Any Meaning Of The Production Capacity Representation And Failed To Introduce Admissible Evidence Of The AMDSP Rates.

Even if the production capacity representation were ambiguous, Flint Hills did not meet its burden proving a contract breach of that representation. *First*, Flint Hills failed to establish its

interpretation of the production capacity representation. Indeed, Flint Hills' witnesses disagreed among themselves about the meaning of the term.

*Second*, the various and inconsistent interpretations of "annualized maximum demonstrated sustainable production," or "AMDSP" that Flint Hills' witnesses suggested during trial contravene this Court's prior orders and the PSA itself.

*Third*, Flint Hills' witnesses testified that the production capacity representation provided Flint Hills with a representation of "effective capacity," even though the undisputed evidence is that BP Amoco explicitly refused to warrant effective capacity.

### a. Flint Hills Bore The Burden Of Proving The Meaning Of The Supposedly Ambiguous Language.

"When the issue before a court is resolution of an ambiguity in a contract, the burden remains with the plaintiff to prove the meaning of the ambiguous language." *Union Pac. R.R. Co. v. Kansas City S. Ry. Co.*, 2009 WL 2489279, at *14 (S.D. Ill. 2009). Illinois courts have held that where the party alleging a breach "presented no evidence concerning industry or trade practices with regard to this matter, nor any other evidence which sheds light on the meaning of this ambiguous term of the parties' contract," then that party "did not sustain its burden of establishing it has a contractual right to recovery of the entire amount claimed." *Prairie Land Constr., Inc. v. Vill. of Modesto*, 213 Ill. App. 3d 364, 370, 571 N.E.2d 1210, 1214 (Ill. App. Ct. 1991); *see also Mefer S.A.R.L. of Paris, France v. Naviagro Maritime Corp.*, 533 F. Supp. 337, 345 (S.D.N.Y. 1982); *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 102 (3d Cir. 2001).

### b. Flint Hills' Witnesses Offered Contradictory Definitions Of AMDSP, And Those Definitions Violated The PSA's Language.

Far from proving a meaning of the production capacity terms this Court found to be ambiguous, at trial Flint Hills' witnesses gave inconsistent, conflicting, and contradictory definitions of AMDSP. Importantly, saying that the AMDSP represents the "capacity" of the Joliet Plant does nothing to resolve the ambiguity found by the Court. As the Court and jury heard, there are myriad ways of defining and measuring capacity. Flint Hills' own expert Dr. Russell Ogle admitted that different engineers use different terms when they are referencing production capacity, and that there is not a generally accepted definition of the word "capacity." (Ex. 26, 9/21/09 Tr. at 1716:3-17) Indeed, the record shows that "capacity" can be measured in different ways and mean different things, including "nameplate capacity," "effective capacity,"

"demonstrated capacity," "boilerplate capacity," "design capacity," and "permitted capacity." (Ex. 10, 9/15/09 Tr. (Stephan) at 939:22-942:16; Ex. 27, 9/17/09 Tr. (Kelly) at 1140:10-1143:23; Ex. 27, 9/17/09 Tr. (Snyder) at 1249:23-1250:4; Ex. 28, 9/18/09 Tr. (Dray) at 1399:10-1400:13, 1401:17-1402:3)  Most of these terms themselves are vague, and the Flint Hills' witnesses here admitted that different engineers often use the same term to mean different things.  (*Id.*)

At trial, Flint Hills' witnesses disagreed about what AMDSP means, or simply had no definition or understanding of that term at all.  Most of Flint Hills' witnesses, and particularly its engineering witnesses, provided no definition of AMDSP.  Flint Hills' two most senior witnesses, James Mahoney and Steve Sanders, offered interpretations of AMDSP that contradicted one another.

Mr. Mahoney, a member of Flint Hills' deal team, claimed that during a call with BP Amoco to negotiate the capacity representation, "We agreed on nameplate."  (Ex. 29, 9/10/09 Tr. at 440:23-441:7)  But Mr. Mahoney admitted that Flint Hills never asked for AMDSP—the term that actually appears in the PSA rather than "nameplate"—to be defined in the PSA.  (*Id.* at 450:1-16, 451:12-14)  Adding to the confusion, Flint Hills' engineering witnesses testified that different engineers have different understandings of what "nameplate capacity" means, such that defining AMDSP as "nameplate capacity" would not resolve any ambiguity.  (Ex. 26, 9/21/09 Tr. (Ogle) at 1716:3-1716:17; Ex. 10, 9/15/09 (Stephan) at 939:22-940:22; Ex. 27, 9/17/09 Tr. (Kelly) at 1140:10-1141:4; Ex. 28, 9/18/09 Tr. (Dray) at 1399:12-1440:13)[2]

Moreover, evidence shows that the nameplate capacity of the production units was at least as great as (if not greater than) the AMDSP representations.  Kim Dray's memorandum on capacity states that the nameplate capacity of the PIA unit is 200 kmta.  (*Id.* at 1417:16-1418:5)  Similarly, the evidence at trial established that Flint Hills' engineer Dr. Snyder testified under oath during his deposition that the nameplate capacity of the PIA unit was 200 kmta.  (Ex. 27, 9/17/09 Tr. at 1251:16-1252:6)  Pre-sale documents regarding the TMA production capacity state a nameplate capacity of 71.0 kmta.  (Ex. 30, Trial Ex. 5064, Tab. 3)  In addition, Trial Exhibit 7006 (Ex. 41)—a document from Flint Hills' own optimization engineers—lists a nameplate capacity of 71,175 metric tons for TMA, 51,100 metric tons for MAN, and 170,090

