**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BP AMOCO CHEMICAL COMPANY,      )
                                           )
           Plaintiff/Counter–Defendant,      )
                                            )     Case No. 05 C 5661
      v.                                          )
                                            )
FLINT HILLS RESOURCES, LLC,           )
                                            )
           Defendant/Counter–Plaintiff.      )
                                            )

## <u>MEMORANDUM OPINION AND ORDER</u>

BP Amoco Chemical Company ("BP Amoco") initially filed suit seeking a declaration

that it had not breached a contract with Flint Hills Resources, LLC ("Flint Hills").  (R. 8-1, Am.

Compl.)  Flint Hills filed counterclaims against BP Amoco for fraud and breach of contract.[1]  (R.

14-3, Answer & Countercls.)  After a nine week trial, a jury returned a verdict against BP

Amoco in the amount of $41,688,648.  BP Amoco now moves for judgment as a matter of law

on the counts that went to trial or, in the alternative, for a new trial.  For the reasons discussed

below, BP Amoco's motion is denied.  Furthermore, BP Amoco's motion to alter or amend the

judgment on its declaratory judgment claim is denied.

## BACKGROUND

This breach of contract case involves the sale of a chemical plant between two

sophisticated business entities.  In May 2004, BP Amoco sold certain rights and assets of its

---

[1] Flint Hills also filed a separate action against the guarantor of the contract, BP Corporation North America Inc. ("BP North America"), for breach of contract and fraud.  (R. 10-1, 05 C 6795, Flint Hills' Am. Compl.)  In advance of trial, the parties stipulated to the voluntary dismissal of BP North America, in exchange for BP North America's agreement to perform its obligations under the PSA if the jury found against BP Amoco.  (R. 774-1, Stipulation.)

Performance Chemicals Business Unit ("PCBU") to Flint Hills for over $300 million pursuant to a contract called the Asset Purchase and Sale Agreement ("PSA"). A chemical plant located outside of Joliet, Illinois (the "Joliet Plant") was one of the assets BP Amoco sold to Flint Hills under the PSA. The parties signed the PSA on March 29, 2004, and Flint Hills assumed ownership of the Joliet Plant on May 28, 2004.

## I.     The PSA

The parties engaged in lengthy negotiations over the terms of the 131-page PSA, which extensively detailed the agreements between the parties. Two specific representations in the PSA were the focus of this lawsuit: (1) the representation regarding the condition of the Joliet Plant's assets and (2) the representation of the Joliet Plant's production capacity. After Flint Hills took over the Joliet Plant, the evidence at trial revealed, it ran into problems with both the condition of assets and the production capacity at the Joliet Plant.

### A.     Condition of Assets Representation

Section 7.1 of the PSA represented and warranted the following regarding the condition of assets at the Joliet Plant:

> All of the Joliet Plant process units and buildings are structurally sound, and all tangible Assets have been maintained substantially in accordance with normal industry practice, are in substantially good operating condition and repair for their age (taking account of their nature, normal wear and tear and continued repair and replacement in accordance with Seller's past practice) . . . .

This representation and warranty was applicable as of the date of the PSA (March 29, 2004) and the date that the sale of the Joliet Plant closed (May 28, 2004).

**B.      Production Capacity Representation**

The Joliet Plant produced three chemicals: (1) trimellitic anhydride ("TMA"); (2) purified isophthalic acid; and (3) maleic anhydride ("MAN").  These chemicals are used in performance plastics and coatings such as plastic water bottles.

Section 7.1(d)(ii) of the PSA set forth the production capacity representation regarding these chemicals:

> Seller represents and warrants to Buyer, as of the date of this Agreement, and as of the Closing, as follows:
>
> The annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons, respectively, with the product produced meeting Seller's standard specifications therefor, recognizing that such demonstrated capacity does not take into account planned or unplanned downtime.

The PSA contains no other statements regarding capacity.  Although the PSA contains various definitions, it does not define the phrase "annualized maximum demonstrated sustainable production" ("AMDSP") or any of the individual words in that phrase.  Similarly, the PSA does not specify how long a rate must be achieved to be deemed "demonstrated" or "sustainable."

**C.      Other Provisions**

The PSA provided that BP Amoco would indemnify Flint Hills under certain conditions for losses incurred that were greater than $75,000.  Specifically, Section 13.2 of the PSA – "Indemnification by Seller" – provided:

> To the fullest extent permitted by Law, Seller, in accordance with the terms of this Article 13, hereby agrees to Indemnify Buyer . . . from and against, any and all Losses incurred or required to be paid by any Buyer Indemnified Party . . . , which arise out of, relate to or result from any of the following: (a) any breach of any warranty or representation of Seller contained in Section 7.1 . . . .

Further, in Section 13.6 of the PSA, the parties agreed that, except for fraud, the remedies set out

in Article 13 are the "sole and exclusive remedies" available for claims arising out of the PSA.

Section 13.6 of the PSA states:

> Except for . . . fraud, any claim or cause of action based on, arising out of or
> relating to this Agreement or Implementing Agreements must be brought by
> either Buyer or Seller, subject to the applicable provisions, conditions and
> limitations of this Agreement or Implementing Agreements, whether such claim
> arises out of contract, tort or otherwise.
> * * *
>
> Except for . . . fraud, the provisions of Article 13, Section 2.8(b) and Section
> 8.1(b) are intended to be the sole and exclusive remedies between the parties for
> the matters covered by such provisions. * * *
>
> SELLER WILL NOT BE LIABLE TO BUYER FOR ANY LOSS OF PROFIT,
> LOSS OF USE, SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL
> DAMAGES SUFFERED BY BUYER, HOWSOEVER ARISING UNDER THIS
> AGREEMENT, WHETHER BASED ON BREACH OF WARRANTY,
> BREACH OF AGREEMENT, STATUTE, STRICT LIABILITY OR
> OTHERWISE, INCLUDING WITHOUT LIMITATION NEGLIGENCE OF
> SELLER. . . . EACH PARTY AGREES THAT IT WILL NOT SEEK AND
> HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO OR FOR
> PUNITIVE OR EXEMPLARY DAMAGES AS TO ANY DIRECT CLAIM
> ARISING IN CONNECTION WITH THIS AGREEMENT.

## II.      Problems at the Joliet Plant

Flint Hills encountered problems with both the assets at the Joliet Plant and its

production capacity after it purchased and took over the Joliet Plant from BP Amoco.  The

problems were extensive and included issues with the fire water system, the laboratory roof, the

MAN reactor flanges, the motor control center buildings, the PIA sewer line, the underground

piping, the tanks and water wells, the MAN sump, the cooling towers, the TMA and other tanks,

the electrical systems, the PIA dryer, the boiler, and an abundant amount of other assets at the

Joliet Plant.  At times, Flint Hills had to shut down the plant to make repairs or to replace the

assets because they were not in substantially good condition and could not operate. In fact, Flint

Hills spent approximately $42 million to repair or replace the damaged assets and estimated an

additional $56 million to complete the necessary repairs and replacements.

In December 2004, Flint Hills sent BP Amoco a claims notice seeking indemnification

for the losses that it incurred as a result of the misrepresentations in the PSA, pursuant to Section

13.5 of the PSA. That section required Flint Hills to notify BP Amoco of its losses in writing

with "reasonable promptness," "specifying, to the extent known, the nature of such Claim . . . ,

setting forth the specific facts and circumstances that are the basis of such Claim in reasonable

detail, the amount of Losses sought . . . ." Flint Hills sent BP Amoco additional notices with

significant details of the problems. Nonetheless, BP Amoco refused to indemnify Flint Hills,

and the parties could not resolve their differences.

## III.     Procedural Background

On September 30, 2005, BP Amoco filed a declaratory judgment action against Flint

Hills, seeking a declaration that BP Amoco did not breach the PSA or defraud Flint Hills. (R. 1-

1, Compl.) On October 17, 2005, Flint Hills filed counterclaims against BP Amoco, alleging

breach of the representations and warranties in the PSA and fraud. It also filed a separate

complaint against BP North America, alleging breach of contract and fraud and raising multiple

environmental claims. On January 5, 2006, Judge Moran consolidated Flint Hills' case with this

one.[2] In advance of trial, Flint Hills moved to realign the parties for trial given that Flint Hills

had the burden of proof on the substantive claims. (R. 480-1, Motion.) BP Amoco did not

---

[2] The case was reassigned to this Court on January 20, 2009, by the Executive
Committee. (R. 276-1, Order.)

oppose the motion. (R. 537-1, Response.) The Court granted the request, and the parties were realigned for trial such that Flint Hills was the plaintiff, and BP Amoco was the defendant. (R. 539-1, Order.) The parties also stipulated to the dismissal of BP North America in advance of trial. (R. 774-1, Stipulation.)

Prior to trial, the parties – both of whom were represented by experienced and talented litigation counsel – extensively briefed the issues now before the Court. The parties engaged in extensive discovery, including BP Amoco serving Flint Hills with 4,637 requests to admit. (R. 191-1, Mem., Op., & Order.) BP Amoco also filed a motion for sanctions, claiming spoliation of certain evidence, which the Court ultimately denied. (R. 362-1, Motion.) BP Amoco filed four separate summary judgment motions[3], and the parties filed 12 separate *Daubert* motions challenging the admissibility of the testimony of 17 experts. In addition, the parties filed approximately 21 lengthy motions *in limine* in advance of trial.

The trial lasted nine weeks. During trial, 41 witnesses testified, two of whom testified twice, and the parties introduced over 1,000 exhibits that were admitted into evidence. After the close of Flint Hills' evidence, the Court granted BP Amoco's motion for a directed verdict under Rule 50(a) on Flint Hills' claim for punitive damages because the circumstances of the case did not justify an award of punitives. Specifically, as a matter of law, a reasonable jury could not have found the necessary willful or wanton fraudulent conduct to award the extraordinary remedy of punitive damages. (R. 899-1, Order.) The Court denied BP Amoco's remaining motions.

---

[3] The Court granted summary judgment as to the majority of Flint Hills' environmental claims. (R. 542-1, Order.)

The jury of twelve deliberated for approximately one week.  On November 13, 2009, the

jury returned a verdict in favor of Flint Hills on the breach of contract claim in the amount of

$41,688,648 and for BP Amoco on Flint Hills' fraud claim.  (R. 910-1, Verdict.)  The verdict

form reflects that the jury based its verdict on the breach of contract claim on both a breach of

the condition-of-assets representation and a breach of the production capacity representation in

the PSA.  (*Id.*)  Under the PSA, Flint Hills is also entitled to fees and costs.[4]  (R. 730-1, Order.)

## ANALYSIS

### I.     Legal Standard

BP Amoco seeks relief under both Federal Rule of Civil Procedure 50(b) and Federal

Rule of Civil Procedure 59(a).  The standard under both rules is difficult to satisfy.

#### A.     Judgment As a Matter of Law Pursuant to Rule 50(b)

When ruling on a motion for judgment as a matter of law following a jury verdict, courts

do not re-weigh the evidence presented at trial or make credibility determinations.  *See Reeves v.

Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

"Once a jury has spoken, we are obliged to construe the facts in favor of the parties who

prevailed under the verdict."  *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir.