---

[2]  Moreover, Flint Hills resorted to the confidential information memorandum ("CIM") to try to define AMDSP as nameplate, but Flint Hills agreed in the PSA itself that BP Amoco would not be liable for any information in the CIM.  (Trial Ex. 1.001 at FHR-00000103)

metric tons for PIA.[3]  (Ex. 10, 9/15/09 Tr. (Stephan) at 1035:20-1036:2, 1036:21-1037:7, 1037:22-24, 1038:8-1039:16)  Significantly, Flint Hills did not introduce any evidence that the nameplate capacity of the Joliet Plant was less than the AMDSP representations in the PSA.

Mr. Sanders, who testified that he participated in the same call with BP Amoco as Mr. Mahoney, contradicted Mr. Mahoney and testified that a definition of AMDSP *did* end up in the PSA.  (Ex. 31, 9/22/09 Tr. at 2036:9-17)  Mr. Sanders also testified that he understood that AMDSP means "what the plant can do up until the point, you know, 24 hours a day, seven days a week, 365 days a year."  (*Id.* at 1925:16-1926:1; *see also id.* at 2026:1-19)  *No* engineer working at the Joliet Plant has offered that as a definition of the term "nameplate capacity" or AMDSP.

Flint Hills' disparate interpretations of AMDSP also violated the Court's rulings and were contrary to the PSA.  For example, Mr. Sanders' interpretation was contrary to the Court's ruling that the word "maximum" in AMDSP does not mean "a rate that can be run constantly, but is instead an upper boundary which actual values may fall below."  (Dkt. 319 at 13 n.6)  Similarly, Mr. Sanders testified that he considered AMDSP to be a rate that can be produced for any duration, year after year.  (Ex. 31, 9/22/09 Tr. at 1925:16-1926:1; *see also id.* at 2026:1-19)  This interpretation violated the plain meaning of the word "sustainable," which the Court held could not reasonably be interpreted "to mean 'able to produce for any duration.'"  (Dkt. 319 at 12 (ellipsis omitted))  It also violated the Court's plain language interpretation that "the word 'maximum' indicates that the given rates are not the average or continuously achievable demonstrated rates."  (*Id.*)

Dr. Ogle—whose opinions on contract interpretation should not have been considered in any event[4]—opined, against the Court's prior holding, that only the word "annualized" could be

---

[3]  On redirect, Flint Hills' counsel elicited from Mr. Stephan that these numbers "come straight from the contract that was given in this case."  (Ex. 10, 9/15/09 Tr. at 1040:19-25)  But in fact the numbers from Flint Hills' optimization engineers are different from and greater than the numbers in the PSA, which are "71,000 metric tons, 170,000 metrics tons, and 51,000 metric tons, respectively" for the "TMA, purified isophthalic acid and MAN production units."  (Trial Ex. 1.001 at FHR-00000086)

[4]  Dr. Ogle testified as an expert witness, not as a fact witness involved in any part of the PSA transaction.  Indeed, Dr. Ogle admitted he has never drafted language in a contract regarding production capacity, and has never been involved in contract negotiations over production capacity.  (Ex. 26, 9/21/09 Tr. at 1688:4-15)  He had no expert basis for interpreting "AMDSP," a term he had not heard prior to his involvement in this lawsuit (*id.* at 1685:6-24), and that he considers a "unique occurrence" undefined in technical literature and not commonly used by engineers (*id.* at 1702:15-1703:8, 1724:7-11).  *See Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (Fed. Cl. 2007); *GPF*

interpreted separately, and that the other four words in AMDSP are mutually dependent. (Ex. 26, 9/21/09 Tr. at 1734:11-15, 1737:1-11) But courts often interpret individual words using their dictionary definitions, and in fact this Court used dictionary definitions to interpret the individual words "demonstrated," "sustainable," and "maximum" separately. (Dkt. 319 at 10-13) Dr. Ogle's definition of "maximum," moreover, was not the "upper boundary" identified by the Court, but an entire month's actual performance—the "best month ever." (Ex. 26, 9/21/09 Tr. at 1734:16-19) Finally, the Court held that in "this case, downtime occurs when the production units are not operating and, as a result, they have zero output" (Dkt. 518 at 3), further explaining that "the plain and ordinary meaning of 'downtime' does not require zero production *for the day*" (*id.* at 4 (internal quotation marks removed, italics in original)). Dr. Ogle plainly contradicted this and adopted a definition of downtime that excludes downtime only when the unit had zero production for the entire day. (Ex. 26, 9/21/09 Tr. at 1743:21-25)

### c. Flint Hills Also Interpreted The AMDSP Representation To Warrant Effective Capacity, Which BP Amoco Explicitly Refused To Warrant.