2008) (citations and quotations omitted).  Considering the totality of the evidence, courts

determine whether the jury was presented with a "legally sufficient amount of evidence from

---

[4] Flint Hills filed its motion for attorneys' fees and expenses on March 16, 2010.  (R.
983-1, Motion.)  The parties also filed a joint statement regarding the petition for fees and
expenses, pursuant to Local Rule 54.3.  (R. 982-1, Joint Statement.)  BP Amoco's response to
the petition is due on or before April 16, 2010, and Flint Hills' reply is due by May 17, 2010.
(R. 977-1, Minute Entry.)  The Court will address this issue in a separate order once it is fully
briefed.

which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). In assessing a motion under Rule 50(b), courts view the evidence and all reasonable inferences in a light most favorable to the party who prevailed under the verdict and "do not make credibility determinations or weigh the evidence." *Tate*, 546 F.3d at 532; *Reeves*, 530 U.S. at 150-51; *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 721 (7th Cir. 2003). As the Seventh Circuit has noted, "the standard is steep. A verdict will be set aside as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Staub v. Proctor Hosp.*, 560 F.3d 647, 658 (7th Cir. 2009) (citations omitted).

### B. New Trial Pursuant to Rule 59(a)

In the alternative, BP Amoco seeks a new trial pursuant to Rule 59(a). "A party seeking to reverse a district court's denial of a motion for a new trial bears a particularly heavy burden." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 569 (7th Cir. 2004)). "In ruling on a motion for new trial, federal law requires a district court to determine whether the verdict is against the weight of the evidence . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (citations and quotations omitted). A verdict will be set aside as contrary to the manifest weight of the evidence only if "no rational jury" could have rendered the verdict. *Moore*, 546 F.3d at 427. Federal courts will not "set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury." *Id.* The Seventh Circuit

reviews new trial motions for an abuse of discretion, which occurs only when no reasonable person could agree with the district court. *ABM Marking, Inc. v. Zanasi Fratelli S.R.L.,* 353 F.3d 541, 543 (7th Cir. 2003).

### C. General Verdict

Before turning to the merits of the motion, the Court first addresses BP Amoco's argument regarding general-verdict forms. According to BP Amoco, where a general verdict form is used, the Court cannot uphold the verdict if any error was committed. The Court disagrees.

Contrary to BP Amoco's argument, the verdict form in this case was not a general verdict on Flint Hills' claims. Flint Hills pursued two claims in this case – a breach-of-contract claim and a fraud claim. Its breach of contract claim rested on two separate theories – breach of contract in connection with the condition-of-assets warranty and breach of contract in connection with the production-capacity warranty. The verdict form had a separate question for liability for Flint Hills' breach of contract claim and for its fraud claim. (R. 910-1, Order.) In addition, the form specifically differentiated between Flint Hills' two theories of liability for breach of contract by directing the jury to proceed to a specific question only if its breach of contract finding was based in part on the production-capacity claim. (*Id.*) Thus, the verdict form was not general on the question of liability. The verdict form did not itemize damages based on Flint Hills' damages theories.

### 1. *Sunkist* Does Not Require Reversal for a Single Error

Relying on *Maryland v. Baldwin*, 112 U.S. 480 (1884), and *Sunkist Growers, Inc. v. Wincker & Smith Citrus Prods. Co.*, 370 U.S. 19 (1962), BP Amoco asserts that because of the

general verdict form in this case, any error – legal or evidentiary – automatically results in reversal. Unlike the cases upon which BP Amoco relies, the verdict form in this case was not "general" in the traditional sense as to the question of liability or defenses. It simply did not itemize the amount of damages awarded. BP Amoco does not cite any cases supporting that the verdict form must itemize damages or reflect the damages theory or theories applied by the jury. Such a requirement would make little sense, especially where – as here – the damages for the breach-of-contract claim were the same whether the breach was for the condition-of assets-claim or the production capacity claim.

Furthermore, as the Tenth Circuit has noted, *Sunkist* "does not paint with as broad a brush as appears from the language quoted. As with all errors committed at trial, a litmus test for reversal is whether the appellant was thereby unjustly prejudiced." *Asbill v. Housing Auth. of Choctaw Nation,* 726 F.2d 1499, 1504 (10th Cir. 1984). As to evidentiary issues, the Seventh Circuit[5] has found that as long as substantial evidence exists to support one theory of liability on a general verdict in a single-claim case, then it will uphold the jury's verdict:

> [B]ecause the plaintiffs could have succeeded under one of two alternative theories of relief, and the jury returned a general verdict as opposed to a special verdict which, for example, could have included specific findings with respect to each theory of relief, we need only find that there was substantial evidence to support the jury's verdict under at least one of the two alternative theories.

*Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988). The same analysis applies

---

[5] Although the parties do not address whether Illinois law governs this issue, given that this is a diversity action and Illinois law governs the PSA, the result would be the same. Under Illinois law, where the jury returns a general verdict on several theories of liability, "the verdict will be sustained if there is at least one good cause of action to support it." *Bandura v. Orkin Exterminating Co., Inc.*, 865 F.2d 816, 822 (7th Cir. 1988) (citing *Moore v. Jewel Tea Co.*, 46 Ill.2d 288, 263 N.E.2d 103 (1970); *Peterson v. Henning*, 116 Ill.App.3d 305, 72 Ill. Dec. 203, 452 N.E.2d 135 (1983)).

where multiple claims are involved in a case. *See Lawndale Nat'l Bank v. American Cas. Co.*, 489 F.2d 1384, 1389 (7th Cir. 1973) (distinguishing general verdicts with multiple theories of defense and multiple theories of liability). Other courts have reached similar results. *See, e.g.*, *Davis v. Rennie*, 264 F.3d 86, 105-07 (1st Cir. 2001) (adopting a harmless error approach and reversing general verdict only where it is "reasonably certain that the jury was not significantly influenced by issues erroneously admitted to it." (citations omitted)).

## 2. BP Has Waived This Argument

Further, BP Amoco requested a general verdict form and did not ask for any itemization of damages; it did not object to the format of the verdict form that went to the jury. BP has therefore waived this argument. BP Amoco's argument that it has not waived any rights by failing to request itemized damages because Flint Hills bore that burden fails. In *Kossman v. Northeast Ill. Reg. Commuter R.R. Corp.*, 211 F.3d 1031 (7th Cir. 2000), the Seventh Circuit rejected a similar argument involving multiple theories of liability where the defendant did not object or specify its request for a special verdict form:

> Because the defendant never requested any special form of verdict, the jury only returned a general verdict for Kossman. And when a jury only returns a general verdict, we need only find support in the record for one of the theories presented to the jury in order to affirm the jury award.

*Id.* at 1037. *See also Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 622 (7th Cir. 2000) (party "has only itself to blame for its inability to demonstrate that the jury was confused by the instruction" where party did not request special interrogatory and party claiming instruction was submitted to the jury on theory for which there was no evidentiary support). As Judge Coar noted in *Dimensions Med. Ctr. Ltd. v. Aetna Life Ins. Co.*, No. 93 C 6244, 1997 WL 208387, at *3 n.1 (N.D. Ill. Apr. 23, 1997):

Because there was a lump sum verdict in this case, however, it is impossible to determine to what extent the award was based on any particular claim. Indeed, defendant makes this argument in its brief. This result is a byproduct of the defendant's failure to submit or request separate and/or itemized verdict forms for each claim. By doing so, defendant took the risk that the award would be uninterpretable when contesting individual claims. Moreover, a lump-sum award is not a basis, as defendant urges, for granting a new trial. *Cf. Jastremski v. United* States, 737 F.2d 666, 670 (7th Cir. 1984) ("The failure to divide the lump sum award into discrete elements of recovery does not warrant reversal."); *In re International Surplus Lines Ins. Comp.,* 1994 WL 502015, *3 (N.D.Ill. Sept.12, 1994) (citing *Robbins v. Day,* 954 F.2d 679, 684 (11th Cir.), *cert. denied,* 506 U.S. 870, 113 S.Ct. 201, 121 L.Ed.2d 143 (1992)); *Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 121 (2d Cir. 1991) ("Lump sum awards are perfectly acceptable and are not subject to vacatur or modification because they are a lump sum."). The court can find no prejudice to defendant where defendant failed [to] mitigate this obvious risk when it had the opportunity. A Rule 50(b) motion is not a vehicle for remedying the inadequate defense of a claim.

*See also Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987)

("When a jury returns a general verdict for the plaintiff after hearing alternative calculations of

damages, we uphold the award if there is substantial evidence in the record as to any one

calculation to support the award.").

### 3.     The Verdict is Supported by the Evidence

Even if BP Amoco's reading of *Sunkist* is correct, as discussed in detail below, it is not

entitled to a new trial. The jury's verdict was more than supported by the evidence, and BP

Amoco has failed to identify any errors.

## II.     BP Amoco Is Not Entitled to Judgment As a Matter of Law

BP Amoco argues that it is entitled to judgment as a matter of law based on various

arguments regarding damages. At trial, Flint Hills sought the same damages for the breach of

the condition-of-assets claim as for the breach of the production-capacity claim. Flint Hills

sought damages for both the costs and expenses it had already incurred in repairing and

replacing the assets and the future estimated damages to bring the Joliet Plant into compliance with the PSA warranties. The Court instructed the jury that:

> Flint Hills has the burden of proving a reasonable basis for its computation of damages. While Flint Hills is not required to prove damages with mathematical precision, the law requires that damages be proved with reasonable certainty. Damages cannot be based on conjecture and speculation.

(R. 907-1, Jury Instructions at 46.)

BP Amoco further argues that it is entitled to a new trial because Flint Hills failed to prove by a preponderance of the evidence the future estimated damages for Claims 9, 21, 56, and 77. In Claim 9, Flint Hills sought damages for the installation of the heating ventilation and air-condition system ("HVAC") in the motor control center buildings. In Claim 21, Flint Hills sought damages concerning the waste water treatment project, including an air compressor used in connection with the production capacity of the Joliet Plant. Flint Hills' Claim 56 involves future costs to replace an electrical system and Substation A. Finally, Claim 77 involves the repair or replacement of a CB-704 boiler necessary to run the Joliet Plant.

BP Amoco asserts that Flint Hills failed to establish that the future estimated costs for these claims were "reasonably certain to occur" and that such costs could "be calculated with reasonable certainty." Furthermore, BP Amoco contends that Flint Hills' damages evidence did not satisfy the Federal Rules of Evidence because the future estimates were hearsay. Finally, BP Amoco argues that the PSA barred many of the damages Flint Hills sought. The Court will address each of these arguments in turn.

## A.    Future Estimated Costs

Viewing the evidence in the light most favorable to Flint Hills, Flint Hills established both the reasonable certainty of the future estimated costs and that such costs were reasonably certain to occur on each of these claims.  BP Amoco's arguments fail as to both elements.

Claim 9 involved the motor control center buildings at the Joliet Plant.  Rick Morris, Flint Hills' Reliability Manager, testified about the condition of this asset and the fact that the HVAC needed to be replaced in order to put that asset in compliance with the PSA representations and warranties.  (Trial Transcript ("Tr.") at 4174.)   Flint Hills received an estimate from Precision Control to conduct this work.  Morris testified that the work on the HVAC system was reasonably certain to occur and that the HVAC provided the air filtration, temperature control, humidity control, and pressurization.  (*Id.* at 4174-75, 4176.)  The estimate from Precision Control was admitted into evidence without objection.  (*Id.* at 4176-77; Trial Ex. 707.)   The Precision Control estimate was for approximately $3 million.  (Tr. at 4176.)