Flint Hills' witnesses claimed that by representing the AMDSP, BP Amoco also was necessarily warranting the effective capacity at which the Joliet Plant could operate. Mr. Mahoney claimed that the effective capacity numbers could be based on the nameplate numbers (even though the term "nameplate" never appears in the PSA's text). (Ex. 29, 9/10/09 Tr. at 233:8-17) Similarly, Mr. Sanders suggested that the effective capacity numbers presented to the Boards of Directors were based on the capacity numbers he believed were warranted in the PSA. (Ex. 31, 9/22/09 Tr. at 2055:6-16) But the undisputed evidence, from Flint Hills' own witnesses, is that BP Amoco refused to represent the effective capacity numbers. Mr. Sanders testified that Michael Wrenn of BP Amoco told Flint Hills that it would not warrant effective capacity. (Ex. 31, 9/22/09 Tr. at 2021:1-16; *see also id.* at 2023:10-2024:18; Ex. 29, 9/10/09 Tr. (Mahoney) 226:9-18, 230:15-231:6) Moreover, the term "effective capacity" never appears in the PSA. (Trial Ex. 1.001) Finally, in the PSA Flint Hills agreed that BP Amoco would not by liable for any information in the CIM. (Trial Ex. 1.001 at FHR-00000103) Thus, Flint Hills should not have been allowed to argue that BP Amoco represented effective capacity and then breached that

---

*Waikiki Galleria, LLC v. DFS Group, L.P.*, 2007 WL 3195089, at *6 (D. Haw. 2007). *Cf. Westfield Ins. Co. v. Sheehan Constr. Co.*, 564 F.3d 817, 819 n.† (7th Cir. 2009).

non-existent representation. And regardless, the effective capacity numbers do not establish a breach of contract under the PSA or the law.

### 3. Flint Hills Did Not Produce Admissible Evidence Of The AMDSP Rates.

In addition to failing to prove that its interpretation of the AMDSP representation is correct—and indeed, failing to present any consistent interpretation of the representation—Flint Hills did not put admissible evidence of the AMDSP rates into the record under any interpretation of the representation. Without evidence of those rates, Flint Hills could not and did not prove that the Joliet Plant failed to meet the AMDSP representation. Thus, Flint Hills did not prove a breach of the AMDSP representation. (Indeed, at various points in the trial, Flint Hils suggested that it was BP Amoco's burden to prove the AMDSP rates—an attempt to reverse the burden of proof.)

Flint Hills' own engineering witnesses admitted that they never tried to calculate the AMDSP rates. Flint Hills' witness Thomas Stephan worked for BP Amoco before the sale, and Flint Hills afterwards. Pre-sale, he served as a technology manager supporting the PIA, TMA, and MAN process technologies. (Ex. 32, 9/14/09 Tr. at 796:6-11) Mr. Stephan testified that he did not do any studies to assess the AMDSP of the TMA, PIA, and MAN production units before the sale. (Ex. 10, 9/15/09 Tr. at 931:12-932:1) Similarly, process engineer Daniel Kelly, who also worked for BP Amoco before the sale and then for Flint Hills, testified that he did not know the AMDSP for the TMA production unit. (Ex. 27, 9/17/09 Tr. at 1155:6-8) Moreover, no one ever asked him to determine the AMDSP for any of the three production units. (*Id.* at 1155:6-20). In fact, no one from Flint Hills asked Mr. Kelly to determine even the nameplate capacity of any unit after the sale. (*Id.* at 1155:25-1156:4) Indeed, the only Flint Hills witness who purported to provide an AMDSP rate is Dr. Ogle, and for the reasons explained above, Dr. Ogle's opinion about the meaning of AMDSP contradicts the Court's rulings and the plain meaning of the PSA. Moreover, Dr. Ogle performed no tests to determine the actual AMDSP rates—either at the time of sale or afterwards.

In contrast to Flint Hills' lack of evidence, BP Amoco's witness Paul Jacobson provided detailed testimony about how the AMDSP rates for each of the production units were supported by the data and actual production rates. (*E.g.*, Ex. 33, 10/28/09 Tr. at 7414:25-7415:18, 7418:3-7437:8, 7447:5-7452:5, 7460:17-7468:19, 7474:3-7483:10; Ex. 34, Trial Ex. 5458) Similarly, Dr. Vincent Van Brunt, based on his analysis, concluded that the PIA and TMA production units

13

satisfied the AMDSP rates specified in the PSA and that BP Amoco's methods for calculating such rates were reasonable. (Ex. 35, 11/3/09 Tr. at 8183:14-8217:12) Because Flint Hills failed to produce any evidence of the actual AMDSP rates, and Mr. Jacobson and Mr. Van Brunt's testimony that BP Amoco properly calculated the AMDSP rates stands unrebutted, a new trial should be granted.

### 4. The Joliet Plant's PIA Production Was Independently Constrained By The Lack Of Metaxylene.

For its production capacity claim, and especially with respect to its claimed damages, throughout the trial Flint Hills directed most of its evidence and argument to its allegation that the PIA production unit's claimed "actual" capacity was less than the capacity represented in the PSA. But Flint Hills' argument overlooks an established, indisputable fact: the Joliet Plant's production for PIA was independently constrained by a lack of meta-xylene, the feedstock for PIA. Thus, any supposed damages from a lower PIA capacity than what was represented are due to this lack of meta-xylene, rather than having been caused by any alleged PSA breach.