In proving Claim 21, Mr. Morris testified about the future costs for an air compressor necessary to increase the production capacity at the Joliet Plant.  Flint Hills had an Authorization for Expenditure ("AFE") (Trial Ex. 1008) for $1.49 million that Mr. Morris had worked on with the Lead Rotating Equipment Engineer and the Senior Electrical Engineer at the Joliet Plant setting forth the cost to repair the air compressor that had been out of service for some time.  (Tr. at 4206-07.)  The Court admitted the AFE without objection.  (*Id.* at 4213.)  This AFE set forth an estimated $1.49 million to complete the work.  (*Id.* at 4211.)  Mr. Morris – who was the Reliability Manager at the Joliet Plant – testified that the air compressor was not working at the time Flint Hills purchased the Joliet Plant from BP Amoco.  He further explained that it was

necessary to restore the air compressor to service in order to meet the production capacity warranted in the PSA. (*Id.* at 4209-11.) He also testified that the air compressor work in Claim 21 was reasonably certain to occur in the future and that it was necessary to meet the production-capacity representations in the PSA. (*Id.* at 4212-13.)

Rick Morris also testified that the future costs for the Substation A replacement project in Claim 56 were reasonably certain to occur. Substation A, created in approximately 1958, housed electrical equipment and distributed electrical power to the waste water treatment plant and other areas at the Joliet Plant. (*Id.*) As Rick Morris testified, "it's very similar to a breaker box in your house, only it's about the size of a trailer home. It's bigger – much bigger." (*Id.* at 4143.) It supplies approximately 10 to 15 percent of the power to the Joliet Plant. (*Id.* at 4144.) Evidence reflected that Substation A had "reached the end of its reliable operating range." (*Id.* at 4146-47; Trial Ex. 710.) Morris testified that Substation A was not insulated and did not have any temperature or humidity control. (Tr. at 4151.) He explained the significance of these problems for this central asset at the Joliet Plant:

> The problem with that, with electrical equipment, is that you need to keep it temperature controlled, so that it doesn't go through heat and cold cycles that would loosen up the connections on the bolts. Also, you can get dew point corrosion, again, with humidity. So, if you get condensation inside the building, that will hurt the electrical equipment. So, it needs to be kept clean and dry. Also, if you get dirt inside the building around the gear, that can cause arcing or tracking of the electricity. It's called corona. And you'll eventually create tracks, and the electricity will go a direction you don't want it to go and you'll have a failure. So, you need to keep electrical equipment pressurized and purged to blow air out of the building – any cracks or openings. You need to keep it at a constant temperature, as well.

(*Id.*) BP internally recognized these same problems and the need to replace Substation A in 1999 and 2002. (*Id.* at 4156.) In order to remedy these problems, Flint Hills worked with

Valdez Engineering in developing an estimate for the cost of replacing Substation A. (*Id.* at 4154-57; 4544-45.) Valdez Engineering estimated $6 million to fix the problems at Substation A. (*Id.* at 4545-46; Trial Ex. 5589.) Mr. Morris testified that the estimated $6 million was reasonably certain to be incurred by Flint Hills given the various benefits and costs associated with the project. (Tr. at 4545.)

Claim 77 involved the repair/replacement of a steam boiler that generates 150 pounds of steam for the Joliet Plant to use in its operations. (*Id.* at 4201.) Morris testified that the boiler was in such bad shape when Flint Hills took over the Joliet Plant that they had to shut it down. (*Id.* at 4201.) In order to repair the boiler, Flint Hills looked into both replacing it and repairing it. (*Id.* at 4202.) Ultimately, Flint Hills decided to repair the boiler and obtained a $3.6 million estimate to rebuild it. (*Id.* at 4203-04.) Morris further testified that the future estimated costs for the repairs were reasonably certain to occur in the future. (*Id.* at 4203.) In addition, George Roman, who served as the project manager for the boiler project, testified that Flint Hills contacted Hayes Mechanical to provide an estimate for a portion of the costs to the boiler at issue in Claim 77. (*Id.* at 4627-29.) Hayes Mechanical visited the plant, then submitted an estimate for certain costs associated with repairing the boiler. (*Id.* at 4628-29.) Roman explained that the $2.5 million estimate from Hayes Mechanical (Trial Ex. 2094) was not for the full scope of the necessary work. After Roman received the estimate, he included additional items that were necessary to repair the boiler and created a total cost estimate, which the Court admitted into evidence without objection. (Trial Ex. 2093; Tr. at 4632.) Mr. Roman testified, based on the detailed total-cost estimate, that the best "expected case" was $3.6 million to repair

the boiler.  (Tr. at 4635.)  The worst expected case was $4.5 million.  Mr. Roman also testified in detail how he reached this figure.  (*Id.* at 4630-36.)

This testimony was more than sufficient to meet Flint Hills' burden.  Contrary to BP Amoco's assertion, the detailed testimony and back up estimates were more than self-serving, conclusory statements.  Mr. Morris' testimony that the expenses at issue were reasonably likely or reasonably certain to occur was supported by the evidence of the physically degraded state of the assets at issue and the necessity of replacing or repairing them in order to run the Joliet Plant. BP Amoco asks the Court to essentially ignore this evidence and make credibility determinations against Flint Hills.  Such arguments, however, are not appropriate under Rules 50 and 59.  *See Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 712 (7th Cir. 2004) (courts "will not second-guess a jury on credibility issues").

### B.     The Damages Evidence Complied with the Federal Rules of Evidence

BP Amoco challenges Flint Hills' use of third-party estimates to prove its damages.  BP Amoco claims that the third-party-written-repair-cost estimates supporting damages for Claims 9, 21, 56, and 77 failed to qualify for the business-records exception to the hearsay rule.  The Court disagrees.

The Federal Rules of Evidence prohibit the admission of hearsay evidence – statements made out of court that are offered to prove the truth of the matter asserted.  Fed.R.Evid. 801, 802.  Federal Rule of Evidence 803(6) sets out an exception to the rule against hearsay for business records.  Under Rule 803(6), the following is excepted from the bar on hearsay:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that

> business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . , unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). A document prepared by a third party may qualify as another business entity's business record under Rule 803(6) if that entity integrated the third-party record into its records and relied upon it in its day-to-day operations. The proponent also must satisfy the other requirements of Rule 803(6). *See*, *e.g.*, *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) ("Several other courts have held that a record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied. . . . We agree with these courts. . . ."); *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) ("[A] record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied)."); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1342-44 (Fed. Cir. 1999) ("This court has not previously addressed the question of the foundation testimony necessary to admit documents produced by third parties not before the court under Rule 803(6) where those documents have been incorporated into another business entity's records. Other courts of appeal have addressed this situation in a number of cases and have generally held that a document prepared by a third party is properly admitted as part of the business entity's records if the business integrated the document into its records and relied upon it."); *United States v. Duncan,* 919 F.2d 981, 986 (5th Cir. 1990) (holding that medical records from hospital were the business records of the insurance company and explicitly recognizing that "there is no requirement that the [business] records be created by the business having custody of them"); *see*

*also Columbia First Bank, F.S.B. v. United States*, 58 Fed. Cl. 333, 339 (Fed. Cl. 2003) (third-party documents can be admitted as business records if they meet the other Rule 803(6) requirements and are "shown to have been received and incorporated, to have been relied upon, and to have indicia of trustworthiness"). Satisfaction of those requirements supplies a sufficient indicia of reliability to permit admission of documents prepared by third parties pursuant to Rule 803(6).

Flint Hills met the mandates of Rule 803(6) for the admissibility of the third-party estimates. George Roman testified that he regularly received third-party estimates from outside contractors for work that Flint Hills performed and intended to have performed. Mr. Roman explained that

> upon receiving an estimate, [h]e would incorporate it into [his] project file, do a scope comparison to see if the estimate was in line with what [he] had requested, would check the reasonableness of the estimate, look for any omissions in the estimate, things that the contractor said that they could not perform that were part of the original scope.

(Tr. at 4615-16.) While at the Joliet Plant, Mr. Roman testified, he followed this same procedure with third-party estimates. (*Id.* at 4517-20.) In addition, Mr. Roman explained how requested third-party estimates were incorporated into Flint Hills' records: "I'll set up a project file in my e-mail on the hard drive on my computer, and then for copies of documents, I print files, notebooks, that are labeled with the project." (*Id.* at 4621-22.) He also explained that he received the Hayes Mechanical estimate for Claim 77 and incorporated it into Flint Hills' business records and relied upon it in going forward on Claim 77. (*Id.* at 4629-30; 4632-33.) Similarly, he incorporated estimates for the damages at issue in Claim 21 into Flint Hills' files.

(*Id.* at 4645-47.)  In addition, Mr. Morris testified regarding the Valdez estimate for Claim 56 and how Flint Hills relied on it.  (*Id.* at 4546-47.)

Moreover, BP Amoco did not object to the admission of the third-party estimates at trial. In a motion *in limine* in advance of trial, BP Amoco argued that estimates prepared by third-party vendors do not qualify for the "business records" exception to the hearsay rule under Federal Rule of Evidence 803(6).  (R. 594-1, Motion.)  The Court rejected this argument as a matter of law.  (R. 767-1, Order.)  BP Amoco also asserted in its *in limine* motion that Flint Hills lacked the requisite evidentiary foundation to admit the third-party estimates.  As the Court specifically noted when it denied BP Amoco's motion without prejudice:

> In light of Flint Hills' contentions regarding the foundational facts it intends to establish at trial, the Court cannot say in the context of a motion *in limine* that Flint Hills will be unable to establish the required foundation for admission of this evidence under Rule 803(6).  *See Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 440 (7th Cir. 1997).  Nevertheless, the burden will remain on Flint Hills to establish the proper foundation at trial for admission of each third-party estimate, including establishing that Flint Hills integrated the document into its records and relied upon it.

(*Id.*)  The Court further ruled:

> Under Rule 803(6), however, the class of witnesses qualified to establish foundation for business records is expansive.  *Given*, 164 F.3d at 394.  Indeed, "[a] qualified witness does not need to be the person who prepared the records or have personal knowledge of the information contained, but the witness must have knowledge of the procedure by which the records were created."  *Id.* (citing *Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998)).  According to Flint Hills, Joliet Plant employees will testify that the cost estimates were prepared in the normal course of business, that Flint Hills integrated the third-party estimates into its own records, and that Flint Hills regularly relies on the accuracy of such work proposals and cost estimates.  (R. 653-1 at 5-7.)  The Court will decide in the context of the foundational testimony at trial whether Flint Hills has laid a proper foundation for the admission of each third-party repair estimate as a business record.

(R. 767-1, Order.)  In other words, the Court specified that it could not address the admissibility

of particular documents in advance of trial without having the benefit of the witness testifying about the foundation. Despite making clear that Flint Hills still had to lay the proper foundation before the Court would admit the third-party documents, BP Amoco nonetheless failed to challenge the admissibility of the documents at trial when Flint Hills sought to admit them. Accordingly, it has waived this argument. *United States v. Haynie*, 179 F.3d 1048, 1050-51 (7th Cir. 1999).