The meta-xylene constraints are established by Flint Hills' own documents as well as the information it received. Flint Hills employee Mark Miller wrote a report during due diligence stating that given 2002 sales, "this leaves meta-xylene supply for only 12 kte/year additional production." (Ex. 36, Trial Ex. 5091) PIA production at the Joliet Plant in 2002 was 82.7 kmt (Trial Ex. 2 at 57), meaning that Mr. Miller estimated that production could not go much beyond 95 kmta because of the meta-xylene constraints, a limit well below the supposed "actual" capacity alleged by Flint Hills. Similarly, before the sale Lehman Brothers told Flint Hills and other potential buyers that meta-xylene capacity "allows only another 15 kilometric tons of PIA production growth over 2002 rates." (Ex. 37, Trial Ex. 5237.007) Indeed, the presentations to the boards of directors of Flint Hills and Koch Industries on which they based their approval of the decision to purchase the PCBU stated that $70 million would have to be spent in 2006 to increase meta-xylene capacity (Ex. 38, Trial Ex. 5234.001 at FHR00425627), but there is no evidence that Flint Hills has spent a penny of this money. As a result, the damages claimed by Flint Hills for alleged production capacity shortfalls for PIA were not due to any claimed breach of contract, but were due independently to a lack of feedstock. *E.g.*, *Klingler Farms, Inc. v. Effingham Equity, Inc.*, 171 Ill. App. 3d 567, 573, 525 N.E.2d 1172, 1176 (Ill. App. Ct. 1988) (holding that breach-of-contract damages cannot be recovered where such damages "were the

result of an independent intervening act"); *see generally Thompson v. County of Cook*, 154 Ill. 2d 374, 383, 609 N.E.2d 290, 294 (Ill. 1993).

**B. The Interpretation Of The PSA's Condition-of-Assets Warranty Presented To The Jury Was Legally Incorrect. (Dkt. 280, 281, 296)**

The PSA's condition-of-assets representation refers to "all tangible Assets." (Trial Ex. 1.001 at 56 § 7.1(d)(ii)) Flint Hills argued and the jury was instructed that the "term 'all tangible Assets' includes each and every tangible asset at the Joliet Plant." (Dkt. 907 at 26) However, as described in Dkt. 281 at 3-7 and Dkt. 296 at 2-8, the plain language of the phrase "all tangible Assets" refers to the Joliet Plant's equipment collectively, in its totality or as a whole, but not individually to each and every component of each and every one of thousands of pieces of equipment at the Joliet Plant. That "all" refers to the assets as a whole is confirmed by dictionary definitions of the word "all" to mean "whole." *See In re Envirodyne Indus. Inc.*, 29 F.3d 301, 305 (7th Cir. 1994); *e.g.*, WEBSTER'S II NEW COLLEGE DICTIONARY 35 (3d ed. 2005); AM. HERITAGE COLLEGE DICTIONARY 35 (4th ed. 2007). Similarly, court decisions have defined "all" to mean "whole" or "aggregate." *E.g.*, *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 377 (Del. Ch. 2004); *Price v. Code-Alarm, Inc.*, 2002 WL 1870041, at *7 (N.D. Ill. Aug. 13, 2002). Moreover, given the scope of the transaction, the Plant's age, and the inherently challenging environment of a chemical plant, it would make little economic sense for the seller to extend (and the buyer to pay for) a warranty about the condition of each and every of the thousands of pieces of equipment at the Joliet Plant. *See Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002).

**C. The Jury Was Improperly Instructed, Including By Not Being Instructed That Flint Hills' Damages Were Limited To The Lesser Of Proven Cost-of-Repair Or Diminution-In-Value Damages. (Dkt. 245, 247, 352, 708, 726, 901)**

BP Amoco incorporates its objections to the jury instructions as set forth in Dkt. 901. In particular, as described in BP Amoco's previous filings, including Dkt. 247 at 4-8 and Dkt. 352 at 1-5, the legal measure of recoverable damages for fixtures to real property for commercial purposes is the lesser of: (1) the diminution in fair market value; or (2) the cost of repairing or replacing the property. The jury here was incorrectly instructed that it could award cost-of-repair and diminution-in-value *as alternative* measures of damages. (Dkt. 907 at 35) The jury was not instructed that Flint Hills was required to prove both measures, and that the jury could award only the lesser amount. For that reason as well as other instructional errors, a new trial should be

granted and the jury should be instructed on the correct measure of damages that Flint Hills must prove and that Flint Hills can be awarded.

The Seventh Circuit has held, in a case involving alleged damages to a house caused by termites, that "[t]he maximum award of compensatory damages is the cost of repair or restoration, or the difference between the original appraised value and the post-termite value, whichever is less." *Normand v. Orkin Exterminating Co.*, 193 F.3d 908, 911 (7th Cir. 1999); *see also Gvillo v. Stutz*, 306 Ill. App. 3d 766, 771-72, 715 N.E.2d 285, 289-90 (Ill. App. Ct. 1999); *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1022, 661 N.E.2d 1178, 1184 (Ill. App. Ct. 1996); *Witty v. C. Casey Homes, Inc.*, 102 Ill. App. 3d 619, 625-26, 430 N.E.2d 191, 196 (Ill. App. Ct. 1981). Thus, a repair-cost measure of damages cannot be used where it exceeds or is disproportionate to the diminution measure of damages. *See*, *e.g.*, *Meade*, 277 Ill. App. 3d at 1022, 661 N.E.2d at 1184; *Witty*, 102 Ill. App. 3d at 625-26, 430 N.E.2d at 196. Where a plaintiff seeking damages for fixtures fails to produce evidence of diminution in value in addition to evidence of reasonable repair or replacement costs, the claim fails as a matter of law. *E.g.*, *First Nat'l Bank of Elgin v. Dusold*, 180 Ill. App. 3d 714, 718-20, 536 N.E.2d 100, 102-04 (Ill. App. Ct. 1989); *Witty*, 102 Ill. App. 3d at 625-26, 430 N.E.2d at 196. Moreover, if the evidence of repair costs consists of general invoices that do not allocate costs among repairs to warranted equipment and repairs to unwarranted equipment, the fact finder is not in a position to allocate such repair costs and cannot award any portion of them as damages. *See*, *e.g.*, *Dusold*, 180 Ill. App. 3d at 719-20, 536 N.E.2d at 104.