Finally, BP Amoco asserts that Flint Hills' employee witnesses lacked the necessary knowledge, skill, experience, training, or education to qualify as expert witnesses under Federal Rule of Evidence 702. As Flint Hills notes, BP Amoco waived this issue by failing to raise it before or during the witnesses' trial testimony. *Id.* BP Amoco's assertion that it preserved the argument by challenging the ability of these witnesses to lay the proper foundation in its reply to a motion *in limine* fails. *Untied States v. Boisture*, 563 F.3d 295, 299 n.3 (7th Cir. 2009) (arguments raised for first time in reply are waived). In any event, as the testimony at trial revealed, these witnesses were sufficiently qualified based on their extensive experience, training, and skills in the subject areas.

### C. The Jury Rejected BP Amoco's Factual Arguments Regarding the Damages

BP Amoco now re-raises various factual arguments regarding damages that the jury rejected or that BP Amoco failed to raise during trial. Such arguments are not a basis for judgment as a matter of law.

#### 1. Journal Entries

BP Amoco challenges Flint Hills' reliance on certain internal "journal entries" to support its damages. The journal entries reflected expenses that Flint Hills had incurred and were part of

the underlying data for the spending summaries introduced by Flint Hills at trial. BP Amoco contends that the costs for these entries were not supported by the evidence. While BP Amoco raised various arguments regarding the spending summary charts in advance of trial, it did not object to the spending summaries on the ground that the internal journal entries were unsupported. As such, it has waived this argument. *See Combined Network, Inc. v. Equitable Life Assurance Soc'y of the U.S.*, 805 F.2d 1292, 1298 (7th Cir. 1986). BP Amoco contends that its Rule 50(a) motion filed at the close of Flint Hills' case preserved this issue. Even assuming that it did preserve the general issue regarding the journal entries, BP Amoco now objects to an additional two entries (exhibits 11 and 13) that it did not raise in its Rule 50(a) motion. (R. 877-1, Mem. In Support at 2-3.) It cannot raise this argument regarding these exhibits for the first time in its post-trial motion. *Combined Network*, 805 F.2d at 1298.

The merits of BP Amoco's argument fail as well. Matthew Daugherty, Flint Hills' Controller, testified at trial regarding the internal journal entries. (Tr. at 4878-87; 4903.) Mr. Daugherty used these journal entries when he created spending spreadsheets on a claim-by-claim basis, summarizing the voluminous documents underlying the expenditures on the cost collectors applicable to each claim. Flint Hills assigned a "cost collector" number prior to work beginning on a particular job or project and thereafter tracked the spending for these costs collectors or projects through "work orders." All spending associated with a job or project is billed to the cost collector, including vendor invoices and warehouse items. These summaries were created and admitted pursuant to Federal Rule of Civil Procedure 1006 to facilitate the presentation of the voluminous spending data at trial.

As Controller, Mr. Daugherty had personal knowledge of Flint Hills' payments for the costs collectors and journal entries, its accounting practices, and its accounting systems used to track the expenses at issue. Mr. Daugherty explained that, in the normal course of business, Flint Hills' Accounting Department tracks spending for costs collections through internal journal entries. (*Id.* at 4903-04.) Reports are generated from these entries and Flint Hills' management relies on such data and reports when making business decisions. (*Id.* at 4903.) Mr. Daugherty testified that Flint Hills' accounting department regularly checks the accuracy and reliability of the journal entries and that journal entries were an important part of Flint Hills' day-to-day operations. (*Id.* at 4904-05; 4725-27.) He further testified that back-up transactional information for internal journal entries was maintained in the Flint Hills computer accounting systems and that he personally reviewed all transactions summarized from the accounting systems. (*Id.* at 4747; 4881-84.) As such, Daugherty explained that the summary spreadsheets that he prepared accurately and reliably summarized the spending for all transactions applicable to each claim. This thorough and detailed testimony provided a sufficient basis to support the journal entries underlying Flint Hills' spending summaries and for admission of the summaries. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("The admission of a summary under Fed.R.Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and . . . [a showing] that the summary is accurate . . . .'" (citations omitted)).

## 2. Characterization of the Damages

In addition, BP Amoco argues that the PSA barred Flint Hills from recovering certain cost of repair damages. Section 13.6 of the PSA specifically provides that "[BP Amoco] will not

be liable to Flint Hills for . . . loss of use, special, indirect, incidental, or consequential damages suffered by [Flint Hills], howsoever arising under this agreement, whether based on breach of warranty, breach of agreement, statute, strict liability or otherwise, including without limitation negligence of [BP Amoco]."  BP Amoco contends that Flint Hills improperly presented damages to the jury that were incidental, consequential, or otherwise "improper."  It argues that the rental and testing costs fall within these prohibited areas.

BP Amoco made these factual arguments to the jury, and now attempts to improperly reargue them at this procedural posture.  The Court instructed the jury as to Section 13.6 of the PSA, informing them that Flint Hills could not recover for "loss of use, special, indirect, incidental, or consequential damages.  (R. 907-1, Jury Instructions at 31.)  In giving the jury this instruction, the Court informed them that the PSA was "binding, and in the course of applying these instructions, you must abide by [Section 13.6] of the agreement in determining the amount of damages for breach of contract, if any, in this case."  *Id.*  "[J]uries are presumed to follow the court's instructions."  *CSX v. Transp., Inc. v. Hensley*, __ U.S. __, 129 S.Ct. 2139, 2141 (2009).  *See also Thomas v. Cook County Sheriff's Dept.*, 588 F.3d 445, 461-62 (7th Cir. 2009) (courts "presume that juries follow the court's instructions").  Because BP Amoco has failed to establish that the jury did not follow the instruction, it has not presented any basis for a judgment as a matter of law or a new trial.

Furthermore, BP Amoco is simply arguing factual matters that the parties presented to the jury.  BP Amoco argued to the jury that the damages in question were consequential and therefore not recoverable under the PSA.  *See American Elec. Power Co.,* 418 F.Supp. 435, 459 (S.D.N.Y. 1976); *see also Taylor, Bean & Whitaker Mtg. Corp. v. GMAC Mtg. Corp.*, No. 05:5-

cv-260-Oc-GRJ, 2008 WL 3200284, at *2 (M.D. Fla. Aug. 6, 2008). There was a sufficient factual basis for the jury to reject this argument and to conclude that the damages were not consequential and therefore recoverable. This is not a basis for a new trial.

Finally, Flint Hills also presented the jury with sufficient evidence for the jury to reasonably conclude that many of the damages which BP Amoco now contests as "consequential" were costs incurred in mitigating damages. As the Court instructed the jury regarding mitigation,

> A party cannot recover damages it could have prevented by taking reasonable steps and using commercially reasonable efforts when it learned or should have learned of the breach. The burden is on BP Amoco to prove that Flint Hills failed to minimize its damages and that the damages should be reduced by a particular amount as a result. . . . If you find that Flint Hills incurred costs in taking reasonable steps and using commercially reasonable efforts to avoid such losses, you must make an award to Flint Hills for such costs.

(R. 907-1, Jury Instructions at 36.) The issue of "whether a party's mitigation efforts were reasonable is a question of fact." *Alper v. Altheimer & Gray*, No. 97 C 1200, 2002 WL 31133287, at *42 (N.D. Ill. Sept. 26, 2002) (citing *Corlett v. Caserta*, 562 N.E.2d 257, 264 (Ill. App. Ct. 1990)). *See also Smith v. Great Am. Rest., Inc.*, 969 F.2d 430, 437 (7th Cir. 1992). Flint Hills submitted more than sufficient evidence that it incurred these challenged costs to keep the Joliet Plant in operation after the breach of the PSA and to minimize the ultimate costs of doing so. As the testimony demonstrated, Flint Hills incurred a substantial portion of these costs for replacing – rather than repairing – certain equipment when practical because the cost of repair was lower than the cost of replacement. Reviewing the evidence in the light most favorable to Flint Hills, there was more than sufficient evidence for the jury to reasonably conclude that the rental costs and the challenged inspection, testing, and remediation expenses

were incurred by Flint Hills in order to mitigate its damages from the breach of the PSA and to reduce its costs of bringing the Assets into the warranted condition.

Viewing all of the evidence in the light most favorable to Flint Hills, BP Amoco is not entitled to judgment as a matter of law on any of these issues. Flint Hills introduced more than sufficient evidence from which the jury could reasonably have reached its verdict.

## III.    A New Trial is Not Warranted

In deciding on a motion for a new trial under Rule 59, the "district court must determine whether the verdict was against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Westchester Fire Ins. Co. v. General Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999) (citations and quotations omitted). The court "will not overturn a jury's verdict as long as there is a reasonable basis in the record to support it." *Id.* (citations and quotations omitted). A party seeking a new trial based on a district court's alleged erroneous evidentiary rulings bears a "heavy burden." *Alverio v. Sam's Warehouse Club,* 253 F.3d 933, 942 (7th Cir. 2001). The Seventh Circuit reviews "the exclusion of evidence for abuse of discretion and gives considerable deference to the trial judge," and thus, "even if a judge's rulings are found to be erroneous, they may be deemed harmless if the record indicates that the end result of the trial would have remained unchanged." *Id.* (internal citation omitted). In other words, a "new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Cerabio LLC v. Wright Med. Tech., Inc.,* 410 F.3d 981, 994 (7th Cir. 2005) (internal citation omitted).

BP Amoco seeks a new trial based on the Court's interpretation of various provisions in the PSA; the sufficiency of the evidence to support certain claims; the jury instruction on the measure of damages; the admission of summary charts at trial pursuant to Rule 1006; the admission of certain expert testimony; the Court's ruling that Flint Hills did not spoliate certain evidence; and various evidentiary rulings at trial. BP Amoco cannot meet its heavy burden of establishing that a new trial is warranted.

**A.  Contract Interpretation**

BP Amoco first argues that it is entitled to a new trial based on the Court's interpretation of the PSA. Illinois law governs the interpretation of the PSA. "In Illinois, as in other states, if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence." *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir. 2009) (citing *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 163 Ill. Dec. 510, 581 N.E.2d 664, 667 (Ill. 1991)). Whether a contact is ambiguous is a question of law. *Id.* As the Seventh Circuit teaches:

> The question of contract ambiguity turns largely on whether the contract language is "reasonably susceptible to more than one meaning," *Susmano v. Associated Internists of Chi., Ltd.,* 97 Ill.App.3d 215, 52 Ill. Dec. 670, 422 N.E.2d 879, 882 (1981), although ambiguity may also exist where the language used is "obscure in meaning through indefiniteness of expression," *Platt v. Gateway Int'l Motorsports Corp.,* 351 Ill. App. 3d 326, 286 Ill. Dec. 222, 813 N.E.2d 279, 283 (2004).

*Curia*, 587 F.3d at 829. *See also Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 379-80 (7th Cir. 2009) ("A contract is ambiguous if its terms are indefinite or have a double meaning.").