### D.     A New Trial Should Be Awarded On Flint Hills' Alleged Damages.

#### 1.     Flint Hills' Damages Were Based On Improperly Admitted Evidence And Documents.  (Dkt. 603, 644, 682)

The damages Flint Hills presented to the jury relied on hearsay and spending summaries that were riddled with errors. The spending summaries were based on work orders, purchase orders, or similar documents for which no proper foundation was laid to qualify them as business records and thus should have been excluded as hearsay. *See Nohcra Commc'ns, Inc. v. AM Commc'ns, Inc.*, 909 F.2d 1007, 1011-12 (7th Cir. 1990); *United States v. Price*, 516 F.3d 597, 605 (7th Cir. 2008); *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999). For the documents underlying the purported summaries to qualify for admission under 803(6), Flint Hills was required—through a witness with personal knowledge—to affirmatively prove that each document was: (i) created contemporaneously with the event described therein, (ii) prepared by

someone with personal knowledge of the events described in the document, and having the duty to regularly prepare such a document, (iii) prepared in the course of a regularly conducted business activity, and (iv) that it was the regular practice of the business to create such a document. Fed. R. Evid. 803(6); *see also Datamatic Servs., Inc. v. United States*, 909 F.2d 1029 (7th Cir. 1990). "The fact that statements made by strangers to the business become a part of its records … does not make them business records unless they are verified by the business and thus adopted and become the business's own statements." *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000); *see also Datamatic*, 909 F.2d at 1033 & n.2. Here, Flint Hills' witnesses who sponsored documents relating to Flint Hills' alleged damages, such as Richard Morris, did not have the personal knowledge to testify that the documents satisfied the business records exception.

Moreover, a single inadmissible underlying document precludes admission of the entire summary. *See Judson Atkinson Candies, Inc., v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). Because the summaries Flint Hills presented to the jury relied on these inadmissible hearsay documents, they should have been excluded.

In addition, if a witness intends to introduce into evidence a FRE 1006 summary, the witness must have personal knowledge not only concerning the preparation of the summary, but also personal knowledge of the underlying documents being summarized, their preparation, and the events described therein unless another witness has already testified to such matters and established the admissibility of and an appropriate evidentiary foundation for the underlying documents. *See In re S.N.A. Nut Co.*, 210 B.R. 140, 145-46 (Bankr. N.D. Ill. 1997); *Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. Snapp Sys., Inc.*, 2008 WL 5383372, at *5-6 (E.D. Mich. Dec. 23, 2008). The wisdom of this rule was aptly demonstrated during trial. Mr. Daugherty, who sponsored the damages summaries, repeatedly deflected questions by testifying that he could not answer questions about the damages stated in the summaries but some other, unknown "individuals with knowledge" could. (*E.g.*, Ex. 2, 10/13/09 Tr. at 4895:19-4896:1, 4896:10-20, 4898:17-23) This confirmed that he lacked the necessary foundational knowledge to answer any substantive questions about the summaries, and thus such summaries should have been excluded.

For these reasons, BP Amoco should be granted a new trial where these inadmissible documents and summaries are excluded.

2.      **Jeffrey Baliban's Opinions And Testimony Should Have Been Excluded.  (Dkt. 247, 352, 378, 383, 498, 816, 818)**

Jeffrey Baliban's opinions regarding Flint Hills' alleged diminution-in-value damages for production capacity should have been excluded for various reasons, as previously explained in the pleadings identified by Docket number in this paragraph.  *First*, his trial testimony violates PSA provisions—such as the disclaimer of any representation of value as well as the prohibition on lost profits—because his analysis depends on projected cash flows, which are the same as lost profits.  (Dkt. 383 at 1-2; Dkt. 498 at 13-14; *see also* Dkt. 247, 352)  *Second*, Mr. Baliban calculated an investment value to Flint Hills, rather than calculating a fair market value as required by applicable legal standard.  (Dkt. 383 at 7-8; Dkt. 498 at 6-8)  *Third*, Mr. Baliban used Flint Hills' internal rate of return to discount cash flows with no support that this is a scientifically accepted method; instead, the authorities use the weighted average cost of capital for discounting cash flows to value a business.  (Dkt. 383 at 9-11; Dkt. 498 at 8-9; Dkt. 816 at 6-7)  *Fourth*, Mr. Baliban speculatively assumed that there was a 50% probability that Flint Hills would have become the exclusive supplier of PIA to Eastman Chemical Company following the closing.  (Dkt. 383 at 12-14; Dkt. 498 at 11-12)  Indeed, Mr. Baliban admitted he picked 50% because it was an indeterminate probability—the mid-point between 0% and 100%, the same as flipping a coin.  (Dkt. 816 at 2-4)  *Fifth*, Mr. Baliban assumed production capacities that are lower than those calculated by Flint Hills' purported capacity expert and that are untethered to any evidence, and thus his opinions are not based on the facts of this case.  (Dkt. 383 at 14-15; Dkt. 498 at 12-13; Dkt. 816 at 7-8)  *Finally*, Mr. Baliban failed to introduce into evidence the methodology and numeric bases underlying his opinion.  (Dkt. 816 at 5)