"The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 226 Ill. 2d 208, 232, 314 Ill. Dec. 133, 148, 874 N.E.2d 43, 58 (Ill. 2007). Under Illinois law, contracts are interpreted according to the "four corners" rule:

"'[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it.  It speaks for itself, and the intention with which it was executed must be determined by the language used.  It is not to be changed by extrinsic evidence.'"  *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992-93 (7th Cir. 2007) (quoting *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005) (citations and internal quotation marks omitted)). Courts first look to the language of the contract alone.  *Camico*, 474 F.3d at 993 (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 236 Ill. Dec. 8, 10, 706 N.E.2d 882, 884 (Ill. 1999)); *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58 ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.").  Under Illinois law, contract terms are interpreted according to their plain meaning unless otherwise defined.  *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004).  "Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent."  *Id.*; *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58.  Furthermore,

> it is long established that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other.

*Curia*, 587 F.3d at 829 (citations omitted).  Courts only look to extrinsic evidence to determine the intent of the parties where the contract is ambiguous.  *Lewitton,* 585 F.3d at 379.

## 1. The Production Capacity Warranty Was Ambiguous

As noted above, Section 7.1(d)(ii) of the PSA sets forth the production-capacity warranty at issue in this case. It specifically warrants that the "annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons, respectively." BP Amoco challenges the contractual interpretation of this ambiguous representation.

The PSA does not define "annualized maximum demonstrated sustainable production." In advance of trial, the Court held that the production capacity representation on its face was ambiguous as to whether the parties intended the representation to warrant the capacity of each production unit running simultaneously or individually. (R. 319-1, Mem., Op., & Order.) Similarly, the Court held that "sustainable production" was ambiguous on its face. (*Id.*) Because BP Amoco did not move for summary judgment based on the use of extrinsic evidence to define the unambiguous terms, the ruling was based on the PSA's plain language. The parties, therefore, submitted extrinsic evidence to the jury to support their respective interpretations of this ambiguous language.

In reaching its holding that the language is ambiguous, the Court thoroughly analyzed the plain language of the PSA and the production capacity warranty. (*Id.*) Indeed, expert testimony at trial established that the production capacity representation was "unique" to this case, not used in the industry, and not defined in any technical literature. (Tr. at 1703, 1723-25.) BP Amoco has failed to raise any argument as to why the ruling warrants a new trial.

Based on its construction, the Court instructed the jury as to the terms it found unambiguous:

With regard to the representation and warranty that: "The annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid and MAN production units at the Joliet Plant are 71,000 metric tons, 170,000 metric tons, and 51,000 metric tons, respectively, with the product produced meeting Seller's standard specifications therefor, recognizing that such demonstrated capacity does not take into account planned or unplanned downtime." "Maximum" is an upper boundary which actual rates may fall below. "Downtime" means when the production units are not operating and, as a result, have zero output.

(R. 907-1, Jury Instructions at 26.)

## 2.       Condition-of-Assets Warranty

In addition, BP Amoco challenges the Court's interpretation of language in the condition-of-assets warranty. In Section 7.1(d)(ii) of the PSA, BP Amoco warranted that "all tangible Assets have been maintained substantially in accordance with normal industry practice, are in substantially good operating condition and repair for their age (taking account of their nature, normal wear and tear and continued repair and replacement in accordance with Seller's past practice) . . . ." In ruling on one of BP Amoco's summary judgment motions, the Court construed the unambiguous term "all tangible Assets" to refer to "each and every tangible asset at the Joliet Plant – not the Joliet Plant as a whole." (R. 348-1, Order at 6-7.) As such, the court instructed the jury:

With regard to the representations and warranties that: "[A]ll tangible Assets have been maintained substantially in accordance with normal industry practice . . . ," and "[A]ll tangible Assets . . . are in substantially good operating condition and repair for their age (taking account of their nature, normal wear and tear and continued repair and replacement in accordance with Seller's past practice) . . . ." The term "all tangible Assets" includes each and every tangible asset at the Joliet Plant.

(R. 907-1, Jury Instructions at 26.)

BP Amoco contends that the Court erred in this interpretation of "all tangible Assets." Instead, BP Amoco asserts that the representation of "all tangible Assets" refers instead to the

Joliet Plant's equipment as a whole, not individually. For the reasons set forth in detail in the Court's prior ruling, the plain language of the PSA supports the Court's ruling. (R. 348-1, Order at 3-7.) *See also Roche v. County of Lake*, 205 Ill.App.3d 102, 113, 150 Ill. Dec. 407, 413, 562 N.E.2d 1210, 1216 (Ill. App. Ct. 1990). The contract was not reasonably susceptible to more than one meaning. Instead, the plain meaning of the warranty in the context of the entire agreement made clear that "all tangible Assets" refers to each and every tangible asset at the Joliet Plant.

Further, BP Amoco's interpretation of the condition-of-assets representation would render meaningless Section 13.4 of the PSA, which provides that BP Amoco is obligated to indemnify Flint Hills for a breach of a PSA representation only when Flint Hills' losses "attributable to the particular breach of representation or warranty which is the subject matter of a Seller Warranty Breach[] exceed seventy five thousand dollars ($75,000) (such amount, the 'Minimum Breach Claim Indemnifiable Amount')." A breach of the condition-of-assets representation under BP Amoco's "as a whole" construction would necessarily result in losses greater than $75,000. Moreover, the reference in Section 13.4 to losses "attributable to the particular breach of representation or warranty" confirms the conclusion that the parties contemplated multiple breaches of each representation, which would only occur if the condition-of-assets representation refers to individual assets, rather than the Joliet Plant "as a whole" or the tangible assets "collectively."

### B.     Proof of the Production Capacity Warranty

BP Amoco next asserts that it is entitled to a new trial because Flint Hills failed to prove the meaning of the ambiguous production-capacity representation at trial, and thus it is entitled

to a new trial.  To the contrary, viewing all the evidence in the light most favorable to Flint Hills, Flint Hills produced more than sufficient evidence of the meaning of the production capacity. The evidence sufficiently supported that BP Amoco warranted the maximum production capacity of each of the three chemical units – 71,000 metric tons of TMA, 170,000 metric tons of PIA, and 51,000 metric tons of MAN – when all three units were operating simultaneously at maximum capacity.

Dr. Russell Ogle, for example, gave extensive testimony about the meaning of AMDSP. (Tr. at 1729-38.)   Flint Hills called Dr. Ogle as an expert at trial.  Dr. Ogle is a licensed Professional Engineer who specializes in the investigation of complex industrial accidents and frequently performs production analyses of chemical-process systems like those found at the Joliet Plant.  Based on his experience, he opined on the meaning of the ambiguous phrase and each of the individual terms.  (*Id.*)  This testimony provided an adequate basis for Flint Hills' interpretation of this ambiguous language.  In addition, Steve Sanders and Jim Mahoney testified about their understanding of the representation at the time of the sale.

BP Amoco makes factual arguments regarding the weight of this evidence.  These factual issues, however, were matters for the jury.  *Hossack v. Floor Covering Assocs. of Joliet, Inc.,* 492 F.3d 853, 859 (7th Cir. 2007) ("the court can neither reweigh the evidence nor make its own credibility determinations").

C.      AMDSP Rates

BP Amoco next claims that it is entitled to a new trial because Flint Hills failed to introduce evidence of the actual AMDSP rates, and therefore, it failed to prove that the Joliet Plant could not meet the AMDSP representation.  The Court disagrees.

Flint Hills introduced an abundance of evidence to support the jury's verdict that the AMDSP representation in the PSA was untrue. The evidence established that the Joliet Plant could not sustainably produce the represented amounts of 170 metric tons of PIA, 71 metric tons of TMA, and 51 metric tons of MAN. Dr. Ogle testified as Flint Hills' production capacity expert. Dr. Ogle testified that the Joliet Plant could not produce at the rates represented in the PSA due to various bottlenecks. He reviewed the historical production capacity data and prepared various charts to explain the data. After discussing the bottlenecks at the Joliet Plant and his extensive review of the historical data, Dr. Ogle gave the following opinion:

> Q.  This section states, "The annualized maximum demonstrated sustainable production of the TMA, purified isophthalic acid, and MAN production units at the Joliet plant are 71,000 metric tons, 170,000 metric tons and 51,000 metric tons, respectively, with the product produced meeting seller's standard specifications, therefore, recognizing that such demonstrated capacity does not take into account planned or unplanned downtime." In your opinion, is that representation and warranty accurate as of May 28th, 2004?
>
> A.  No, it is not.
>
> Q.  Running together, can the TMA, purified isophthalic acid, and MAN production units produce at the rates represented in the PSA in this section?
>
> A.  No, there are too many bottlenecks, due to shared resources.
>
> Q.  Running separately, assuming away all shared resource limitations, can any of these units individually produce at these rates?
>
> A.  No.

(Tr. at 1652-53.) This testimony alone was sufficient for the jury to conclude that the Joliet Plant could not produce the three chemicals at the rates represented in the PSA.

Flint Hills also introduced testimony from Kim Dray, a BP Amoco engineer who worked at the Joliet Plant. She testified that as of the date of the sale of the Joliet Plant, the maximum

rate that TMA could produce at was 66 metric tons, and the maximum rate that PIA could

produce at was 131 metric tons. (*Id.* at 1281-82, 1352-54; *see also* Trial Ex. 1034.)

In addition, Thomas Stephan, BP Amoco's former Technology Manager who had various

engineers and chemists reporting to him at the relevant time, including two from the Joliet Plant,

testified about the production capacity. During his years of work at BP Amoco, Mr. Stephan had

expensive experience with both the PIA and TMA chemicals. Mr. Stephan testified that in late

March or early April of 2003, he raised a concern with BP Amoco employee John Dueker about

the production-capacity representation in the PSA. (Tr. at 830-31.) Specifically, he questioned

Mr. Dueker about the representation that the Joliet Plant's production capacity for PIA was 170

metric tons. Mr. Stephan testified that he raised this concern because "the plant had had

difficulty and had not reached rates anywhere near that, and we had documents relating to the

capacity of the plant and the bottlenecks that indicated it was significantly less than that." (*Id.*)

In response, Mr. Dueker told Mr. Stephan that the deal team for the sale of the Joliet Plant would

determine what information to provide to the buyers and that BP Amoco did not have any

obligation to provide them with complete information. (*Id.* at 831-32.) Mr. Stephan also

testified that based on his experience and taking into account downtime, the Joliet Plant was not

capable in May of 2004 of producing 170,000 metric tons of PIA, 71,000 metric tons of TMA

and 51,000 metric tons of MAN. (*Id.* at 916-17.)

While Dr. Van Brunt, BP Amoco's expert, testified that the Joliet Plant was capable of

producing the chemicals at the AMDSP rates in the PSA, this conflicting testimony was an issue

for the jury. Indeed, issues of credibility and weight of the evidence are left for the jury. *See*

*Harvey*, 377 F.3d at 712.