3.      **Sharon Moore Bettius' Opinions And Testimony Should Have Been Excluded.  (Dkt. 247, 352, 378, 383, 498)**

Similarly, Ms. Bettius' opinion does not satisfy the standards of FRE 702 or *Daubert* for several reasons, as explained previously in the pleadings identified by Docket number in this paragraph.  *First*, as with Mr. Baliban, Ms. Bettius' opinion violated PSA provisions—such as the disclaimer of any representation of value as well as the prohibition on lost profits—because her analysis depends on projected cash flows, which are the same as lost profits.  (Dkt. 383 at 1-2; Dkt. 498 at 13-14; *see also* Dkt. 247, 352)  *Second*, Ms. Bettius' opinion applied various discounts that failed to distinguish between losses caused by Flint Hills' allegations and those caused by independent events, and thus calculated as damages the differences in size between the

PBCU and other companies and differences in liquidity. (Dkt. 383 at 6-7; Dkt. 498 at 3-4) *Third*, no methodology connected the amounts of Bettius' changes to capital expenditures, profitability, or the discount rate to any alleged breaches. (Dkt. 383 at 8-9; Dkt. 498 at 4-6) *Fourth*, the decrease in Flint Hills' alleged damages from approximately $180 million to $100 million had no effect on her opinions, demonstrating that her opinions were not based on the facts of this case. (Dkt. 383 at 11-12; Dkt. 498 at 9-10) *Fifth*, Ms. Bettius assumed the complete absence of any representations or warranties in the PSA, which was inconsistent with Flint Hills' allegations and the facts of this case. (Dkt. 383 at 12; Dkt. 498 at 10-11)

### E. Flint Hills Spoliated Evidence And Should Have Been Precluded From Pursuing Its Claims. (Dkt. 249, 251, 340, 355)

BP Amoco's spoliation arguments were thoroughly briefed and ruled on before trial. (Dkt. 249, 251, 340, 355, 362) BP Amoco contends that Flint Hills spoliated equipment at issue in Claims 3/57, 15, 19, 48, 53, 54, 58, and 67. Moreover, Flint Hills' duty to preserve all discoverable evidence included electronic data, such as email. *See Wiginton v. Ellis*, 2003 WL 22439865, at *4 (N.D. Ill. Oct. 27, 2003). Despite this duty, Flint Hills' then-CEO and president, David Robertson, admitted to intentionally deleting his e-mails. (Ex. 39, Deposition of David Robertson at 18:19-24:20, 30:12-20)

Sanctions for spoliation are especially appropriate where the destruction of the evidence has prejudiced a party. *Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806 (7th Cir. 1995). Although a showing of prejudice is not required for imposing sanctions, the prejudice to the non-offending party can be considered. *In re Old Banc One S'holders Sec. Litig.*, 2005 WL 3372783 at *4 (N.D. Ill. Dec. 8, 2005); *see also Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993). Without the opportunity to test, examine, use, or inspect the equipment as it existed at the time of the sale, BP Amoco's ability to disprove Flint Hills' allegations that the equipment did not comply with the PSA's representations was seriously impaired at trial. Moreover, because of the destruction of Mr. Robertson's e-mails, BP Amoco was deprived of various pieces of evidence as outlined in its prior briefing on this subject.

Because of this spoliation, Flint Hills' claims in total should have been precluded. At a minimum, the specific claims where Flint Hills spoliated equipment should have been precluded, and an adverse inference instruction should have been given because of Mr. Robertson's destruction of his e-mails. Accordingly, a new trial should be granted to BP Amoco.

### F. The Notes Rick Morris Used To Refresh His Recollection On The Stand Should Have Been Produced.

Richard Morris was a key witness for Flint Hills, whom Flint Hills used to introduce into evidence most of the foundation for its allegedly incurred damages. During his cross-examination, Mr. Morris studied many pages of his own written notes. (Ex. 4, 10/8/09 Tr. at 4370:5-4375:3, 4483:16-20) Mr. Morris admitted under oath that those notes refreshed his recollection as to the claims at issue in this case. (*Id.* at 4483:25-4484:2) Nevertheless, Flint Hills and Mr. Morris claimed that these notes were privileged, and the Court did not grant BP Amoco's request that the notes be produced to BP Amoco. The notes should have been produced for two reasons.

First, under FRE 612, "if a witnesses uses a writing to refresh memory for the purpose of testifying … while testifying," the opposing party is entitled to its production and to introduce portions of it into evidence. Importantly, for writings used to refresh memory "before testifying" production is qualified by the statement "if the court in its discretion determines it is necessary in the interests of justice," but for writings used to refresh recollection "while testifying" there is no such qualification. Fed. R. Evid. 612. Therefore, "[p]roduction of documents used to refresh [a] witness's recollection while testifying is mandatory." *Newton v. City of New York*, 640 F. Supp. 2d 426, 444 n.140 (S.D.N.Y. 2009) (quoting 4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 612.04[3] (2d ed. 2007); *see also Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 637 (E.D.N.Y. 1997) ("Moreover, being phrased in mandatory language, Rule 612(1) prevails when pitted against a claim of privilege."). Thus, BP Amoco submits that the Court did not have discretion on this issue and the Court should have ordered Mr. Morris' notes to be produced under FRE 612.