BP Amoco's argument regarding effective capacity is similarly unavailing. It asserts that Flint Hills improperly argued that BP Amoco had warranted the effective capacity numbers in the PSA, not the AMDSP. BP Amoco, however, fails to cite any place where Flint Hills made such an argument to the jury. Furthermore, neither Mr. Sanders nor Mr. Mahoney testified that the PSA warranted effective capacity. To the contrary, they both testified that the effective capacity could be calculated from the rates warranted in the PSA, not that the PSA warranted effective capacity. (Tr. at 2206-09; 230-31; 233.) As Mr. Sanders explained: "Effective capacity is a mathematical calculation. It's simply the annualized maximum demonstrated sustainable production capacity, times a factor. So, if that nameplate capacity goes down, necessarily the effective capacity goes down in lockstep." (Tr. at 2208-09.)

### D. Metaxylene

BP Amoco also argues that Flint Hills overlooked an "indisputable fact" that the Joliet Plant's production for PIA was independently constrained by a lack of metaxylene, the feedstock for PIA. It further argues that Flint Hills' damages were not caused by a breach, but instead were caused by the lack of feedstock. BP Amoco made this factual argument to the jury, and the jury rejected it. BP Amoco is essentially asking the Court to re-weigh the evidence. This is not a basis for a new trial. *Hossack,* 492 F.3d at 859 ("the court can neither reweigh the evidence nor make its own credibility determinations").

### E. Jury Instruction

At the close of the case, the Court instructed the jury that it had been presented with two measures of damages – cost of repair and diminution in value – and explained the meaning of each of these measures. The Court then instructed the jury as follows regarding damages for a

breach of contract under Illinois law:

> If you find a breach of contract based on one or more representations and warranties, you should assess as damages Flint Hills' reasonable expenditures necessary to put the purchased property into the condition represented and warranted, including the amount you find that Flint Hills is reasonably certain to incur in the future to do so, in accordance with the Cost-of-Repair measure, unless you conclude, from your consideration of the evidence, that such an amount would be unreasonably disproportionate to the benefit to the purchaser or grossly disproportionate to the results obtained, in which case you should instead award Flint Hills the difference between the fair market value of the purchased property as actually delivered, and the fair market value the purchased property would have had if the property had been in the condition represented and warranted, in accordance with the Diminution-in-Value measure.

> It is for you to decide which of these two measures of damages to apply, and what the appropriate amount of Flint Hills' recoverable damages should be.

(R. 907-1, Jury Instructions at 35.)

BP Amoco argues that this instruction is legally incorrect because the jury had the option of awarding these damages as alternative measures. According to BP Amoco, Flint Hills was instead required to prove both measures of damages and could only award the lesser amount. As explained in detail in the Court's prior rulings, BP Amoco's argument fails under both the PSA and Illinois law on damages. (R. 437-1, Mem. Op., & Order at 5-12.)

The PSA expressly provides that BP Amoco will indemnify Flint Hills for all "damages" "incurred" as a result of a breach of Section 7.1 "to the fullest extent permitted by Law." Under Illinois law, which governs the interpretation and enforcement of the PSA, the injured party in a breach-of-contract case is entitled to be placed in the position it would have been in absent the breach. *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 932 (7th Cir. 2002); *Sharon Leasing, Inc. v. Phil Terese Transp., Ltd.*, 299 Ill.App.3d 348, 356, 233 Ill. Dec. 876, 882, 701 N.E.2d 1150, 1156 (Ill. App. Ct. 1998). It is well-settled under Illinois law that the measure of

damages for breach of warranty involving injury to real property, even in a commercial dispute, is generally the "cost of repair." *Park v. Sohn*, 89 Ill. 2d 453, 464, 60 Ill. Dec. 609, 615, 433 N.E.2d 651, 657 (Ill. 1982); *Arch of Ill., Inc. v. S.K. George Painting Contractors, Inc.*, 288 Ill.App.3d 1080, 1082, 224 Ill. Dec. 428, 429, 681 N.E.2d 1049, 1050 (Ill. App. Ct. 1997). *See also Kunkel v. P.K. Dependable Const.*, 387 Ill.App.3d 1153, 1158 (Ill. App. Ct. 2009). An exception applies, "[i]f, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or if correcting them would entail unreasonable destruction of the builder's work." *Park*, 89 Ill. 2d at 464, 60 Ill. Dec. at 615, 433 N.E.2d at 657. In such cases, "the amount by which the defects have reduced the value of the property should be the measure of damages." *Id.*; *Arch*, 288 Ill.App.3d at 1082, 224 Ill. Dec. at 429-30, 681 N.E.2d at 1050-51 (noting that if this exception applies "the measure of damages is the amount by which the defects have reduced the value of the property as a whole"); *Meyers v. Woods*, 374 Ill.App.3d 440, 453-54, 312 Ill. Dec. 760, 772, 871 N.E.2d 160, 172 (Ill. App. Ct. 2007).

Diminution-in-value damages may be appropriate here if the repair costs are "unreasonably disproportionate to the benefit to the purchaser" or are grossly "disproportionate to the results obtained." *Witty v. C. Casey Homes, Inc.*, 102 Ill.App.3d 619, 625, 58 Ill. Dec. 249, 254, 430 N.E.2d 191, 196 (Ill. App. Ct. 1981). *See also Linhart v. Bridgeview Creek Dev., Inc.*, 391 Ill.App.3d 630, 639, 909 N.E.2d 865, 874 (Ill. App. Ct. 2009). As one Illinois court explained:

> The determination of which measure of damages to apply is usually a question for the jury. The jury should be permitted to hear evidence on both the cost of repairs and the diminution in value. Then, the jury should be instructed that the usual measure of damages is the cost of correcting the defects and that the diminution-in-value method applies only if it finds that one of the two exceptions exist.

*Arch*, 288 Ill.App.3d at 1082-83, 224 Ill. Dec. at 430, 681 N.E.2d at 1051 (citations omitted).

The Court instructed the jury consistent with this Illinois law. Accordingly, BP Amoco is not entitled to a new trial on this basis.

Further, the jury's verdict was less than both the diminution-in-value and the cost of repair here. Any error is therefore harmless. *See United States v. Ramirez*, 574 F.3d 869, 883 (7th Cir. 2009); *Thompson v. City of Chicago*, 472 F.3d 444, 456 (7th Cir. 2006).

### F.     Damages Issues

The parties disputed various aspects of the evidence supporting damages in advance of trial. In its motion, BP Amoco again challenges the admission of the summary charts supporting Flint Hills' damages and the admissibility of the opinions of Flint Hills' damages experts. Both of these arguments fail.

### 1.     Summary Chart Evidence Was Properly Admitted

BP Amoco challenges the admission of certain summary charts on the ground that the underlying documents for the summary charts were hearsay and that the spending summaries were "riddled with errors." Federal Rule of Evidence 1006 governs the admissibility of such summaries and provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

*See also generally United States v. Isaacs*, 593 F.3d 517, 527-28 (7th Cir. 2010).

Rule 1006 facilitates the presentation of "voluminous" data at trial. Fed.R.Evid. 1006. If a large amount of data cannot be "conveniently examined in court," the parties may be allowed

to submit summaries of the data in place of the underlying documents. *Id.*; *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990). In addition, "[t]he admission of a summary under Fed.R.Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and . . . [a showing] that the summary is accurate . . . .'" *Judson Atkinson Candies*, 529 F.3d at 382 (citing *Briscoe*, 896 F.2d at 1495). A witness who testifies about the summary need not have personally calculated the underlying data, but he or she must be "knowledgeable about . . . how the original data was collected" or computed. *Sportmart, Inc. v. Spirit Mfg., Inc.*, No. 97 C 7120, 2000 WL 343467, at *4 (N.D. Ill. Mar. 30, 2000). The "proponent of the summary [must] demonstrate that the underlying records are accurate and would be admissible as evidence." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009) (citations omitted).

BP Amoco argues that the Court improperly admitted the documents underlying the summary charts because they were hearsay and did not qualify for the business-records exception to the hearsay rule. While the Federal Rules of Evidence prohibit the admission of hearsay evidence at trial, Federal Rule of Evidence 803(6) sets out a hearsay exception for business records. "A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of regularly conducted business activity, and that it was the regular practice of that business to make such records." *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999) (citing *Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998)). Once the proponent of a summary has established that certain records are, in fact, business records, a summary of those records is admissible under Rule 1006, subject to that rule's separate requirements. *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990).

Flint Hills established at trial that the underlying records for its summaries fell within the business-records exception. BP Amoco fails to identify any specific documents that it claims the Court improperly admitted. The majority of the underlying documents consisted of work orders and purchase orders. Rick Morris, Flint Hills' Reliability Manager, testified that these documents were incorporated into Flint Hills' records, maintained in the course of Flint Hills' regularly-conducted-business activity, and relied upon by Flint Hills. Accordingly, as discussed above, the purchase orders and work orders underlying the summary charts fell within the business-records exception to the hearsay rule. *See United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) ("a record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied"); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1342-44 (Fed. Cir. 1999) (affirming admission of documents prepared by third parties and integrated into records of another business entity as business records under Rule 803(6)); *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990); *Krawczyk v. Centurion Capital Corp.*, No. 06 C 6273, 2009 WL 395458, at *4 (N.D. Ill. Feb. 18, 2009).

BP Amoco's argument that Mr. Morris did not have the personal knowledge to lay the foundation for the admissibility of the documents underlying the summary charts is equally unavailing. Indeed, "[a] qualified witness does not need to be the person who prepared the records or have personal knowledge of the information contained, but the witness must have knowledge of the procedure by which the records were created." *United States v. Given,* 164 F.3d 389, 394 (7th Cir. 1999). As the Seventh Circuit has noted, the exception "clearly does not require that the witness have personal knowledge of the entries in the records. The witness need

only have knowledge of the procedures under which the records were created." *United States v. Christ*, 513 F.3d 762, 769-70 (7th Cir. 2008) (citing *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984)). Similarly, Mr. Daugherty – Flint Hills' Controller, who created and testified regarding the summary charts – did not have to lay the foundation for the underlying documents.

BP Amoco later states that "[a] single inadmissible underlying document precludes admission of the entire summary." The cases that BP Amoco cites for support, however, do not stand for this proposition. In *Judson Atkinson Candies*, for example, the court found that a summary exhibit should be excluded not solely because a piece of underlying data was inadmissible, but rather because the summary's proponent failed to "authenticate the summaries in any way." *Id.* at 382. In any event, BP Amoco fails to identify any particular documents that the Court admitted in error.

In sum, BP Amoco's conclusory statements without specific examples of how they were prejudiced fail to establish a basis for a new trial.

## 2.     The Court Properly Admitted Baliban's Opinions

Next, BP Amoco asserts that the Court should have excluded the opinions of Jeffrey Baliban, Flint Hills' expert on damages, for the reasons "previously explained" in various pleadings. (R. 922-1, Mem. at 18.) In a very cursory fashion, BP Amoco merely rehashes arguments previously rejected by the Court or raises arguments going to the weight of Baliban's testimony. Because the Court properly exercised its "gate-keeper" function and concluded that Baliban's testimony was both reliable and relevant, BP Amoco has failed to establish error. *See Winters v. Fru-Con Inc*., 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)).