Second, Mr. Morris testified as a putative expert witness, and he offered opinions such as whether the costs of estimated work were reasonable and whether the costs were proportional to the benefits. Documents and information used by a testifying expert in connection with his testimony are discoverable, regardless of any claims of privilege. *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir. 2001). This rule applies equally to company employees who serve as experts. *OCI Wyoming, L.P. v. PacifiCorp*, 2005 WL 5985388 (D. Wyo. Feb. 25, 2005). Therefore, independently of FRE 612, the Court should have ordered Mr. Morris's notes to be produced.

### G. A New Trial Should Be Granted For Errors In Admitting Or Excluding Evidence.

BP Amoco suggests that there were errors in admitting or excluding evidence at trial. These evidentiary errors should be corrected, and a new trial held.

#### 1. Flint Hills' Late Production Of Documents Should Have Led To The Dismissal Of Claims 67, 72, 77 And Portions Of Claim 21. (Dkt. 547, 548, 610)

In May 2009, Flint Hills produced over 48,000 pages of new documents, many of which were created well before the close of fact and expert discovery—documents which supposedly supported the new damages figures contained in Flint Hills' "revised" February 2009 Claim Chart. Both these documents and the new Claim Chart were produced months after the close of discovery. Flint Hills' failure to timely produce documents upon which it is relied, and its revised February 2009 Claim Chart, severely prejudiced BP Amoco. While Flint Hills and BP Amoco were able to reach agreement on appropriate remedies for this late production for many claims, Claims 67, 72, 77, and the long-term waste water treatment project portion of Claim 21 could not be mutually resolved.

Given the timing and volume of Flint Hills' late discovery production, Flint Hills should have been barred from asserting any claims or damages for Claims 67, 72, 77, and the long-term waste water treatment project portion of Claim 21. Such a remedy was necessary to ensure that BP Amoco was not prejudiced in this case. *E.g.*, *Salgado v. General Motors Corp.*, 150 F.3d 735, 741-42 (7th Cir. 1998); *see also Happel v. Wal-Mart Stores, Inc.*, 2007 WL 495277, at *5 (N.D. Ill. Feb. 9, 2007). BP Amoco was prevented from questioning Flint Hills' witnesses about these documents during fact discovery, and the 30(b)(6) depositions in the summer of 2009 did not cure the prejudice to BP Amoco.

#### 2. Evidence Of BP Amoco's Price Concessions Should Have Been Admitted. (Dkt. 661)

BP Amoco and Flint Hills agreed to a reduction of $19 million in the purchase price for the PCBU in late October and early November 2003, with evidence suggesting that this price reduction was attributable to Flint Hills' due diligence findings relating to the condition of certain assets, at least in part. Flint Hills' motion to exclude evidence of pre-sale price negotiations (Dkt. 588) should have been denied and this evidence should have been admitted. Among other things, this evidence was relevant to BP Amoco's betterment defenses—the jury should have been allowed to consider evidence that Flint Hills may have received a reduction in

the purchase price for certain condition-of-asset issues for which it sought further compensation at trial, which could have resulted in Flint Hills improperly being placed in a better position than absent the alleged breach.  *See Kokomo Opalescent Glass Co. v. Arthur W. Schmid Int'l, Inc.*, 371 F.2d 208, 214-15 (7th Cir. 1966); *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400, 1402-03 (N.D. Ill. 1993).  Moreover, this evidence was relevant and material to the jury's understanding of the importance of due diligence, its role in the transaction, and its effect on the ultimate price of the deal.  (*See also* BP Amoco's response to Flint Hills' motion in limine, Dkt. 661)

### 3. Evidence Of Flint Hills' Modus Operandi To Seek Purchase Price Adjustments Through Litigation Should Have Been Admitted.  (Dkt. 709)

The jury should have been allowed to hear evidence concerning prior suits establishing Flint Hills' modus operandi of engaging in opportunistic post-sale contract interpretations, including its attempt to seek post-closing purchase price adjustments through litigation.  For example, in *Invista B.V. v. E.I. du Pont de Nemours & Co.* No. 08 CV 3063 (S.D.N.Y., filed Mar. 26, 2008), a Koch Industries subsidiary purchased chemical plants and then sued the seller (DuPont) shortly after the purchase.  In its lawsuit, the Koch subsidiary alleged that it conducted only limited due diligence and that immediately after closing it discovered various environmental and asset-condition issues purportedly worth hundreds of millions of dollars in damages. Similarly, in *Flint Hills Resources, LP v. Kerr-McGee Corp. & Southwestern Refining Co.*, No. 04-5441-E (148th Judicial Dist., Texas, filed Jan. 28, 2005), Flint Hills alleged that, in reliance on representations from the seller (Kerr-McGee), it purchased a refinery and then discovered environmental and refinery-function issues purportedly worth millions of dollars in damages. *See also Koch Business Holdings, LLC v. Amoco Pipeline Holding Company*, 554 F.3d 1134 (11th Cir. 2009).