In advance of trial, the Court addressed BP Amoco's motion to strike Baliban's testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Indeed, the Court held a *Daubert* hearing to determine whether Baliban's valuation conflicted with the provision of the PSA that precluded recovery of lost profits.  After reviewing the extensive briefing and conducting the *Daubert* hearing, the Court engaged in a careful *Daubert* analysis and concluded that Baliban's opinions were both relevant and reliable and therefore ultimately permissible under both the mandates of *Daubert* and Rule 702.  (R. 561-1, Order; R. 669-1, Order.)  *See United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (district court has "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis in original)).  BP Amoco again moved to strike Baliban's opinions after he testified at trial.  The Court again denied the motion after conducting a *Daubert* analysis and provided the parties with its detailed analysis. (R. 886-1, Order.)  BP Amoco provides no basis to conclude that there was error in these rulings.

Flint Hills retained Baliban to determine the value of the Joliet Plant attributable to the difference between the production capacities represented in the PSA and the "true capacities" alleged by Flint Hills.  Given that both cost of repair and diminution-in-value are permissible alternative measures of recovery under the PSA, Baliban's opinions regarding diminution in the

value of damages were certainly relevant. Furthermore, as detailed in prior rulings, Baliban's methodology in assessing the diminution-in-value damages was reliable. (R. 561-1, Order; R. 886-1, Order.) The weight to give to Baliban's opinions was up to the jury.

Even if Baliban's opinions were improperly admitted, Flint Hills introduced sufficient evidence for the jury's verdict based on its extensive evidence of its cost-of-repair damages. As such, BP Amoco is not entitled to a new trial.

> **3. Sharon Moore Bettius' Opinions Met the Standards of Both Federal Rule of Evidence 702 and *Daubert***

Similarly, BP Amoco argues that the Court should have barred Ms. Bettius from testifying and that it is entitled to a new trial based on the admission of her expert testimony. The Court disagrees.

Flint Hills offered Sharon Moore Bettius – who has over 20 years of experience providing valuation consulting, valuation opinions, and expert testimony to more than 500 public and private companies for a variety of purposes, such as transaction pricing and structuring, bankruptcy, solvency opinions, financial statement reporting, and dispute resolution to offer opinions – to testify regarding diminution-in-value damages. Ms. Bettius used the market approach and income approach to opine that the fair market value of the PCBU as of May 29, 2004, was $200 million, compared to the purchase price of $300 million. Again, the Court conducted a thorough *Daubert* analysis and concluded that (1) Ms. Bettius was qualified as an expert based on her knowledge, skill, experience, and training; (2) her reasoning and the methodology underlying her opinions was scientifically reliable; and (3) her testimony regarding the diminution in value of the Joliet Plant would certainly assist the jury in determining damages. (R. 561-1, Order.) "The focus of the district court's *Daubert* inquiry must be solely on the

principles and methodology, not on the conclusions they generate." *Winters*, 498 F.3d at 741. BP Amoco fails to identify any error in this ruling.

### G. Spoliated Evidence

BP Amoco next claims that it is entitled to a new trial based on its argument that Flint Hills spoliated certain equipment at issue in the case and destroyed e-mails. It argues that the Court should have dismissed certain claims based on this "spoliated" evidence and, at a minimum, given the jury an adverse inference instruction. BP Amoco's arguments fail.

Spoliation sanctions are appropriate when a party has a duty to preserve evidence, yet intentionally destroys such evidence in bad faith. *See Trask-Morton v. Motel 6 Operating L.P.,* 534 F.3d 672, 681 (7th Cir. 2008); *Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 644 (7th Cir. 2008). It is clear that the "destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the [defendant's] case." *Park v. City of Chicago,* 297 F.3d 606, 615 (7th Cir. 2002). "The crucial element is not that evidence was destroyed but rather the reasons for the destruction." *Faas*, 532 F.3d at 644; *see also S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.,* 695 F.2d 253, 258 (7th Cir. 1982) ("the crucial element is not that the evidence was destroyed but rather the reason for the destruction."). "Bad faith" is a prerequisite to imposing sanctions for the destruction of evidence. *See Trask-Morton,* 534 F.3d at 681. "A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." *Faas*, 532 F.3d at 644.

As the Court noted in its April 2, 2009, ruling on this issue, BP Amoco's initial spoliation motion was untimely, thus it cannot serve as the basis for a new trial. (R. 362-1, Order.)

44

Further, as described in detail in the prior ruling, BP Amoco either had the e-mails at issue or the relevant financial information underlying the e-mails, thus it failed to establish any bad faith on Flint Hills' part. (R. 362-1, Order.) BP Amoco also failed to establish that Flint Hills acted in bad faith regarding the equipment at issue because Flint Hills made a reasonable effort to retain the equipment and preserve evidence regarding the equipment. (*Id.*) In sum, BP Amoco failed to present any evidence that Flint Hills intentionally destroyed the evidence in bad faith.

In addition, BP Amoco fails to identify how this alleged spoliated evidence had any impact on the jury's verdict. Without more, it has failed to establish that any such "error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Cerabio,* 410 F.3d at 994.

### H. Rick Morris' Notes

BP Amoco next seeks a new trial based on the Court's denial of BP Amoco's request to have Mr. Morris produce certain handwritten notes that he took in advance of trial. As noted above, Rick Morris testified at length during the trial. BP Amoco's attorneys informed the Court that they observed Mr. Morris taking and reviewing notes while waiting outside the courtroom. In response to questions outside the presence of the jury, Mr. Morris explained that he did take notes and that he had taken them "at the law office, in working on preparation with Mr. Figliulo." (Tr. at 4373.) Mr. Morris did not take any of the notes on his own – he took them only during preparation with Flint Hills' attorneys. (*Id.*)

On cross examination, Mr. Morris testified that he met with Flint Hills' lawyers in advance of his testimony, and he took written notes while at the meetings with these lawyers in a small notepad. Mr. Morris further admitted on cross examination that he had used the notes to

refresh his recollection. There is no evidence that Mr. Morris referred to the notes while testifying – he reviewed them in advance of his testimony and at least once during a break before cross examination. Pursuant to Federal Rule of Civil Procedure 612, the Court, in its discretion, denied BP Amoco's request to obtain a copy of Mr. Morris' notes. BP Amoco now argues that this ruling requires a new trial.

In addressing evidentiary issues, "[a] new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury . . . , and the result is inconsistent with substantial justice." *Cerabio*, 410 F.3d at 994 (citations omitted). This ruling does not warrant a new trial.

Federal Rule of Civil Procedure 612 provides, in relevant part:

> [I]f a witness uses a writing to refresh memory for the purpose of testifying, either – (1) while testifying, or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

Although Mr. Morris took the notes to refresh his recollection on certain issues, BP Amoco thoroughly cross examined him on both the substantive issues and the fact that he took the notes while preparing to testify. In fact, BP Amoco extensively cross examined Mr. Morris for approximately an entire day. During this time, BP Amoco cross examined Mr. Morris on the number of meetings he had with Flint Hills' attorneys, the type of notes he took, the amount of notes he took, the use he made of the notes, and over what period of time he took the notes. BP Amoco brought out before the jury that Mr. Morris met with Flint Hills' attorneys in advance of his testimony on multiple times, took notes during his meetings with Flint Hills' attorneys, and reviewed these notes for his testimony. BP Amoco had this testimony to argue credibility and

memory issues to the jury regarding Mr. Morris. The Court did not abuse its discretion. *See United States v. Blas*, 947 F.2d 1320, 1326 (7th Cir. 1991).

Further, the Court took possession of Mr. Morris' notes during his testimony and reviewed them. Nothing in this review changed the Court's ruling.

Moreover, even if BP Amoco was entitled to review the notes, a new trial is not warranted because BP Amoco cannot establish that this evidentiary ruling is inconsistent with substantial justice or that it had a substantial and injurious effect or influence on the jury's determination. The trial lasted nine weeks, and the jury heard 41 witnesses. Given the volume of testimony and documentary evidence, BP Amoco cannot establish that the failure to receive the notes of one witness warrants a new trial, especially given the extensive and thorough cross examination BP Amoco conducted of that witness.

## I.      Other Evidentiary Issues

Finally, BP Amoco seeks a new trial based on various evidentiary rulings in advance of trial, including multiple rulings on the exhaustive motions *in limine*. As the Seventh Circuit has noted, it "will order a new trial based on erroneously excluded evidence only if [it] determine[s] that the district court abused its discretion in excluding the evidence and that such error prejudiced substantial rights of the appellant." *Thomas v. United States*, 41 F.3d 1109, 1119 (7th Cir. 1994) (citations omitted). *See also Harris v. City of Chicago,* 266 F.3d 750, 755 (7th Cir. 2001). "[E]videntiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000). BP Amoco has failed to establish error or prejudice to its substantial rights.

### 1.    Late Production of Documents

BP Amoco first seeks a new trial based on the late production of certain documents by Flint Hills in advance of trial.  BP Amoco waited until approximately two months after the untimely production and two months before the commencement of the trial to raise this issue with the Court.  Federal Rule of Civil Procedure 37(c)(1) vests the Court with broad discretion to preclude the use of evidence which a party fails to disclose during discovery or to impose other sanctions for such violations of discovery obligations.  *See Keach v. U.S. Trust Co.*, 419 F.3d 626, 640 (7th Cir. 2005) ("The decision to admit previously undisclosed testimony is entrusted to the broad discretion of the district court.").

BP Amoco contends that a new trial is warranted because the Court denied its request to strike certain claims associated with the late production of documents.  In making this argument, BP Amoco fails to acknowledge the extensive relief the Court provided BP Amoco based on Flint Hills' late production.  Specifically, the Court barred Flint Hills from using the untimely-produced documents at trial, precluded Flint Hills from calling certain witnesses at trial, permitted BP Amoco to take additional depositions at Flint Hills' expense based on the late production, gave BP Amoco leave to subpoena additional documents, and permitted BP Amoco to issue supplemental expert reports.  (R. 671-1, Order; R. 758-1, Order.)  This relief sufficiently sanctioned Flint Hills for the late production of the documents and cured any potential prejudice to BP Amoco.  BP Amoco does not explain how this ruling prejudiced its substantial rights.  Accordingly, it has failed to establish a basis for a new trial.

### 2.    BP Amoco's Price Concessions

Prior to the commencement of trial, the Court granted without prejudice Flint Hills'

motion *in limine* to preclude BP Amoco from introducing evidence that Flint Hills received a

$19 million reduction in the purchase price of the PCBU.  (R. 736-1, Order.)  BP Amoco argued

that this pre-sale adjustment in the purchase price arose out of Flint Hills' due diligence concerns

about the condition of certain assets at issue in Flint Hills' breach of warranty claims.  BP

Amoco sought to admit such evidence of pre-sale purchase price negotiations as evidence of the

due diligence process and to support its betterment defense that Flint Hills would receive an

impermissible betterment if awarded the full amount of damages it sought on its condition-of-

assets claims because the pre-sale reduction already took the condition into consideration.

Admission of evidence regarding the pre-sale agreement would have violated the parol

evidence rule.  The parol evidence rule "generally excludes evidence of prior agreements or

contemporaneous oral agreements if the evidence is introduced to vary or contradict the terms of

a[n] [integrated] written contract."  *IFC Credit Corp. v. Burton Indus., Inc.*, 536 F.3d 610, 614

(7th Cir. 2008).  In addition, Section 16.7 of the PSA contains an integration clause.  The Court

precluded the use of this evidence of the negotiations leading up to the signing of the PSA to

limit or modify the unambiguous terms of the contract.  *Extra Equipamentos E Exportacao Ltda.*

*v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008).  BP Amoco fails to articulate how the

preclusion of this evidence prejudiced its substantial rights.