As BP Amoco explained in its pretrial briefing (Dkt. 709), there were several reasons for seeking to introduce this evidence, including (i) to show, in conjunction with other evidence, that Flint Hills' motive in filing this lawsuit was not to remedy BP Amoco's contractual deficiencies, but simply to obtain a purchase price adjustment or other benefits it was unable to secure by pre-sale negotiations; (ii) in conjunction with other evidence, to oppose Flint Hills' allegations that it was prevented from conducting adequate due diligence; and (iii) to establish, in conjunction with other evidence, that Flint Hills' damage claims were unreasonable and were not made in good

faith. These reasons satisfy the Seventh Circuit's standards for admitting evidence of other suits under FRE 404(b). *See Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494-95 (7th Cir. 1998); *see also Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 775-76 (7th Cir. 2001); *Duckworth v. Ford*, 83 F.3d 999, 1001-02 (8th Cir. 1996).

### 4. Evidence Of The PCBU's Post-Transaction Profitability Should Have Been Admitted For Its Substance. (Dkt. 654, 750, 817)

Flint Hills generated $163 million in EBITDA from the PCBU during the first four years of post-sale operation. Indeed, in 2007 alone the PCBU generated nearly $107 million in EBITDA for Flint Hills, demonstrating that the assets of the business were in substantially good operating condition, and were fully capable of generating large cash flows as well as earnings when sufficient market demand was present. The Court admitted this evidence for the limited purpose of impeaching Sharon Moore Bettius, but the evidence also should have been admitted as substantive evidence. The Court also gave a limiting instruction regarding this evidence. (Dkt. 907 at 38)

This evidence of post-transaction profitability was relevant and probative because the PCBU's post-transaction financial evidence makes it more probable that the assets at issue were in substantially good operating condition and that Flint Hills would have received a windfall or betterment in its diminution-in-value and cost-of-repair damages. Moreover, Flint Hills opened the door to this evidence again and again throughout the trial by putting at issue and raising questions regarding the post-transaction financial and EBITDA performance of the PCBU and Joliet Plant. (*See* discussion in Dkt. 654, 750, and 817)

### 5. The Admission Regarding Contract Compliance By Flint Hills' 30(b)(6) Witness Should Have Been Admitted. (Dkt. 881)

The Court excluded Glenn Personey's Rule 30(b)(6) deposition testimony, in which Mr. Personey admitted that at the time of the sale Flint Hills believed the condition-of-assets warranty was accurate and nothing it learned in due diligence changed that conclusion. (Ex. 40, Glenn Personey 30(b)(6) Deposition at 157:4-19) This testimony showed that, at the time of the sale, Flint Hills had concluded that the equipment now at issue was in compliance with the PSA, and that the age, wear, and tear of that equipment was within what the PSA allowed. Thus, this evidence is relevant to both interpreting the condition-of-assets interpretation and whether equipment on which Flint Hills conducted due diligence satisfied that representation. (*See also* discussion in Dkt. 881)

## III. THE COURT SHOULD GRANT A STAY OF THE JUDGMENT UNTIL IT HAS RULED ON THIS MOTION.

Under FRCP 62(b), on "appropriate terms for the opposing party's security, the court may stay the execution of a judgment—or any proceedings to enforce it—pending disposition of" motions under Rule 50 for judgment as a matter of law and Rule 59 for a new trial. Pursuant to FRCP 62(b), the Court has the discretion to stay execution of the judgment pending disposition of this motion without requiring posting of a bond, and such stays are common given the brief time that typically is required to consider post-trial motions. *See, e.g., Houben v. Telular Corp.*, 309 F.3d 1028, 1038 (7th Cir. 2002); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 2006 WL 2034577, at *1 (W.D. Wis. July 18, 2006).

There is no need for requiring security in this case—particularly while this motion is pending. BP Amoco has more than adequate resources to satisfy the judgment in this case, and thus there is no risk that Flint Hills will not be paid. Moreover, the period for such a stay likely will be relatively short, and requiring security thus would be inefficient and impose an unnecessary cost on BP Amoco with no benefit to Flint Hills. Other courts in similar circumstances have declined to require the posting of security. *See Xenon*, 2006 WL 2034577, at *1; *Sabatini v. Its Amore Corp.*, 2009 WL 3878245, at *2 (M.D. Pa. Nov. 19, 2009); *see also Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 761 (D.C. Cir. 1980).

## CONCLUSION

For these reasons, BP Amoco respectfully requests that the Court: (1) set aside the verdict and judgment; (2) under FRCP 50(b), order judgment as a matter of law in favor of BP Amoco or a new trial on Flint Hills' damages claims; (3) under FRCP 59, order a new trial on Flint Hills' breach-of-contract claim; and (4) under FRCP 62(b) , order a stay of the execution of the judgment while this motion is pending.

Dated:  November 25, 2009               Respectfully submitted,


By:_____/s/ R. Chris Heck_____
Richard C. Godfrey, P.C. (ARDC #3124358)
Scott W. Fowkes, P.C. (ARDC #6199265)
R. Chris Heck (ARDC #6273695)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

*Attorneys for BP Amoco Chemical Company*

## CERTIFICATE OF SERVICE

I hereby certify that November 25, 2009, I caused a true and correct copy of the foregoing to be served electronically via the CM/ECF system on the following:

James Figliulo, Esq.
Ryan P. Stiles, Esq.
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603

Susan M. Franzetti, Esq.
FRANZETTI LAW FIRM, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603

                                    /s/ R. Chris Heck