### 3.    Modus Operandi Evidence

Prior to trial, the Court granted Flint Hills' motion *in limine* to preclude BP Amoco from

introducing evidence regarding two prior litigation matters: (1) a civil action filed in March of

2008 involving an acquisition by Koch Industries[6] of a company known as Invista (the "Invista Litigation"); and (2) a previously settled civil action that was filed in 2005 involving Flint Hills' acquisition of certain refinery assets from Kerr McGee (the "Kerr McGee Litigation"). BP Amoco sought to admit evidence of these prior lawsuits pursuant to Federal Rule of Evidence 404(b) as evidence of Flint Hills' "modus operandi." Because the evidence did not meet the mandates of Rule 404(b), the Court granted Flint Hills' motion *in limine*. (R. 727-1, Order.)

Morever, the Court alternatively excluded the evidence under Federal Rule of Evidence 403 because any potential probative value of it was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, as well as by substantial delay. Admission of the other litigations would have resulted in mini-trials on the merits of those litigations, adding substantial delay to the nine-week trial that took place. *Mathis v. Phillips Chevrolet*, 269 F.3d 771, 775-76 (7th Cir. 2001).

BP Amoco fails to argue how the Court's exclusion of what essentially amounted to propensity evidence constituted an error, much less an error having a substantial and injurious effect or influence on the jury's determination. *See Giles v. Wyeth, Inc.*, 556 F.3d 596, 600 (7th Cir. 2009). As such, BP Amoco has failed to establish a basis for a new trial.

### 4. PCBU's Post-Transaction Profitability

BP Amoco argues that the Court erred when it precluded BP Amoco from introducing evidence of the post-sale financial performance of the PCBU. BP Amoco simply argues that

---

[6] Flint Hills is wholly owned by Koch Industries.

such evidence was "relevant and probative." BP Amoco fails to explain how the Court erred or how the alleged error prejudiced "substantial rights."

Prior to trial, the Court granted in part and denied in part without prejudice Flint Hills' motion to preclude the admission of evidence regarding the post-transaction-financial performance of the PCBU. (R. 746-1, Order.) During the trial, BP Amoco argued that Ms. Bettius had opened the door to the admission of this evidence. While the Court permitted BP Amoco to cross examine Ms. Bettius regarding certain post-transaction profitability evidence to test certain assumptions she made in giving her opinions, it precluded BP Amoco from introducing substantive evidence of the post-sale profitability. (R. 840-1, Order.) As such, the jury was instructed on the limited use of this evidence. (R. 862-1, Order.) Flint Hills did not open the door to the admission of this evidence, and any probative value of the evidence was substantially outweighed by the risk of confusion and misleading the jury because, in part, the PCBU includes other revenue-generating assets outside the Joliet Plant. (*Id.*)

### 5. Contract Compliance – Rule 30(b)(6) Witnesses

Finally, BP Amoco asserts that the Court should have admitted Glenn Personey's Rule 30(b)(6) deposition testimony regarding Flint Hills' belief that the condition-of-assets warranty was accurate at the time of the sale. In ruling, the Court found:

> The Court previously addressed this issue at a pretrial conference in this case – that prior ruling stands, and the Court sustains this objection pursuant to Rule 403. The question is misleading and any probative value is substantially outweighed by the danger of confusion and unfair prejudice. As BP has repeatedly argued in this case (and the Court has held multiple times) whether Flint Hills knew the representations were true or false at the time of the sale is irrelevant to the breach of contract claims in this case. Flint Hills has not opened the door to this testimony.

(R. 887-1, Order.)  *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 649 (7th Cir. 2002).  BP Amoco provides no basis to conclude that the Court abused its discretion in this ruling, or that the exclusion of one witness' deposition testimony during the course of a nine-week trial amounted to error.

## IV.     The Declaratory Judgment Action

BP Amoco filed a separate motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e) regarding its declaratory judgment claim.  (R. 933-1, Motion.)  Flint Hills argues that BP Amoco waived its right to pursue its declaratory judgment claim.  The Court agrees, and therefore denies BP Amoco's motion to alter or amend the judgment on its declaratory judgment claim.

On October 13, 2005, BP Amoco filed an amended complaint against Flint Hills seeking a declaratory judgment that BP Amoco did not breach the PSA.  Flint Hills then filed counterclaims against BP Amoco for breach of contract and fraud.  Prior to trial, BP Amoco did not object to Flint Hills' motion to realign the parties for trial given that Flint Hills had the burden of proof on the substantive claims.  (R. 480-1, Motion; R. 537-1, Response.)  As noted above, the parties thereafter were realigned for trial such that Flint Hills was the plaintiff and BP Amoco was the defendant.  (R. 539-1, Order.)

The parties filed their joint final pretrial order on July 22, 2009.  (R. 696-1, Proposed Pretrial Order.)  BP Amoco failed to specifically include any reference to its declaratory judgment claim in the final pretrial order.  Significantly, BP Amoco also failed to include its declaratory judgment claim in its proposed jury instructions or proposed verdict form filed with the final pretrial order.  (R. 696-8, Proposed Jury Instructions.)  Instead, BP Amoco's proposed

verdict form only included Flint Hills' claims against BP Amoco. (*Id.*) BP Amoco further failed to raise its declaratory judgment claim during the extensive proceedings in advance of trial. Additionally, BP Amoco never raised its declaratory judgment claim during the nine weeks of trial – it did not mention the declaratory judgment action in its opening statement, during the presentation of evidence, during the closing arguments, or during the multiple jury instruction conferences.

Following the jury trial and based on the jury's verdict, the Court entered judgment on November 13, 2009, for Flint Hills on its breach of contract counterclaim and for BP Amoco on Flint Hills' fraud counterclaim. On November 30, 2009, when the parties came into court for presentment of BP Amoco's motion for judgment as a matter of law and for a new trial, counsel for BP Amoco raised the issue of the declaratory judgment action for the first time. (11/30/09 Tr. at 6-8.) Specifically, counsel noted that BP Amoco still had its declaratory judgment action, and "obviously, the result is dictated by the result on the jury verdict." (*Id.* at 6-7.) On December 11, 2009, after consultation with the parties, the Court dismissed BP Amoco's claim for declaratory judgment regarding Flint Hills' breach-of-contract claim in light of the jury's verdict. (R. 926-1, Order.) BP Amoco thereafter filed a separate motion for judgment as a matter of law and for a new trial on the declaratory judgment action. BP Amoco, however, has waived its right to proceed with its declaratory judgment action.

The Seventh Circuit has "recognized that the pretrial conference and order are a vital part of the procedural scheme created by the Federal Rules of Civil Procedure." *Gorlikowski v. Tobert*, 52 F.3d 1439, 1443 (7th Cir. 1995). They are especially important "[b]ecause the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order

is treated as superseding the pleadings and establishes the issues to be considered at trial." *Id.* at 1443. *See also* Fed. R. Civ. P. 16(e); *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474, 127 S.Ct. 1397, 1409, 167 L.Ed.2d 190 (2007); *Wilson v. Kelkhoff*, 86 F.3d 1438, 1442 (7th Cir. 1996); *Erff v. MarkHon Indus., Inc.*, 781 F.2d 613, 617 (7th Cir. 1986). The final pretrial order should state claims specifically and clearly in order to inform the parties and the court what issues remain for trial. *See Wilson*, 86 F.3d at 1442 (a pretrial order must "clearly set forth the various issues the parties intend to litigate"). Moreover, a party waives any claim, issue, or theory by failing to include it in the pretrial order, even if the complaint contains those claims. *Wilson*, 86 F.3d at 1443; *see also SNA Nut Co. v. Haagen-Dazs Co., Inc.*, 302 F.3d 725, 732 (7th Cir. 2002) ("a claim or theory not raised in the pretrial order should not be considered by the fact-finder"); *Walker v. Anderson Elec. Connectors*, 944 F.2d 841 (11th Cir. 1991) (plaintiff waived her declaratory judgment claim where plaintiff sought declaratory judgment in her complaint but failed to include her declaratory judgment claim in the pretrial order). Because BP Amoco failed to even mention its declaratory judgment action in the final pretrial order or at the final pretrial conference, it has waived this claim.

BP Amoco's argument that it asserted its declaratory judgment claim in a timely manner fails based on the plain language of the final pretrial order. The final pretrial order states that "Flint Hills has brought claims alleging that BP Amoco breached [the contract]." (R. 696-1, Final Pretrial Order at 4.) It also states that "for Flint Hills' claim relating to BP Amoco's representation regarding the capacity of the production units at the Joliet Plant, Flint Hills also alleges that BP Amoco committed fraud." (*Id.*) The plain language of the final pretrial order –

including the proposed jury instructions and verdict form – reflect that only Flint Hills' claims remained for trial.

Similarly, BP Amoco's assertion in the final pretrial order that it "contends that it did not breach the terms of the PSA, that it did not make any false representations or warranties, or commit fraud, and that it does not owe Flint Hills any indemnification under the PSA," does not preserve its declaratory judgment claim. These broad denials of Flint Hills' allegations do not amount to an assertion of BP Amoco's declaratory judgment claim.

Second, BP Amoco's argument that it asserted its declaratory judgment claim also fails because BP Amoco failed to pursue its claim at trial. If a party fails to specifically raise its claims in a pretrial order and fails to raise its claims at trial, the party waives those claims. *See Wilson*, 86 F.3d at 1442-43 (where a pretrial order is vague, a court can consider the party's failure to include the claim in the jury instructions as a waiver of its claim); *see also RK Co. v. Harvard Scientific Corp.*, No. 99 C 4261, 2007 WL 4150317, at *2 (N.D. Ill. Nov. 16, 2007) (a party waives its claim when it fails to include it in the pretrial order and fails to raise it at trial). BP Amoco failed to mention its declaratory judgment claim during the nine weeks of trial. Instead, BP Amoco reasserted its declaratory judgment claim only after the jury trial and several weeks after the jury's verdict. Rule 59(e) "does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). Accordingly, by failing to pursue its claim in the final pretrial order and at trial, BP Amoco waived its declaratory judgment claim.

Finally, even if BP Amoco did not waive its declaratory judgment claim, the Court would not grant BP Amoco's motion. For the reasons discussed in this opinion, BP Amoco has failed to establish that it is entitled to relief on the jury's verdict. As BP Amoco recognized, "the result [on the declaratory judgment claim] is dictated by the result on the jury verdict." As such, BP Amoco's arguments fail.

**V.      Staying The Judgment**

BP Amoco's request to stay the judgment until the Court rules on these pending post-trial motions is now moot.

**CONCLUSION**

For the reasons discussed above, the Court denies BP Amoco's motion for judgment as a matter of law on the counts that went to trial and for a new trial. The Court denies as moot BP Amoco's request to stay the judgment until the resolution of this motion. In addition, BP Amoco's motion to alter or amend the judgment on its declaratory judgment claim is denied because BP Amoco has waived this claim.

**DATED**: March 25, 2010                    **ENTERED:**

_____
AMY J. ST. EVE
United States District Court Judge